# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                )
                                         )
      Plaintiff,                         )     No. _____
                                         )
      v.                                 )
                                         )
THE CITY OF MINNEAPOLIS,                  )
                                         )
      Defendant.                         )
                                         )
_____  )

## <u>CONSENT DECREE</u>

## TABLE OF CONTENTS

**I. INTRODUCTION** ................................................................................................ **1**

**II. COMMUNITY ENGAGEMENT** ...................................................................... **4**

**III. USE OF FORCE** ............................................................................................... **7**

    A. Use of Force Principles ................................................................................... 7

    B. Requirements Applicable to All Uses of Force ............................................. 8

    C. Weapon-Specific Provisions ........................................................................ 13

        1. Firearms ................................................................................................ 14

        2. Conducted Electrical Weapons (CEWs) ............................................. 14

        3. Oleoresin Capsicum (OC) Spray ........................................................ 16

        4. Chemical Munitions and Impact Projectiles ....................................... 17

    D. Use of Force Reporting, Investigation, and Review .................................... 18

    E. Training ........................................................................................................ 36

    F. Force Investigation Files, Data Collection, Analysis, and Reporting ........... 36

**IV. FAIR AND IMPARTIAL POLICING** .......................................................... **38**

    A. Prohibition on Discrimination ..................................................................... 38

    B. Requiring Fair and Impartial Street Enforcement ....................................... 39

        1. Field Interviews ................................................................................... 39

        2. Investigative Stops .............................................................................. 40

        3. Citations and Arrests ........................................................................... 44

    C. Enforcement Requirements and Priorities ................................................... 47

    D. Training and Supervision ............................................................................. 48

    E. Data Collection, Analysis, and Response .................................................... 48

**V. FIRST AMENDMENT** .................................................................................... **49**

    A. Prohibiting Retaliation for First Amendment-Protected Activity ............... 49

    B. Responding to First Amendment Events ...................................................... 50

        1. Dispersing First Amendment Events ................................................... 51

        2. Force During First Amendment Events ............................................... 53

        3. Arrests During First Amendment Events ............................................. 55

C. Protecting Journalists' Rights to Gather and Report the News, and Protecting Individuals Who Observe and Record Law Enforcement Officers in the Public Discharge of Their Duties ................................................................................................................ 56

D. Public Transparency about MPD's Response to First Amendment Events ..................... 58

E. Training, Supervision and Accountability ........................................................ 59

F. Data Collection .................................................................................... 60

**VI. PEOPLE WITH BEHAVIORAL HEALTH DISABILITIES ........................................... 61**

A. Response to Behavioral Health Related Calls and Related Coordination ...................... 61

B. Dispatching Appropriate Response ................................................................ 63

C. MPD Training and Crisis Intervention ............................................................ 66

D. Enhanced Crisis Intervention Team (CIT) Specialists and Coordinator ........................ 68

E. Quality Assurance ................................................................................. 70

**VII. INTERACTIONS WITH YOUTH ...................................................................... 74**

**VIII. MISCONDUCT AND ACCOUNTABILITY .............................................................. 76**

A. General Principles ................................................................................ 76

B. Complaint Processing Authority ................................................................... 77

C. Staffing and Training ............................................................................. 79

D. Disciplinary Matrix ............................................................................... 80

E. Cooperation & Anti-Retaliation ................................................................... 82

F. Filing a Misconduct Complaint .................................................................... 83

G. Intake of Misconduct Complaints .................................................................. 85

H. Misconduct Complaint Intake Auditing ............................................................. 91

I. Coaching Process .................................................................................. 91

J. Mediation ......................................................................................... 92

K. Misconduct Investigations ........................................................................ 93

L. Criminal Referrals ................................................................................ 98

M. Investigation Review .............................................................................. 99

N. Chief Determination .............................................................................. 100

O. Accountability ................................................................................... 101

P. Civilian Oversight Commission ................................................................... 102

Q. Data, Transparency, and Documentation ................................................... 102

**IX.  POLICY DEVELOPMENT TEAM** ................................................................. **106**

**X. SUPERVISION** .................................................................................................. **109**

A. Duties of Supervisors ........................................................................................ 109

B. Early Intervention System ................................................................................ 112

**XI.  BODY-WORN CAMERAS** ............................................................................ **113**

A. BWC Documentation, Access, and Review ..................................................... 114

B. BWC Policies ...................................................................................................... 115

**XII. TRAINING** .................................................................................................... **115**

A. Training Coordination and Planning ............................................................... 116

B. Field Training Officer Program ........................................................................ 118

**XIII. SECONDARY EMPLOYMENT** .................................................................. **119**

**XIV. PERFORMANCE EVALUATIONS AND PROMOTIONS** ........................... **121**

A. Performance Evaluations .................................................................................. 121

B. Promotions ......................................................................................................... 122

**XV. RECRUITMENT AND HIRING** ................................................................... **123**

**XVI. OFFICER AND EMPLOYEE ASSISTANCE AND SUPPORT** .................... **125**

**XVII. DATA MANAGEMENT** .............................................................................. **127**

**XVIII. IMPLEMENTATION AND MONITORING** ............................................... **127**

A. Implementation .................................................................................................. 127

1. Staffing and Resources to Facilitate Implementation and Compliance ..................... 127

2. Collaboration, Submission, and Approval ....................................................... 128

B. Independent Monitor .......................................................................................... 129

1. Selection .............................................................................................................. 129

2. Term of the Monitor ........................................................................................... 131

3. Fees and Costs ..................................................................................................... 131

4. Compliance Reviews .......................................................................................... 133

5. Annual Implementation Plans ........................................................................... 134

6. Recommendations and Technical Assistance .................................................. 138

7. Comprehensive Assessment and Hearing ........................................................ 138

8. Semiannual Progress Reports ............................................................... 140

9. Communications with the Parties, the Court, and the Public .................................... 142

10. Testimony, Records, and Conflicts of Interest........................................... 143

C. Data Maintenance, Access, and Confidentiality ............................................. 145

D. Court Jurisdiction and Decree Modifications ................................................ 148

E. Partial Termination and Final Termination................................................... 153

1. Partial Termination ...................................................................... 154

2. Final Termination........................................................................ 155

**XIX. DEFINITIONS**.................................................................... **156**

## I.    INTRODUCTION

1.      The United States and the City of Minneapolis ("City") including the Minneapolis Police Department ("MPD"), collectively "the Parties," are committed to effective law enforcement that complies with federal law and the Constitution, treats people with dignity and respect, and promotes public safety.

2.      On June 16, 2023, the United States issued a report detailing its investigation under 34 U.S.C. § 12601 and 42 U.S.C. § 12101 *et seq.* ("Report"). The Report states  there was reasonable cause to believe that the City and MPD engage in a pattern or practice of conduct that deprives people of rights protected by the United States Constitution and federal law. The Report states that: (1) MPD uses excessive force, including unjustified deadly force, in violation of the Fourth Amendment; (2) MPD unlawfully discriminates against Black and Native American people in its enforcement activities; (3) MPD violates the rights of people engaged in protected speech; and (4) MPD and the City violate the Americans with Disabilities Act by discriminating against people with behavioral health disabilities when responding to calls for assistance. The Report also outlined persistent deficiencies in MPD's accountability systems, training, supervision, and officer wellness programs, which contribute to the violations of the Constitution and federal law.

3.      The United States' Complaint, in the above-captioned matter, alleges that the City and MPD are engaged in a pattern or practice of conduct that deprives people of their rights under the First and Fourth Amendments to the United States Constitution. This Consent Decree ("Decree") is effectuated pursuant to the authority granted to the United States under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Omnibus Crime Control and Safe Streets

Act of 1968, 34 U.S.C. § 10228; and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12134.

4.     The Parties recognize that constitutional and effective policing are interdependent and rely on a strong partnership between MPD and the community it serves. So that the reforms embodied in this Decree are responsive to community concerns, the United States consulted extensively with community leaders, police officers, residents, and others who offered meaningful recommendations and insights on reform.

5.     The City and MPD do not concede the allegations in the Report or the claims in the Complaint. However, while the City does not concede that there is a pattern or practice of unlawful behavior, the City agrees that the United States' Report raises issues of great importance to the City, MPD, and the community, and the Parties engaged in good faith negotiations to resolve this matter to avoid the time and expense of taxpayer-funded litigation.

6.     The Parties acknowledge and agree that this Decree does not constitute an admission for purposes of liability or otherwise by the City or MPD, or their current or former officials, officers, employees, agents, representatives, assigns, or their successors (collectively, "Released Parties"). By agreeing to this Decree, the Released Parties are not waiving any rights or defenses as it relates to the United States' Complaint or to any future actions. The Parties have agreed to the terms of this Decree to avoid the risks, expense, and burdens of litigation and to resolve voluntarily the claims in the United States' Complaint. This Paragraph survives the termination of this Decree.

7.     This Decree resolves all claims in the United States' Complaint filed in this case. This Decree also constitutes a full and complete settlement and release of any and all civil claims the United States may have, whether such claims are known or unknown, as of the Effective

Date (as provided in Paragraph 15), against the Released Parties regarding any alleged pattern or practice of unconstitutional or unlawful conduct of the Released Parties, and any claims regarding any individual instances of alleged unlawful conduct by the Released Parties, of the type or nature addressed in the Report or the Complaint. This release does not include unrelated claims, known or unknown to the United States, including those involving the City's or MPD's compliance with the Americans with Disabilities Act. This Paragraph survives the termination of this Decree.

8.      Compliance with this Decree, as described more fully below, will result in the termination of the Decree and a dismissal of the Complaint. The Parties agree that the goal statements in this Decree are not enforceable obligations but set forth the Parties' goals for the enforceable provisions that follow.

9.      The United States recognizes that the City and MPD have already begun the critical work of implementing important reforms to improve public safety and community trust in the City and MPD. Furthermore, the United States acknowledges that the City and MPD may already have taken steps to comply with certain requirements of this Decree. The fact that a requirement appears in this Decree is not an indication that the City and MPD have not already complied or partially complied with the requirement, and the Parties have not undertaken to identify in this Decree whether the City's or MPD's current or past policies, procedures, or practices are consistent with its requirements.

10.     The United States acknowledges that the City and MPD have entered into a Settlement Agreement and Order with the Minnesota Department of Human Rights, No. 27-CV-23-4177 (4th Dist. Ct., Minn., entered July 13, 2023) ("State Court Agreement"). If a requirement of this Decree conflicts with the State Court Agreement (or the State Court's or

Monitor's interpretation of the State Court Agreement), such that compliance with the State Court Agreement and this Decree is not possible, the Parties shall implement the requirements of this Decree notwithstanding the conflicting requirement of the State Court Agreement.

11.    Nothing in this Agreement requires the MPD and City to violate or act inconsistently with the Minnesota Government Data Practices Act.

12.    Should any provision of this Decree be declared or determined by any federal court of competent jurisdiction to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions will not be affected. The Parties will not, individually or in combination with one another, seek to have any federal court of competent jurisdiction declare or determine that any provision of this Decree is invalid or terminated other than through the modification or termination provisions set forth in this Decree or any related appeal.

13.    Failure by either Party to enforce this entire Decree or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver, including of any right to enforce other deadlines and provisions of this Decree.

14.    This Decree may be executed in multiple counterparts, which will be construed together as if one instrument. The Parties will be entitled to rely on an electronic copy of a signature as if it were an original.

15.    This Decree is effective upon the date it is approved and so ordered by the Court ("Effective Date").

## II.    COMMUNITY ENGAGEMENT

16.    MPD will integrate community-oriented and problem-oriented policing principles—strategies that emphasize collaboration between police and the community to address

crime—into its policies and procedures, recruitment, training, personnel evaluations, resource deployment, and tactics.

17.    On an annual basis, MPD will provide training on community policing and problem-oriented policing methods and skills for all officers, including Supervisors, that shall include:

    a.    Strategies and tactics to improve public safety and crime prevention through community engagement, including how to establish partnerships with community organizations, how to work with communities to set public safety and crime prevention priorities, and how to create opportunities for positive interactions with, among others, Youth, LGBTQIA+, homeless, and mental health organizations and communities;

    b.    Scenario-based training that promotes the development and strengthening of partnerships between the police and the community;

    c.    Leadership, ethics, and interpersonal skills;

    d.    Problem-oriented policing tactics;

    e.    Principles of procedural justice and its goals;

    f.    Conflict resolution, including verbal de-escalation of conflict;

    g.    Cultural awareness and sensitivity training that addresses the history and culture of Minneapolis's communities, including the relationship with law enforcement; and

    h.    Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination.

18.     MPD will take concrete steps to encourage patrol officers to be familiar with the geographic areas they serve, including the geographic area's issues, problems, and community leaders; engage in problem identification and problem solving activities with the community members around the community's priorities; and work proactively to attempt to address quality-of-life issues in a manner that minimizes Stops, Citations, Searches, Arrests, and Uses of Force consistent with the requirements of this Decree. MPD will effectively provide officers with information regarding, and opportunities to gain familiarity with, the communities they serve, including their assets and challenges, relevant history, community groups and leaders, and business, residential, and demographic profiles. MPD will Require that Supervisors identify and recognize positive efforts by officers to engage with the communities they serve.

19.     Before issuing new or substantially revised policies related to the requirements of the Use of Force, Fair and Impartial Policing, and First Amendment Sections of this Decree, MPD will provide public notice and publish a draft of the policies on its webpage, which shall be available in English, Spanish, Somali, and Hmong, for at least 45 calendar days. MPD will allow the public to submit written comments via its webpage. MPD will review and consider all public comments before submitting the policies to the United States for feedback and the Monitor for approval. For policies required by this Decree, other than those listed in this Paragraph, MPD shall facilitate community engagement pursuant to Paragraph 296.

20.     MPD may make changes to the policies identified in Paragraph 19 without completing community engagement as required by Paragraph 19 if such changes are required by law, are *de minimis,* or are required by the Minnesota Board of Peace Officer Standards and Training.

21.     MPD may make changes to the policies identified in Paragraph 19 prior to completing community engagement as required by Paragraph 19 if such changes are necessary to respond to an urgent situation and the changes do not otherwise violate this Decree, so long as MPD completes the community engagement process at the earliest feasible time.

## III.     USE OF FORCE

### A.     Use of Force Principles

22.     MPD shall Require that, when officers use force, they comply with the United States Constitution, state and federal law, and this Decree.

23.     MPD shall investigate and review Reportable Force incidents in accordance with this Decree to determine whether officers' force was consistent with MPD Policy. Where concerns about Policy, training, tactics, or supervision are involved, MPD shall take timely and appropriate corrective action.

24.     MPD shall Require that officers:

a.   Promote the sanctity of human life as the highest priority in their activities;

b.   Carry out their law enforcement duties with professionalism and respect for the dignity of every person;

c.   Do not allow race, gender, ethnicity, or any other characteristic protected under Minnesota or federal law to influence any decision to use force, including the amount or type of force used;

d.   Resolve incidents without using force where possible, and use only force that (i) is objectively reasonable, (ii) is an amount and type of force necessary to effect an arrest or protect the officer or another person, (iii) avoids unnecessary injury or risk of injury to officers and others, and (iv) is proportional to the threat;

e.  Use de-escalation to minimize the need to use force and increase the likelihood of voluntary compliance;

f.  Do not unnecessarily escalate an encounter and thereby create a need to use force;

g.  Continually assess the situation and modulate the use of force appropriately, including ending the use of force as soon as the threat subsides or the person is restrained;

h.  Accurately, timely, and completely report all Reportable Force used or observed;

i.  Do not retaliate or threaten to retaliate against other officers for reporting force used or observed or for intervening to stop an officer from using force that violates Policy;

j.  Are held accountable for uses of force that violate Policy; and

k.  Before using force, identify themselves as a police officer and, when feasible, warn of their intent to use force and allow adequate time for the person to comply.

**B.    Requirements Applicable to All Uses of Force**

25.    MPD shall develop and implement clear and comprehensive use of force Policies that reflect the provisions of this Decree and federal and Minnesota law. MPD's Use of Force Policies shall clearly define and describe each force option and the circumstances under which use of such force is appropriate.

26.    MPD shall Require that, before using force against a person, officers consider, to the extent possible, the person's age, size, and whether the person may be noncompliant due to physical condition, impairment, disability, behavioral health issue, or language barrier.

27.    MPD shall Require that each strike, deployment, or use of a weapon be objectively reasonable, necessary, and proportional under the totality of the circumstances.

28. MPD shall Prohibit officers from beginning a foot pursuit solely because a person flees upon seeing an officer. MPD shall develop and implement a foot pursuit Policy requiring officers to evaluate the risks the person poses to public safety and the risks of the pursuit itself. MPD shall Require that officers avoid unnecessary force during, or at the conclusion of, a foot pursuit and that officers keep members of the public and officers safe.

29. MPD shall Require that officers use only the force techniques and weapons for which the officer is trained and/or certified. Officers shall use improvised weapons only where officers lack an approved less-lethal alternative and where the use of an improvised weapon is reasonable and necessary.

30. MPD shall Prohibit the use of neck restraints and choke holds, as defined in Minn. Stat. § 609.06.

31. MPD shall Require that officers who carry a firearm also carry, on their person at all times while on duty, at least one less-lethal weapon that they have been trained on and are certified to use, whether in uniform or while working in a plainclothes capacity. Officers who are working undercover or whose role is in an administrative or investigative capacity, unless such duties routinely involve conducting Stops, Searches, or Arrests, are exempted from this requirement.

32. MPD shall develop and implement use of force policies that categorize force into three levels for the purposes of reporting, investigating, and review. These levels shall be based on the following factors: potential to cause injury or disability; degree of actual injury or disability; duration of force; and potential for abuse or misuse of the weapon or force. Each level of force shall Require reporting, investigation, and review, as set forth in Section D.

a. **Level 1 Reportable Force involves** (1) low levels of force that are reasonably expected to cause transient pain but do not result in injury or complaint of injury, or (2) the display and pointing of certain weapons. An escort, touch, or handcuffing of a person with minimal or no resistance is not a Level 1 Reportable Force. Types of Level 1 Reportable Force include:

    i. Displaying a firearm when engaged with any subject;

    ii. Pointing a firearm at an individual;

    iii. Pointing a less-lethal launcher when engaged with a subject;

    iv. Pointing a CEW, using a CEW to conduct a warning arc, or laser painting with a CEW, when engaged with a subject;

    v. Pointing a chemical aerosol when engaged with a subject;

    vi. Pressure point compliance techniques;

    vii. Joint manipulation techniques (e.g., wristlocks, armbars);

    viii. Weaponless defense techniques (e.g., push-aways, holds);

    ix. Body weight to pin;

    x. Control pressure;

    xi. Authorized or improvised tool to push a subject without striking; and

    xii. Any other use of force that does not rise to Level 2 Reportable Force or Level 3 Reportable Force.

b. **Level 2 Reportable Force** involves the use of an Intermediate Weapon, weaponless strikes in specific situations, or force that causes injury or complaint of injury but does not rise to Level 3 Reportable Force. Types of Level 2 Reportable Force include:

    i.    Discharge of a chemical aerosol;

    ii.    Deployment of a CEW or application of a CEW in drive-stun mode;

    iii.    Weaponless strikes, other than strikes to the head or neck;

    iv.    Impact weapon strikes (including improvised impact weapon strikes) to any part of the body, other than the head, neck, sternum, spine, groin, or kidney area;

    v.    Impact munition use (40mm or handheld);

    vi.    Chemical munition use;

    vii.    Flash/sound diversionary device ("FSDD") use;

    viii.    Takedowns (including leg sweeps and vehicle extractions to the ground);

    ix.    Physical apprehension by a canine, except those that would otherwise constitute Level 3 Reportable Force;

    x.    Maximal restraint device use;

    xi.    Use of any other Intermediate Weapon;

    xii.    An escort, touch, handcuff, or other action that results in an injury or complaint of injury; and

    xiii.    Any use of force by an MPD officer that results in injury, including aggravation of a preexisting injury or complaint of an injury, except Level 3 Reportable Force.

c.  **Level 3 Reportable Force** involves (1) weaponless strikes to the head, throat, or neck near a hard surface; (2) force that results in admission to the hospital, or (3) any force that constitutes deadly force. Types of Level 3 Reportable Force include:

i.    Deadly force, including but not limited to, neck restraints and choke holds, as defined in Minn. Stat. § 609.06;

ii.    Using an impact weapon (including an improvised impact weapon) to strike a person's head, neck, sternum, spine, groin, or kidney area;

iii.    Punches or slaps to the head if the person's head is near a hard surface;

iv.    Knee strikes or kicks to the head or neck;

v.    Weaponless strikes to the throat;

vi.    Force resulting in loss of consciousness, or substantial bodily harm or greater; and

vii.    Three or more total instances of CEW energizing or energizing for more than 15 seconds at a time.

33.    MPD shall Require that, regardless of tenure or rank, any officer who observes another MPD officer using force in a manner that they reasonably believe amounts to any Prohibited, inappropriate, and/or unreasonable force, as detailed in this Decree and in MPD Policy, must attempt to safely intervene by verbal and physical means. MPD Policy shall Require that if officers do not do so, they may be subject to discipline to the same severity as if they had engaged in the Prohibited use of force. MPD shall develop and implement a peer intervention program through which it empowers and supports officers in their duty to intervene.

34.    MPD shall Require that officers do not use force against a restrained person, except when reasonable to gain or maintain control, and lesser means, including de-escalation, would be ineffective or have already failed.

35.    MPD shall Require that officers promptly render or obtain, as appropriate, any necessary emergency medical care whenever a person is injured, complains of injury, or requests

medical attention, consistent with their training and experience, as soon as the officer can safely do so, and until professional medical care providers can take over.

36.     MPD shall develop and implement specific Protocols regarding officers' duty of care following an arrest or use of force, the risks of asphyxia, requirements to care for persons while in MPD custody, requirements to inform medical personnel of the circumstances of the injury or illness, and requirements to arrange for appropriate medical evaluation while in MPD custody.

37.     MPD shall develop and implement Policies and Procedures to provide timely and accurate information to the public about a use of force that results in death or great bodily harm (as defined in Minnesota law), which may include releasing body-worn camera footage, consistent with Minnesota law. The Policies and Procedures will include taking into account the protection of the integrity of law enforcement investigations, privacy interests of members of the public, safety of witnesses, and identities of confidential sources.

38.      MPD's Policies shall state that a use of force that violates law may subject officers to criminal prosecution and/or civil liability.

### C.     Weapon-Specific Provisions

39.     MPD shall Require that officers carry and use only MPD-issued or MPD-approved weapons, except as provided in Paragraph 29 above.

40.     MPD shall develop and implement weapon-specific Policies for the use of each type of weapon. These Policies shall clearly describe the proper use of each weapon; the circumstances under which the weapon's use is appropriate; and the officer training and certification requirements for each weapon. The training and certification requirements may be provided in an appendix to the Policies. These Policies shall incorporate the principles stated in Paragraphs 22–24 and the requirements below.

### 1.    *Firearms*

41.    MPD shall Require that officers do not:

    a.    Unholster and display a firearm, by holding or pointing it, unless there is an objectively reasonable belief that Lethal Force may become necessary;

    b.    Use a firearm before identifying themselves as a police officer and stating their intention to use Lethal Force, unless such actions are not feasible;

    c.    Fire warning shots when the target is not in the officer's sight;

    d.    Fire at moving vehicles or the driver of a moving vehicle, except (1) to counter an imminent threat of death or serious physical injury to the officer or another person, by a person in the vehicle, other than the vehicle itself, (2) to counter a situation where the officer or others are unavoidably in the path of the vehicle and cannot move safely, or (3) in the extreme case of a "vehicle ramming attack," where a vehicle is being used as a weapon to target people to cause great bodily harm or death. Officers should avoid positioning themselves in the path of a moving vehicle; or

    e.    Fire at a person whose actions present a threat only to that person.

### 2.    *Conducted Electrical Weapons (CEWs)*

42.    MPD shall Require that officers keep CEWs in a weak-side holster.

43.    MPD shall Require that officers Discharge CEWs only where grounds for arrest or detention are present, and Discharge is necessary to protect the officer or any person from imminent physical harm if lesser means, including de-escalation, would be ineffective or have already failed.

44.    MPD shall Require that officers warn the person and other officers prior to Discharging a CEW, when feasible, and announce to other officers that they are Discharging a CEW.

45.    Each application (in probe, darts, or drive-stun mode) or standard cycle (five seconds) of a CEW is a separate use of force, and MPD shall Require that each application or cycle is (i) objectively reasonable, (ii) is an amount and type of force necessary to effect an arrest or protect the officer or another person, (iii) avoids unnecessary injury or risk of injury to officers and others, and (iv) is proportional to the threat. MPD shall Require that officers give the person a reasonable opportunity to comply prior to applying another cycle.

46.    MPD shall Require that officers do not deploy more than three cycles or 15 total seconds of a CEW against a person during a single incident unless Lethal Force is justified. MPD shall Require that officers report the justification for each application or cycle in their use of force reports. MPD shall Require officers to consider alternatives, including de-escalation, if the CEW is ineffective.

47.    MPD shall Require that officers do not Discharge or activate CEWs:

a.    In drive-stun mode solely for pain compliance. Officers may Discharge CEWs in drive-stun mode only to supplement the probe deployment to complete the incapacitation circuit, or to gain separation between the officer and the person so that officers can consider another force option;

b.    To target the face, head, neck, breasts, chest, or groin, but should instead target the lower center mass (except where Lethal Force is justified);

c.    By intentionally using more than one CEW at a time against a person;

d. Against a person who flees, unless there is probable cause to believe the person has committed a serious or violent crime or poses a significant threat of physical injury or death to the officer or a significant risk of committing another imminent violent felony. MPD shall Prohibit flight from being the sole reason for applying a CEW on a person;

e. When it is reasonably evident that a Discharge may cause serious physical injury or death, including if the person may fall from a significant height onto a hard surface or sharp object, drown, if the person is in physical control of or may fall from a moving vehicle, or if the person has been exposed to a flammable substance (except where Lethal Force is justified);

f. On a person who a reasonable officer should recognize is pregnant, infirm, elderly, visibly frail, or has low body mass (except where Lethal Force is justified);

g. On a person only because they are exhibiting signs of a mental or behavioral health crisis; and

h. On a person the officer knows to be a small child, except as provided by Paragraph 216.

### 3.   *Oleoresin Capsicum (OC) Spray*

48.    MPD shall train officers on protocols regarding officers' responsibilities following OC Spray use, including minimizing exposure of non-targeted persons and providing aid to exposed persons.

49.    Other than when using OC Spray to disperse a First Amendment Event, which is governed by Section V.B.2, MPD shall Require that officers do not use OC Spray to disperse

16

crowds unless persons within those crowds are committing acts that endanger officer or public safety, and there are no less intrusive force options that would resolve the threat. Where OC Spray is intended to be used on a specific person(s) in a crowd, MPD shall Require that officers direct the spray only at the person(s) who endangers officer or public safety.

50.     MPD shall Require that officers, whenever feasible and reasonable, issue a verbal warning to the person on whom they are intending to use OC Spray and allow a reasonable amount of time to allow the person to comply before using OC Spray.

51.     MPD shall Require that officers do not use OC Spray on a person in a car, unless the person presents an imminent threat of physical harm to the officers or others, and other attempts to address the threat have been unsuccessful. MPD shall Require officers to consider whether incapacitating the driver with OC Spray poses risks to passengers or others nearby. MPD shall Require that, if officers use OC Spray on a person in a car, officers allow available air circulation and should consider whether there are others nearby or passengers in the vehicle who could be adversely affected.

### 4.    *Chemical Munitions and Impact Projectiles*

52.     MPD shall Require that officers are trained on Protocols regarding their responsibilities following chemical munition and impact projectile use, including minimizing exposure of non-targeted persons and providing aid to affected persons.

53.     MPD shall issue less-lethal Impact Projectile launchers and munitions only to members trained and certified in their use and expressly authorized to carry those tools in their assignment.

54.     MPD shall implement a Policy for 40 mm weapons governing pointing, red-dotting, and use, consistent with the goals of the Use of Force Policy.

**D.    Use of Force Reporting, Investigation, and Review**

55.    MPD shall create a Force Review Board ("FRB") to provide executive-level review of certain force incidents. The FRB will be chaired by the Police Chief, or the Chief's designee at the level of Deputy Chief or above, or Chief of Staff if they are sworn, and will include, at a minimum, the Deputy Chiefs of Patrol and Professional Standards, and MPD employees responsible for overseeing policy development, policy implementation, training, and Misconduct investigations. The Police Chief may include additional individuals as members of the FRB, including ad hoc members.

56.    MPD shall Require that the Chief of Police and command staff meet quarterly in a Force Trend Analysis ("FTA") meeting to review citywide and precinct-level data regarding reportable Uses of Force to:

    a.    Assess the relative frequency and type of force used by MPD officers against persons in specific demographic categories, including race and/or ethnicity, gender, age, or perceived or known disability status;

    b.    Identify and address any trends that warrant changes to policy, training, tactics, equipment, or MPD practice;

    c.    Review any recommendations by the FRB identifying a need for improvements in training, counseling, or correction for MPD as a whole;

    d.    Review recent discipline decisions involving use of force or lack of de-escalation;

    e.    Make appropriate recommendations to minimize:

        i.    The need to use force;

        ii.    Officer and civilian injuries and deaths in force incidents;

        iii.    Discrimination and disparate impact in the use of force;

      f.   Monitor and follow-up as to FTA recommendations.

57.    MPD shall create a Force Investigation Team ("FIT") to review certain uses of Reportable Force. FIT investigators shall be at the rank of sergeant or above. The FIT may include civilians to assist, so long as they have the necessary training.

58.    MPD shall Require that all precinct or unit Supervisors have adequate training and guidance to complete timely, thorough, and accurate force reviews consistent with the requirements of this Decree. MPD shall Require that all members of the FIT and the FRB have adequate training and guidance, including annual refresher training, to complete timely, thorough, and accurate force investigations and force reviews consistent with the requirements of this Decree. MPD shall create a training curriculum and procedural manual for the FIT and FRB, which shall be updated at reasonable intervals and shall include, at a minimum:

    a.   Clear statements of the FIT's and FRB's mission and authority;

    b.   Relevant references to the law, this Decree, and Policy related to the use of force; stops, searches, and arrests; the duty to intervene; the duty to render medical aid; fair and impartial policing; First Amendment-protected activity; interactions with Journalists; and interactions with people with behavioral health disabilities;

    c.   All relevant Procedures and Protocols for conducting investigations and reviews of uses of Reportable Force, as outlined in this Decree and Policy.

59.    MPD shall Require that officers notify an uninvolved Supervisor immediately, or as soon as practicable, following any use of Reportable Force. If another Supervisor is unavailable citywide within a reasonable period of time, officers may notify a Supervisor who witnessed the Reportable Force (but did not participate), after documenting the efforts made to request another Supervisor at the scene. MPD shall Require that, for scenes with multiple

officers who used or witnessed Reportable Force, each officer is responsible to notify the Supervisor of the Reportable Force they used or witnessed. MPD shall Require that, when an incident involves multiple types of Reportable Force or multiple officers, the entire incident must be reported at the highest level of Reportable Force used by any officer during the incident.

60.     MPD shall Require that officers who used Reportable Force ("involved officers") and officers who witnessed Reportable Force ("witness officers") submit use of force written reports for Reportable Force as soon as practicable and before the officer is relieved of their shift. The report submission requirement may be extended for extenuating circumstances, such as when an officer is injured and must leave work to obtain medical attention, in which case MPD shall Require the officer to submit a written report as soon as the extenuating circumstances allow.

61.     MPD shall Require that officers do not use only conclusory statements, boilerplate, or canned language (e.g., "furtive movement," "fighting stance," "characteristics of an armed person") in Reportable Force documentation.

62.     MPD shall Require that written Use of Force reports document the reason for the initial police presence; describe every type of Reportable Force used; and for each use of Reportable Force, the circumstances that led to the use of force, the subject's level and type of resistance, and the subject's perceived or known race and ethnicity, age, gender or the perceived or known presence of a disability. MPD shall Require that for uses of Level 2 or Level 3 Reportable Force, the officer's use of force report must also include, to the extent known or observed, a detailed narrative account of the incident, including:

    a.  A detailed description of the subject factors observed by the officer;

    b.  Whether the subject was engaged in First Amendment-Protected Activity;

20

c. Any perceived or known behavioral health challenge;

d. The subject's alleged crime(s);

e. Whether the subject posed an imminent threat to the public if not apprehended;

f. Any threat the subject posed to the officer or any other person before the use of Reportable Force;

g. The force and de-escalation options considered by the officer;

h. Any de-escalation techniques used;

i. An account of all injuries and a description of any aid rendered to injured persons;

j. The presence and location of witnesses; and

k. For officers who witnessed the force, whether the officer believed they were required to intervene and any actions the officer took to do so.

63. MPD shall Require that whenever any officer discharges a firearm, the officer shall provide a Public Safety Statement to their Supervisor as soon as possible. MPD shall Require that no officer who discharged a firearm may leave the scene until giving their Public Safety Statement, unless the officer must leave to receive emergency medical care. The Public Safety Statement must include the following information:

a. The direction and approximate number of shots fired by the officer and suspect(s);

b. The location of any unsecured weapons;

c. A description of any non-apprehended suspects and their direction of travel, time elapsed since suspect(s) were last seen, and any weapon(s) that were available to them;

d. A description and the location of any known injured persons or witnesses;

21

e.   Details to enable the primary responders or investigators to secure the scene, such as the description and location of the crime scene and any known evidence; and

f.   Any other information relevant to providing officer and public safety, and to assisting in apprehending outstanding suspects.

64.   MPD shall Require that when the Supervisor is notified of any use of Reportable Force, the Supervisor must determine, based on Policy and the facts then known, the level at which the use of force should be categorized. A Supervisor may opt for a higher-level response than would usually be required for the level of the force used, depending on the circumstances of the incident. MPD shall Require that when an incident involves multiple types of force or multiple officers, the entire incident will be categorized at the highest level of Reportable Force used by any officer during the incident. MPD shall Require that the Supervisor immediately notify the FIT of any Level 3 Reportable Force.

65.   MPD shall Require that the Supervisor who responds to the scene must hold a permanent rank of Sergeant or higher.

66.   MPD Supervisors are not required to respond to the scene of a Level 1 Reportable Force but may do so. MPD shall Require that, if a Supervisor is notified of or responds to a Level 1 Reportable Force and feels that the use of force needs further review, that Supervisor shall conduct the Supervisor Force Review Response (as detailed in Paragraph 70).

67.   For a Level 2 Reportable Force, MPD shall Require that the Supervisor respond to the scene and conduct the Supervisor Force Review Response (as detailed in Paragraph 70), unless the Supervisor has determined that the circumstances require a FIT response, in which case the Supervisor shall immediately notify the FIT and take direction from the FIT.

68.     For a Level 3 Reportable Force, MPD shall Require that the Supervisor respond to the scene and conduct the Supervisor Force Support Response (as detailed in Paragraph 71), in support of the FIT investigation, and shall Require that the Supervisor promptly submit all evidence and documentation from their on-scene response to the FIT.

69.     For a Level 3 Reportable Force, MPD shall Require that the FIT respond to the scene and conduct a FIT investigation.

70.     MPD shall Require that the on-scene Supervisor duties in a Supervisor Force Review Response must be to:

a.  Take reasonable steps to render or obtain any necessary emergency medical care for persons at the scene who are injured, complain of injury, or require medical attention, consistent with their training and experience, as soon as they can safely do so, and until professional medical care providers can take over;

b.  Identify witnesses to the use of Reportable Force, to the extent reasonably possible, including known witnesses and/or witnesses who consent to be identified and/or interviewed, and document their identities;

c.  Identify the MPD officer(s) on scene during the incident;

d.  Debrief the MPD officer(s) who engaged in the use of Reportable Force. The Supervisor must debrief the officer(s) individually;

e.  Debrief the MPD officer(s) who witnessed the use of Reportable Force. The Supervisor must debrief the employee(s) individually;

f.  Interview the subject of the Reportable Force, if they consent. The Supervisor shall not detain a person further for the purpose of the force review, and they shall

advise the person(s) that they are free to leave once any legal authority for detention ends;

g.  Interview any witnesses to the Reportable Force who are not MPD employees, if they consent. The Supervisor shall advise the person(s) that they are free to leave once any legal authority for detention ends;

h.  Require that all MPD camera footage (including body-worn camera ("BWC") footage, in-car camera footage, surveillance footage, and/or facility footage) is preserved;

i.  Gather and preserve any relevant video evidence from other available sources, which may include closed-circuit television footage, private or public surveillance, cell phone footage, broadcast, and online footage;

j.  Visually inspect and photograph the person(s) subjected to the use of Reportable Force and involved officers, and document any injuries observed or reported;

k.  Photograph the scene to accurately depict conditions and to identify relevant evidence to be collected, such as forensic evidence;

l.  Gather and preserve any other evidence related to the use of Reportable Force; and

m.  Make notifications as required by Policy.

71.  MPD shall Require that the on-scene Supervisor, in a Supervisor Force Support Response and in support of the FIT investigation, must:

a.  Take reasonable steps to render or obtain any necessary emergency medical care for persons at the scene who are injured, complain of injury, or require medical

attention, consistent with their training and experience, as soon as they can safely do so, and until professional medical care providers can take over;

b. Identify the MPD officers on scene during the incident. This includes identifying which officers were involved in the use of Reportable Force, which employees were witnesses to the use of force, and which employees were otherwise on scene. The Supervisor shall separate any involved officers and witness officers for the FIT investigation;

c. Identify witnesses to the use of Reportable Force to the extent reasonably possible, including known witnesses and/or witnesses who consent to be identified and/or interviewed, document their identities, and separate them if at all possible;

d. Require that all officers on scene continue operation of their body-worn cameras and do not mute their camera microphones, unless directed otherwise by the FIT investigators;

e. If the subject of the Reportable Force or any witnesses who are not MPD officers do not consent to remain on scene for the FIT interview, the Supervisor shall consult with the FIT for further direction. The Supervisor shall not detain a person further for the purpose of the force review, and they shall advise the person(s) that they are free to leave once any legal authority for detention ends;

f. Take appropriate steps to secure and maintain the integrity of the scene.

72.    MPD shall Require that, before leaving the scene of a use of Reportable Force that requires a FIT Investigation under this Decree, other than the Critical Incidents described in Paragraph 74, the FIT shall, at a minimum, take the following steps to secure relevant evidence:

a.  Visually inspect and photograph the person(s) subjected to the use of Reportable Force and involved officers and document any injuries observed or reported;

b.  Conduct debriefings, conduct interviews and obtain individual statements about the use of Reportable Force, as detailed in Paragraph 73;

c.  Take necessary steps to preserve relevant MPD camera footage (including body-worn camera footage, in-car camera footage, surveillance footage, or facility footage);

d.  Gather and preserve any relevant video evidence from other available sources, which may include closed-circuit television footage, private or public surveillance, cell phone footage, broadcast, and online footage;

e.  Visually inspect and photograph the person(s) subjected to the use of Reportable Force and involved officers and document any injuries observed or reported;

f.  Photograph the scene to accurately depict conditions and to identify relevant evidence to be collected, such as forensic evidence. For Level 3 Reportable Force, promptly arrange for a crime lab technician to process and document the scene;

g.  Gather and preserve any other evidence related to the use of Reportable Force; and

h.  Make notifications as required by Policy, including immediate notification to MPD's Internal Affairs Division ("IAD") if there is evidence of officer misconduct or criminal conduct by the officer.

73.    MPD shall Require that, when investigating Level 3 Reportable Force (other than Critical Incidents, described in Paragraph 74) and debriefing MPD officers who used or

witnessed Reportable Force, interviewing civilian witnesses of Reportable Force, or interviewing the person(s) subjected to Reportable Force, the FIT shall adhere to the following requirements:

a. FIT investigators shall use trauma-informed interview techniques;

b. When debriefing, conducting interviews, or taking statements, FIT investigators shall avoid using leading questions that suggest legal justifications for the officers' conduct;

c. FIT investigators shall not detain a person further for the purpose of the force review, and they shall advise the person(s) that they are free to leave once any legal authority for detention ends;

d. Each civilian witness shall be interviewed separately and outside the presence of any other witness. If a civilian witness refuses to be interviewed, that refusal shall be documented on video unless not feasible, and that documentation, whether written or on camera, shall occur outside the presence of any other witness;

e. The FIT shall use MPD-issued equipment to video-record all debriefing and interviews;

f. When requesting an interview with the person(s) subjected to the use of Reportable Force, FIT investigators shall inform that person that the purpose of the interview is to determine circumstances surrounding the use of Reportable Force;

g. The FIT shall Require that all involved officers and witness officers are separated from and do not communicate with one another or with any civilian or officer witnesses until after they are debriefed individually. MPD shall Require that, after an involved officer or witness officer has been debriefed, they do not discuss the

case with any other involved officer, witness officer, or civilian witness who has not yet been debriefed or interviewed; and

h.  The FIT shall individually debrief each involved officer and witness officer and record that debriefing. These debriefings shall take place before the officers are relieved from their shifts, unless an officer is incapacitated and unable to be debriefed.

74.    MPD shall create effective Protocols for the Supervisor and the FIT to coordinate with an outside criminal investigating agency in a Level 3 Reportable Force incident that is a Critical Incident so that any response and investigative steps the Supervisor and FIT take do not hamper the criminal investigation. For any Level 3 Reportable Force incident not subject to an outside agency's criminal investigation of an MPD officer's use of force, the FIT shall conduct the investigative duties in Paragraphs 72 and 73.

75.    MPD shall Require the following for Supervisor Force Review Responses:

a.  When a designated precinct or unit Supervisor conducts a Supervisor Force Review Response, the Supervisor shall complete a written review ("Supervisor Review") prior to the end of their shift.  In the Supervisor Review, the Supervisor shall document the steps they took to conduct their Supervisor Review and assess whether the use of Reportable Force complied with Policy and the reasons for that assessment, citing to relevant evidence.

b.  The Supervisor shall submit the completed Supervisor Review to the Secondary Reviewer. The Secondary Reviewer shall be a higher rank than the Supervisor who responded and any involved officer or witness officer. The Secondary

Reviewer shall conduct a review ("Secondary Review") within 5 days of receiving the Supervisor Review, and make assessments of:

    i.   Whether the Supervisor Review was timely, thorough, and complete;

    ii.  Whether the Supervisor's assessments regarding the Reportable Force are consistent with Policy;

    iii. Whether there are tactical, equipment, policy, or other considerations that should be addressed.

c.   Upon completion, the Secondary Reviewer shall submit the Secondary Review to the FIT.

76.    MPD shall Require the following for FIT reviews:

a.   MPD will Require that the FIT review a sample of Level 1 Reportable Force reports, assess whether the use of Reportable Force complied with Policy, and the reasons for that assessment, citing to relevant evidence. The City shall propose the sampling methodology subject to approval by the Monitor. The FIT shall compile the sample of Level 1 Reportable Force reports for review by the FRB. The FIT shall also compile all Level 2 Reportable Force materials for the FRB.

b.   The FIT shall conduct a review ("Quality Assurance Review") of all Supervisor Reviews and Secondary Reviews to confirm the reviews were consistent with Policy review requirements, confirm the assessments made in the Supervisor Reviews and Secondary Reviews, and confirm that any recommendations made by the Secondary Reviewer were sufficient.

c.   For all Level 3 Reportable Force, the FIT shall complete a written review of the use of Reportable Force, supported by appropriate citations to evidence ("FIT

Review"). Unless an extension is authorized by the FIT commander, the FIT shall complete the FIT Review and submit it to the FIT commander within 30 days of the use of Level 3 Reportable Force. The FIT Review shall include:

i.    Whether the uses of Reportable Force complied with Policy and the basis for that assessment, along with a detailed narrative description of the incident;

ii.    For each use of Reportable Force, a description of any injuries, the nature of any resistance preceding each use of Reportable Force, any de-escalation techniques used prior to each use of Reportable Force, and any medical aid rendered;

iii.    Documentation of all actions taken by the Supervisor who responded to the scene;

iv.    Documentation of all evidence that the initial responding Supervisor and the FIT gathered and/or reviewed related to the investigation, including contact information for witnesses. If there are no known witnesses, the report shall specifically state this fact. If witnesses were present but circumstances prevented FIT personnel from obtaining complete contact information, the FIT shall state the reasons why the witnesses were unavailable and detail steps made to locate them;

v.    Identification of any material inconsistencies in the evidence or witness statements and police reports, and how the investigator considered them in forming an assessment;

vi.    An assessment of any potential Policy violations;

vii.    Any potential Policy violations that FIT referred to IAD;

viii.    Whenever the FIT assesses that a use of Reportable Force did not comply with Policy; an assessment as to whether each officer present during the use of Reportable Force had an opportunity to intervene; and if so, whether the officer took any action to intervene, whether the officer provided medical aid, and an assessment as to whether any officer failed to meet their obligation to intervene;

ix.    With respect to each use of Reportable Force, an assessment as to whether the officer who used force used sufficient de-escalation techniques or had other viable non-force options; whether the officer escalated the situation or otherwise contributed to circumstances that led to the use of force; and whether there were any other means by which the use of force could have been avoided;

x.    Regardless of whether an officer's use of Reportable Force violated Policy, an assessment of whether the incident raises a need for additional training, counseling, or correction for any officer or for MPD as a whole;

xi.    A complete account of each involved officer's relevant training  including documentation of the officer's certification and training for any weapon the officer used, disciplinary history, and Use of Force history.

d.  After receiving the FIT Review, the FIT Commander shall conduct a review ("FIT Commander Review") and make assessments of:

i.    Whether the FIT Review was timely, thorough, and complete;

31

ii.    Whether the FIT assessments regarding the Reportable Force are consistent with Policy;

iii.    Whether there are tactical, equipment, Policy, training, or other considerations that should be addressed.

e.    The FIT Commander shall submit the FIT Commander Review to the Chief's designee at the level of Deputy Chief or above ("the Deputy Chief") within 15 days of receiving the FIT Review. The Deputy Chief shall conduct a review ("Deputy Chief Review") and make assessments of:

i.    Whether the FIT Review and the FIT Commander Review were timely, thorough, and complete;

ii.    Whether the FIT assessments regarding the Reportable Force are consistent with Policy; and

iii.    Whether there are tactical, equipment, Policy, training, or other considerations that should be addressed.

f.    The Deputy Chief shall document the basis for their assessments in writing, including a detailed basis for any departures from the FIT assessments, within 15 days of receiving the review from the FIT Commander.

77.    MPD shall Require that, if any review of a use of Reportable Force discovers any evidence of officer Misconduct, then the FIT, the Deputy Chief, or any Supervisor in the chain of command, shall promptly make a referral to IAD.

78.    MPD shall Require that all Reportable Force reviews required by this Decree are timely, complete, and satisfy all requirements of this Decree and Policy. MPD shall require that reviews are returned to the reviewer for correction or supplementation when necessary to meet

the requirements of this Decree, to correct an error, or take any other appropriate steps to improve the reliability and credibility of the assessments.

79.    MPD shall Require that the FRB review all Level 3 Reportable Force, all Level 2 Reportable Force, and a sample of Level 1 Reportable Force. The City shall propose the sampling methodology subject to feedback from the United States and approval by the Monitor, pursuant to Paragraphs 378–380.

80.    MPD shall Require that, when reviewing a Reportable Force incident as required by this Decree, FRB shall conduct a review ("FRB Review") and make assessments of:

    a.    Whether all prior reviews were thorough and consistent with the requirements of this Decree. This includes any Supervisor Review, Secondary Review, Quality Assurance Review, FIT Review, FIT Commander Review, and Deputy Chief Review, as described in Paragraphs 75 and 76. MPD will Require that the FRB take prompt corrective action whenever a review or recommendation is incomplete, inaccurate, or when action is needed to improve the reliability and credibility of the FRB's assessment.

    b.    After consulting the reviews and the relevant evidence provided, whether each use of Reportable Force complied with Policy.

81.    MPD shall Require that, for Level 3 Reportable Force, the FRB shall also conduct a review ("FRB Level 3 Review") and assess the following:

    a.    For each use of Level 3 Reportable Force that did not comply with Policy, whether each officer present satisfied their duties to intervene under Policy;

b.  When a use of Level 3 Reportable Force resulted in injuries or complaints of injury to a person, whether officers timely rendered necessary medical aid, as required by Policy;

c.  With respect to each use of Level 3 Reportable Force, whether the officer who used force used sufficient de-escalation techniques or had other viable non-force options; whether the officer escalated the situation or otherwise contributed to circumstances that led to the use of force; and whether there were any other means by which the use of force could have been avoided;

d.  A recommendation of whether the incident raises a need for additional training, counseling, or correction for any officer or for MPD as a whole.

82.  MPD shall Require that the FRB prepare a written report with appropriate citations including the following requirements:

a.  A narrative description of the incident and the evidence that supports each of FRB's assessments;

b.  A detailed account of the available evidence and an explanation of whether and how missing or unavailable evidence impacted FRB's assessments;

c.  An explanation of how FRB resolved any material inconsistencies in the evidence or witness statements;

d.  If FRB makes any assessment that is inconsistent with any prior review, FRB shall explain its reasons for doing so;

e.  When the FRB reviews a particular incident, it shall not make recommendations concerning discipline. However, if FRB identifies a potential violation of Policy at any stage of the encounter, whether or not related to a use of Reportable Force,

34

the FRB shall promptly refer the potential violation to IAD in writing, and

document having done so in the FRB report.

83.     MPD shall Require that, absent an extension from the Chief, FRB shall complete

its report within 15 days of beginning its review. If the FRB returns the FIT Review or

Supervisory Review for supplementation or correction, the FRB must complete its report within

15 days of receiving the corrected FIT Review or Supervisory Review.

84.     MPD shall Require that the FRB submit its report to the Chief or their designee.

MPD shall Require that the Chief shall reject, adopt, or modify each FRB assessment and

determine any corrective action within 30 days of receiving the FRB report, and shall document

the basis for those decisions in writing, including a detailed basis for any departures from the

FRB's assessments.

85.     MPD shall Require that if the FRB identifies any need for training, counseling, or

correction, the FRB shall submit the completed report and relevant documents to the Deputy

Chief of Professional Standards for action.

86.     MPD shall Require that, for all uses of Level 3 Reportable Force reviewed by the

FRB, unless the involved officer has been placed on investigatory leave, the involved officer

must attend a meeting with their Supervisor and officials from the Training Division and the

Professional Standards Bureau. During the meeting, the officer will be informed of the FRB's

assessments, including any recommendations in the FIT or FRB reports, for avoiding uses of

Level 3 Reportable Force, otherwise improving the officer's performance, and any

recommendations referring the officer to supportive services.

### E.    Training

87.    MPD shall provide all officers with at least 16 hours initial and 8 hours annual use of force training that is consistent with the use of force terms of this Decree. Initial use of force training shall cover the requirements of Policies adopted pursuant to Paragraph 25.

88.    MPD shall provide for Supervisors an additional 8 hours of initial Supervisory training in conducting force investigations.

### F.    Force Investigation Files, Data Collection, Analysis, and Reporting

89.    MPD shall Require that all documentation related to an officer's use of Reportable Force, including: the officer's documentation, the responding Supervisor's documentation, the FIT Review or Supervisor recommendation, the FRB report, and any related disciplinary decisions, along with all relevant evidence, are maintained in an electronic Force Investigation File. Force Investigation Files must be searchable by the officer's name, badge number, and all associated incident numbers. MPD shall Require that Force Investigation Files are referenced in or linked to officers' personnel files and related Stop, Search, Arrest, or Citation reports or investigative files.

90.    MPD shall timely collect and maintain all data and records necessary to accurately evaluate its use of force practices, facilitate transparency, and enable broad public access to information related to MPD's decision-making and activities, consistent with Minnesota law.

91.    MPD shall create and maintain a reliable and accurate electronic system to track all data derived from Reportable Force-related documents, including:

    a.  The type(s) of force used;

    b.  The actual or perceived race, ethnicity, age, and gender of the person(s) subjected to force;

c.  The name, shift, and assignment of the officer(s) who used Reportable Force;

d.  Whether the incident occurred during an officer-initiated contact or a call for service;

e.  The person's reported or perceived mental health or medical condition, use of drugs or alcohol, or the presence of a disability;

f.  The actions that led to the use of Reportable Force, including whether the person(s) possessed, brandished, and/or used weapon(s);

g.  Any use of de-escalation techniques or other interventions to avoid or reduce the use of Reportable Force;

h.  Whether the person was handcuffed or otherwise restrained during a use of Reportable Force;

i.  Any injuries or complaints of injury sustained by officer(s) or person(s), and whether the officer(s) or person(s) received medical services;

j.  In the event of multiple types or uses of Reportable Force, the justification for each use of Reportable Force;

k.  Whether the officers rendered aid to an injured or ill person;

l.  Whether the person was charged with an offense, and, if so, which offense(s);

m.  For firearms-related Level 3 Reportable Force incidents, the number of shots fired by each involved officer, the accuracy of the shots, and whether the person was armed or unarmed; and

n.  The length of time between the use of Reportable Force and the completion of each step of the Force Investigation and review.

92.    MPD shall routinely and timely report relevant aggregate Reportable Force-related data to the Chief, FRB, and the Training Division. MPD shall also timely report Reportable Force-related summary data, as defined by the Minnesota Government Data Practices Act, required by this Decree through its public dashboards, consistent with Minnesota law.

93.    MPD shall periodically audit and analyze the data captured in officers' use of Reportable Force reports and all force reviews to identify significant trends, to correct any deficient policies and practices, and to improve performance. MPD also shall periodically audit forms and data collection systems to improve the accuracy and reliability of Reportable Force data. These audits will be provided to the Monitor, the United States, and the public consistent with Minnesota law. MPD shall develop a schedule of such audits, in consultation with the United States and the Monitor.

## IV.    FAIR AND IMPARTIAL POLICING

### A.    Prohibition on Discrimination

94.    MPD shall Prohibit officers from considering race or national origin, or substitutes for or stereotypes of race or national origin, to any extent or degree when taking or refraining from taking any law enforcement action, except as part of a specific and credible description of a suspect in an ongoing investigation that also includes other appropriate identifying factors that are not solely race or national origin.

95.    MPD shall Require that any officer who witnesses conduct that the officer knows or reasonably should know violates Policies on discrimination consistent with this Decree must affirmatively report that conduct to IAD or a Supervisor, who is required to report the conduct to IAD.

96.    The City and MPD shall Require that, whenever the appropriate reviewer finds a basis to investigate a violation of MPD's anti-discrimination Policies consistent with this Decree,

38

the reviewer shall determine whether any other officers witnessed conduct that any officer would reasonably understand violated the Policy at issue. MPD Policy shall Require that any officers who fail to report such violations may be subject to the same level of discipline as if they themselves had engaged in the same conduct.

97.     Because the concept of "excited delirium" lacks sufficient scientific evidence to be recognized as a medical condition and can lead to racially biased uses of force, MPD shall Require that officers do not:

    a.   Communicate that "excited delirium" is a recognized medical diagnosis or cause of death; or

    b.   Use the term "excited delirium" in any official capacity to describe an individual or their behavior.

**B.     Requiring Fair and Impartial Street Enforcement**

98.     MPD shall develop and implement Policies, training, and practices consistent with the requirements below to address any unjustified racial disparities in its Stops, Searches, Citations, Arrests, and uses of force.

99.     MPD shall Require that officers and employees treat all members of the public with courtesy and respect. MPD shall Require that officers and employees do not abuse their authority or use harassing or derogatory language when interacting with members of the public or speaking about members of the public in a professional setting.

**1.     Field Interviews**

100.     MPD shall Require that, during field interviews with community members to gather information about criminal activity, officers refrain from using words or actions that would tend to communicate that the person(s) are not free to leave or must answer questions.

MPD shall Require that, if asked by the person(s) whether they are free to leave or may decline to engage in conversation, officers shall answer in the affirmative.

101.    MPD shall Require that officers do not use a person's reluctance or refusal to participate in a voluntary interaction, including a field interview, as the sole basis for reasonable suspicion or probable cause.

102.    MPD shall Require that officers provide any person who was interviewed a contact card, form, or other documentation (written or electronic) of the officer's identifying information and the date.

### 2.    *Investigative Stops*

103.    The City shall establish a Policy permitting notices of repair issues to be mailed to a vehicle owner when the only offense(s) are those listed below, and MPD will Require that officers do not initiate a Traffic Stop when the only offense(s) are those listed below, unless it is a commercial vehicle:

    a.  Failure to display registration tabs, or driving with expired registration tabs;

    b.  Failure to illuminate license plate;

    c.  Rim or frame obscuring license plate, except for the plate letters and numbers;

    d.  Driving with only one functioning and visible headlight, brake light, or taillight;

    e.  Driving with only one functional sideview mirror present;

    f.  Driving without a rearview mirror, with the rearview mirror obstructed, or with an item dangling from the rearview mirror;

    g.  Driving without working windshield wipers;

    h.  Failure to signal a lane change or a turn, unless the driver is operating a vehicle in an unsafe manner or creating an imminent safety hazard;

   i. Cracked windshield, unless it substantially obscures the driver's view; and

   j. Window tint that does not comply with Minnesota law, unless it creates an imminent hazard to safety.

104. A goal of this Decree shall be that MPD shall use Traffic Stops to advance public safety—including by improving roadway safety, reducing the potential for traffic injuries and fatalities, and actively engaging motorists to increase safety and deter safety infractions—and to prioritize the use of less intrusive options, where effective and available, when a Stop would not further public safety.

105. MPD shall Require that, unless not consistent with a public safety need for immediate action, at the beginning of each Vehicle Stop, and before making contact with the vehicle or individual, MPD officers activate their body-worn camera and state the basis for the Stop.

106. MPD shall Require that when officers make a Stop, officers identify themselves as MPD officers and inform the person(s) stopped that they are not free to leave. MPD will also Require that officers communicate to the stopped/detained individual why the officer has stopped or detained that individual and, when feasible, explain what the officer is doing while conducting the Stop. MPD shall Require that officers shall provide their name, rank, and badge number upon request.

107. MPD shall Require that officers do not initiate or justify a Stop based on any of the following, without an individualized, reasonable, and articulable suspicion that the person is, has, or is about to engage in criminal activity:

   a. Solely on a person's geographic location, presence in a "high-crime" area, or proximity to the scene of suspected or reported crimes;

    b.  A person's verbal criticism of law enforcement, including profanity;

    c.  Solely on a person's response to the presence of officers, such as a person's apparent anxiety or attempt to avoid contact with an officer prior to the Stop; and

    d.  Solely on a person's presence in the company of others suspected of criminal activity.

108.   MPD shall Require that officers detain persons during Stops only as long as necessary to complete the tasks related to the reason for the Stop or related to any reasonable suspicion of criminal conduct uncovered during the Stop. MPD shall Require that officers do not purposefully delay the completion of tasks related to a Vehicle Stop without legitimate justification.

109.   MPD shall Prohibit officers from requesting consent to Search, unless the officer has reasonable, articulable suspicion that the Search will reveal evidence of a crime. MPD will Require that consent for a Search is freely given by the subject of the Search, and not based on intimidation or coercion. MPD shall Require officers to record, on body-worn camera, all requests to Search a person and the person's response. Nothing in this Paragraph shall be interpreted to conflict with Paragraphs 136 and 143 of the State Court Agreement.

110.   MPD shall Require that, after an officer completes any investigatory Stop that does not result in a Citation or Arrest, the officer shall provide the person Stopped with a contact card or form showing the officer's identifying information and the case control number of the encounter.

111.   MPD shall Require that officers document every Stop—whether or not it results in a Citation or Arrest—in a written report and submit the documentation to the officers' Supervisor by the end of the officers' shift. This written report shall include:

a.  The officers' names and badge numbers;

b.  The date, time, location, and duration of the Stop;

c.  The apparent race, ethnicity, gender, age, and disability status (including type of disability) of each person Stopped;

d.  A clear and accurate description of the specific and articulable facts that established reasonable suspicion to justify the Stop. In providing this description, an officer shall not use information or evidence discovered after the Stop was initiated (e.g., open warrants) as a justification for the initial Stop;

e.  For Traffic Stops, the manner in which the Stop advances public safety, which may include: improving roadway safety; reducing the potential for traffic injuries and fatalities; actively engaging motorists to increase safety and deter safety infractions; and, if the public safety basis includes investigation of another crime, a statement of the additional, articulable information, which may or may not amount to reasonable suspicion regarding the other crime;

f.  Where applicable, Weapons Pat-Downs conducted during the Stop; any illegal weapons or other contraband found during the Pat-Down; and, for each Pat-Down, the specific facts establishing the officer's reasonable, articulable suspicion that the person patted-down was armed and dangerous;

g.  Where applicable, any Searches conducted during the Stop, and for each Search conducted: the person Searched, type of Search, whether officers found any illegal weapons or other contraband or evidence of a crime during the Search and the nature of any such contraband or evidence, whether the person consented to

43

the Search, and a description of whether there was an additional basis for the Search;

h.  For any Search based on probable cause, a clear and accurate description of the specific facts that established probable cause to conduct the Search;

i.  Where applicable, for Vehicle Stops, any vehicle occupant the officer ordered to exit the vehicle and the reason;

j.  Where applicable, any person the officer handcuffed and the reason;

k.  If the Stop was extended to investigate criminal activity unrelated to the reason for the Stop, then the specific facts discovered during the Stop that establish reasonable, articulable suspicion justifying the extension of the Stop;

l.  Disposition of the Stop, including whether officers issued a warning or Citation or made an Arrest.

### 3.  Citations and Arrests

112.  Except in situations where the individual is in a physical altercation or the individual is using or threatening physical force, for Quality-of-Life Offenses, public urination, disorderly conduct, obstruction of law enforcement or failure to obey, obstruction of legal process, and/or non-traffic petty misdemeanors, MPD shall Require that officers use the least intrusive response necessary under the circumstances to put the person on notice of the violation; halt the violation; and/or deter similar harm to the public in the future. MPD shall Require that officers prioritize problem-solving approaches where effective in resolving such violations (e.g., a warning is generally preferable to enforcement action unless such warning has been or would

reasonably be ineffective in protecting public safety or addressing significant community disorder).

113.    MPD shall Require that before officers make a Pedestrian Stop, issue a Citation, or make an Arrest solely for Quality-of-Life Offenses, disorderly conduct, obstruction of law enforcement or failure to obey, obstruction of legal process, and/or non-traffic petty misdemeanors, unless the individual is in a physical altercation or the individual is using physical force, officers shall:

   a.   Activate their body-worn camera;

   b.   Air over the radio their location and that they are issuing a warning, unless not possible to do so;

   c.   Request that the individual stop engaging in the conduct;

   d.   Permit a reasonable amount of time based on the totality of the circumstances for the individual to comply with the request; and

   e.   Record the warning.

114.    MPD shall Require that, when an officer issues the warning as provided by Paragraph 113, the individual is not detained and is free to leave. If the individual refuses to stop the conduct after a reasonable amount of time has passed since the officer's warning, based on the totality of the circumstances, Policy may allow the officer to engage in a custodial detention and issue the appropriate citations or arrest, and they must properly documents this enforcement activity in accordance with Policies.

115.    MPD shall Require that the initial warning, as provided in Paragraph 113, be documented on body-worn camera footage, on Computer Aided Dispatch ("CAD"), and by

police radio; if the individual stops the conduct, the officer need not complete a report related to the warning.

116.    MPD shall Require that, when an officer issues a Citation or makes an Arrest for the following offenses when they do not involve a physical altercation or the use or threat of physical force: Quality-of-Life Offenses, public urination, disorderly conduct, obstruction of law enforcement or failure to obey, obstruction of legal process, and/or non-traffic petty misdemeanors—the officer shall document their reasonable determination, based on the individualized facts available to the officer, that a less-intrusive law enforcement response (such as a warning instead of a Citation or Citation instead of an Arrest) would be insufficient to put the person on notice of the violation halt the violation and/or deter similar harm to the public in the future. MPD shall Require that, for Arrests, the officer also must document their reasonable determination, based on individualized facts, that the person must be detained to prevent bodily injury to that person or another, that further criminal conduct will occur absent detention, or that a substantial likelihood exists that the person will not respond to a Citation.

117.    For the following offenses when they do not involve a physical altercation or the use or threat of physical force: Quality-of-Life Offenses, public urination, disorderly conduct, obstruction of law enforcement or failure to obey, obstruction of legal process, and/or non-traffic petty misdemeanors—MPD shall issue and effectively communicate appropriate guidance to officers and Supervisors about how to determine what response should be considered sufficient to put a person on notice of a violation, halt an ongoing violation, and/or deter similar harm to the public in the future. In crafting this guidance, MPD must consider credible evidence about the short-term and long-term effects of various types of responses on public safety.

118.    For Citations and Arrests for the following offenses when they do not involve a physical altercation or the use or threat of physical force: Quality-of-Life Offenses, public urination, disorderly conduct, obstruction of law enforcement or failure to obey, obstruction of legal process, and/or non-traffic petty misdemeanors—MPD shall Require that a Supervisor reviews every Citation or Arrest to determine whether it was supported by probable cause and conducted in compliance with MPD Policy and the requirements of this Decree. MPD shall Require that the Supervisor take appropriate action to address violations or deficiencies in the Citation or Arrest, including voiding the Citation, releasing the person if they are in MPD's custody, or conveying their concerns to prosecutors.

### C.    Enforcement Requirements and Priorities

119.    MPD shall not select particular communities, locations, or neighborhoods for targeted enforcement based to any degree on the racial or ethnic demographic composition of the area or on demographic characteristics that may be used as proxies for race or ethnicity, such as income.

120.    MPD shall not use quotas, whether formal or informal, for Stops, Citations, contraband recovery, or Arrests, including arrests for specific types of offenses.

121.     MPD or the Office of Community Safety shall create a plan, which must be submitted to the United States for feedback and for approval by the Monitor, pursuant to Paragraphs 378–380, to periodically assess the effectiveness of its enforcement strategies at addressing violence reduction, traffic safety, and any other public safety concerns as determined by MPD or the Office of Community Safety and to determine whether any of MPD's enforcement strategies generate significant racial disparities. MPD and the Office of Community Safety shall consider any feedback received from stakeholders and the public about MPD's enforcement strategies.

122.    When, pursuant to the requirements of this Decree or its own analysis, the City and MPD find that a law enforcement strategy produces significant racial disparities, the City and MPD shall meaningfully consider alternative approaches, including alternatives to law enforcement, that effectively protect public safety while reducing significant racial disparities.

### D.    Training and Supervision

123.    MPD shall provide all officers with at least 16 hours initial and 8 hours annual of fair and impartial policing training.

### E.    Data Collection, Analysis, and Response

124.    MPD shall Require that MPD officers accurately document the required data for Stops, Pat-Downs, Searches, Citations, Arrests, and uses of Reportable Force, including the required demographic information, and take appropriate corrective action when an officer fails to do so. To that end, at regular intervals, MPD shall identify officers who disproportionately omit required demographic data from their reports and investigate whether corrective action is appropriate. MPD shall state in Policy that intentional omissions of required demographic data may result in discipline.

125.    MPD shall regularly analyze data of Stops, Pat-Downs, Searches (including hit rate and requests for consent to Search), Citations, Arrests, and any other law enforcement actions agreed upon by the Parties for potential indicia of racially discriminatory policing. MPD shall base its analyses on accurate, complete, and reliable data. MPD shall conduct its analyses using reliable statistical methods. MPD's methodology and schedule for conducting data analyses shall be included in the Annual Implementation Plan (as described in Paragraph 394 below).

126.    Within a year of the Effective Date, and periodically afterwards as set forth in the Annual Implementation Plan, MPD will document the results of the analysis required in

48

Paragraph 124 in a written report that will: (a) identify steps currently being taken by MPD and the City to reduce racial disparities; (b) explain whether current policies are reducing racial disparities; and (c) explain whether any further actions are necessary to reduce racial disparities. All analyses and reports shall be provided to the Monitor and the United States and made available to the public on the MPD webpage.

127.    MPD shall conduct audits regarding data on Stops, frisks, Searches, detentions, Citations, and Arrests to verify whether officers are (a) capturing the basis for a Vehicle Stop pursuant to Paragraph 111, and (b) documenting all Pedestrian and Vehicle Stops in appropriate databases. MPD's audit methodology and schedule shall be subject to feedback from the United States and approval by the Monitor, pursuant to Paragraphs 378–380. MPD shall take appropriate corrective action in response to deficiencies identified through audits.

128.    If MPD's analysis of street enforcement data shows evidence of racially discriminatory policing, then the City and MPD shall take appropriate corrective action, which may include: counseling, training, and closer supervision; discipline; changes to Policies and Procedures; changes to enforcement priorities; and alternative enforcement approaches that would reduce racial disparities.

## V.    FIRST AMENDMENT

### A.    Prohibiting Retaliation for First Amendment-Protected Activity

129.    MPD shall Prohibit Retaliation by officers against any person engaging in First Amendment-Protected Activity. MPD shall assess retaliatory intent based on the totality of the circumstances.

130.    MPD shall Require that officers do not treat a person or group differently based on the content of their First Amendment-Protected Activity.

### B.     Responding to First Amendment Events

131.     A goal of this Decree is that, when MPD is responding to First Amendment Events, individuals will be able to engage in First Amendment-Protected Activity to the greatest extent possible while enabling MPD to preserve public safety and avoid major disruptions to public order. To that end, a goal of this Decree is that MPD's response prioritizes de-escalation, uses the least confrontational tools and strategies that will protect public order and public safety under the circumstances, and, to the extent reasonably possible, addresses lawbreakers through individualized responses.

132.     Nothing in this Decree prevents the City and/or MPD from imposing and/or enforcing reasonable time, place, and manner restrictions consistent with the requirements of the First Amendment.

133.     MPD shall Require that the Incident Commander and/or other appropriate MPD leadership in charge of the response to a First Amendment Event, if feasible, makes a good faith attempt to communicate with the organizers of the First Amendment Event, if known or identifiable. In communicating with the organizers of the First Amendment Event, the MPD representative shall make a good faith attempt to discuss the event, establish a plan for communicating during the event, and identify strategies to prevent the escalation of disruptive behavior by individuals in the crowd. MPD shall Require that outreach occur in advance of or as early as possible during the First Amendment Event.

134.     MPD shall Require that responding officers shall visibly wear, and not intentionally obscure, their badges, nameplates, and/or other appropriate personal and MPD identifiers, and that, if asked, officers shall provide their surname, badge number, and rank, and the fact that they are MPD officers.

135.    To avoid escalation and protect public trust, in responding to First Amendment Events, MPD shall seek to minimize the appearance of a military operation and avoid use of tactics and equipment that may provoke a crowd. To that end, MPD shall not deploy officers in riot gear or SWAT teams in response to First Amendment Events, except when the Incident Commander and/or other appropriate police leadership in charge of the response to the First Amendment Event deems it necessary to prevent loss of life, substantial bodily harm to officers or members of the public, or widespread or catastrophic damage to property. Riot gear and SWAT teams may be staged at a nearby location, preferably out of sight of demonstrators, in case the need for them arises.

136.    When MPD engages with any other law enforcement agency to respond to a First Amendment Event within MPD's jurisdiction, MPD shall not request that any other responding law enforcement agency use tactics Prohibited by Policy or this Decree.

### 1. Dispersing First Amendment Events

137.    When responding to a First Amendment Event, MPD shall Require that officers order dispersal of a crowd consistent with the law and only when:

a. Unless impracticable, MPD officers have meaningfully attempted to address the issues through: dialogue with any identifiable First Amendment Event's leaders; providing audible requests to comply with police directives and opportunities to safely do so; targeting specific individuals who engage in or incite violence; and using other de-escalation techniques reasonable under the circumstances; and

b. Any declaration or order that would terminate a First Amendment Event is approved by the Chief or Chief's designee, who must have the rank of Lieutenant or higher.

138.    Prior to enforcing an order to disperse by using force or making arrests, MPD shall Require that officers make reasonable efforts to:

    a.    Effectively communicate to the entire crowd both the order to disperse and the specific potential consequences of non-compliance (e.g., arrest or use of force); and

    b.    Provide a meaningful opportunity to safely comply.

MPD shall not take any action to enforce a curfew upon individuals engaged in a First Amendment-Protected Activity at the time the curfew goes into effect without first issuing a dispersal order and meeting the above-listed dispersal order requirements.

139.    MPD shall require that orders to disperse shall be narrowly tailored to address unlawful conduct and shall leave open ample alternative channels for engaging in First Amendment-Protected Activity. MPD may issue orders to disperse to the extent necessary to address a Civil Disturbance. In situations that do not constitute a Civil Disturbance, MPD shall avoid dispersing First Amendment Events, unless: 1) that crowd or a portion of the crowd presents a specific, imminent risk to public health or public safety, including blocking access to essential facilities or emergency services; or 2) the duration of the First Amendment Event has rendered it a public nuisance causing prolonged impairment to a public right-of-way or public services; and 3) the risk or prolonged nuisance cannot be addressed without dispersing the crowd, in whole or in part. The fact that some isolatable individuals in the crowd have engaged in unlawful conduct shall not by itself provide grounds to end the entire First Amendment Event and disperse the entire crowd. Nothing in this Decree prevents MPD from issuing and enforcing a lawful demand to depart under Minnesota trespass law when consistent with the First Amendment.

140.    MPD shall Require that orders to disperse shall clearly identify viable exit points for individuals to disperse and the specific location to which the order applies, and people who have no reasonable way to safely comply with the dispersal order (for example, if exits are blocked) shall not be arrested or subjected to force solely for not complying with a dispersal order.

141.    MPD shall Require that, other than for curfew violations, if a dispersed crowd reconvenes at a distinct location where the participants engage in First Amendment-Protected Activity, they shall not be ordered to disperse from that location, unless the requirements of Paragraph 137–139 of this Decree are met.

142.    MPD shall Require that, as soon as practicable, an officer giving a dispersal order shall document all details about the dispersal order, including: the date, time, and location of the dispersal order; the path(s) of egress offered; the text of the dispersal order; the amount of time given to exit; and the number of times the order was repeated before action was taken.

### 2.    *Force During First Amendment Events*

143.    Even when dispersal of a First Amendment event is permitted under Paragraphs 137–139, MPD shall Prohibit officers from using force to disperse a First Amendment Event unless: 1) the use of force is consistent with the law; and 2) the health or safety risk, or prolonged public nuisance, presented by the First Amendment Event (as described in Paragraph 139) cannot be effectively addressed without the use of force. In those circumstances, MPD shall Require that officers use the minimum amount of force practicable to eliminate the risk or abate the nuisance. This paragraph does not affect the MPD's ability to use reasonable force to make lawful arrests at a First Amendment Event.

144.    MPD Policy shall provide that, if a dispersal of a First Amendment Event is necessary, preferred tactics to disperse a crowd include: a display of forceful presence; the use of law enforcement formations to force crowd movement; de-escalation; and negotiation with the organizers of the First Amendment Event.

145.    Absent an immediate need to protect themselves or others from imminent physical harm, MPD shall Prohibit officers from using any Crowd Control Weapons during a First Amendment Event, unless authorized by the Chief of Police or the Chief's designee, who shall have the rank of Deputy Chief or higher.

146.    MPD shall Prohibit officers from using force during a First Amendment Event in a manner that creates a substantial risk of harm to individuals other than the target of the force, unless necessary to address a specific, imminent risk that outweighs the risk of harm to bystanders. In such circumstances, to the extent practicable under the circumstances, MPD shall Require that officers seek to minimize the risk of collateral substantial bodily harm to others.

147.    Outside of the circumstances set forth in Paragraph 143, MPD shall Prohibit use of Chemical Agents on subjects, arrestees, or detainees who are compliant or who are exhibiting only passive resistance.

148.    In addition to the requirements of Paragraph 143, MPD shall Prohibit officers from using Chemical Agents to disperse a First Amendment Event unless the preferred tactics are unavailable, unlikely to be effective, or have been tried and proven ineffective.

149.    MPD shall Prohibit officers from using CN gas or FSDDs for crowd control purposes.

150.    MPD shall Prohibit officers from using CS gas for crowd control purposes, unless the crowd has become violent or is threatening to become violent, and lesser force options are

either not available or would likely be ineffective. The use of CS gas must be authorized by the Chief of Police or Chief's designee.

151.    MPD shall Prohibit officers from using Impact Projectiles indiscriminately against a crowd or at a group of people.

152.    MPD shall Require that, when responding to First Amendment Events, officers use Impact Projectiles only against specific individuals who are engaging in conduct that poses a serious threat to public safety or a threat of imminent physical harm.

153.    MPD shall Require that whenever reasonably possible, officers shall give an audible warning and a reasonable opportunity to comply before using Impact Projectiles. MPD shall Require that officers use Impact Projectiles only in accordance with the appropriate deployment distances for the projectile at issue, and that officers shall make reasonable efforts to use de-escalation techniques and alternatives to the use of Impact Projectiles.

154.    MPD shall Prohibit officers from carrying or deploying any crowd control weapon, including impact projectile launchers, aerial flash bang grenades, pepper balls, and high-volume OC-delivery systems during a First Amendment Event, unless designated to do so by the Incident Commander and/or other appropriate police leadership in charge of the response to a First Amendment Event. Such officers must have received appropriate, annual training on the specific weapon's proper use in crowd control settings, including appropriate range time.

### 3.    *Arrests During First Amendment Events*

155.    MPD shall Prohibit officers from making any arrests during First Amendment Events unless that arrest is supported by individualized probable cause.

156.    MPD shall Prohibit officers from seeking to encircle or enclose an individual or individuals within a First Amendment Event crowd who are the target of a arrest unless the arrest

is lawful and supported by individualized probable cause. If other individuals, as to whom there is not individualized probable cause to make a lawful arrest, are encircled, they shall be permitted to exit the encirclement as soon as it is safe and practical to do so, and officers shall facilitate those individuals' exit as soon as feasible.

157.    MPD shall Require that a Supervisor shall review each arrest made during a First Amendment Event for compliance with the requirements in this Section.

### C.    Protecting Journalists' Rights to Gather and Report the News, and Protecting Individuals Who Observe and Record Law Enforcement Officers in the Public Discharge of Their Duties

158.    MPD shall Require that officers do not intentionally impede or discourage any individual an officer knows or reasonably should know is a Journalist from gathering, receiving, processing, or reporting news, including by observing and/or recording officers performing their duties in public places, subject only to reasonable time, place, and manner restrictions consistent with the requirements of the First Amendment.

159.    MPD shall Require that officers do not take any action to prohibit, restrict, or interfere with any person attempting to photograph, record, or observe officers performing their law enforcement duties in public, except when reasonably necessary to prevent a legitimate risk of bodily harm, or when necessary to carry out lawful police activity. MPD shall Require that, if an officer takes action pursuant to these exceptions, the officer may not require the person to move more than necessary to address the issue, and shall, to the fullest extent possible, allow the person to continue photographing, recording, and/or observing within reasonable proximity to the law enforcement activities.

160.    MPD shall Require that officers allow a person to record their own interaction with officers. However, officers may instruct the person to put down the recording device when the person is being placed under lawful arrest.

161.    MPD shall Require that officers do not impose or enforce—including through actual or threatened law enforcement action—curfews, or orders to disperse against any individual the officer knows or reasonably should know is a Journalist, except when necessary to prevent imminent bodily harm or to carry out lawful police activity. If an officer takes an action pursuant to these exceptions, MPD shall Require that the officer shall: obtain prior Supervisor approval when possible and, absent prior approval, inform a Supervisor of the action as soon as possible; tailor the restriction as narrowly as possible; to the fullest extent possible, allow the Journalist to continue news-gathering and/or reporting within reasonable proximity to the law enforcement activities; and give the Journalist a meaningful opportunity to comply prior to taking further enforcement action.

162.    MPD shall Prohibit MPD officers from detaining any individual the officer knows or reasonably should know is a Journalist unless they have individualized reasonable, articulable suspicion that the Journalist has committed a crime. MPD shall Prohibit MPD officers from arresting or threatening to arrest any individual the officer knows or reasonably should know is a Journalist unless they have individualized probable cause to believe the Journalist has committed a crime. MPD shall Require that if an individual the officer knows or reasonably should know is a Journalist is detained or arrested, the Journalist shall be permitted to speak with a supervising officer of higher rank immediately for the purpose of challenging the detention or arrest unless circumstances make it infeasible to do so. MPD shall Require that officers obtain approval from a Supervisor before transferring any individual the officer knows or reasonably should know is a Journalist to a holding facility.

163.    MPD shall Require that officers do not intentionally or recklessly cause the destruction or alteration of any observer's or Journalist's cameras, cell phones, recording

equipment, or information contained on the equipment. MPD shall Require that officers do not view or access information contained on the equipment absent a warrant, subpoena, court order, or the owner's consent. If the contents of the seized equipment are needed for evidentiary purposes, MPD shall Require that officers promptly seek a search warrant, subpoena, or other appropriate court order for that purpose. If such a warrant, subpoena, or court order is denied, or if seized items are not needed for evidentiary purposes, MPD shall Require that officers immediately release the items to their rightful possessor.

164.    The City shall appoint and publicly identify an appropriate point of contact to respond to media inquiries, communicate information with media outlets, and coordinate with Journalists in the field when officers are responding to First Amendment Events ("Media POC"). The City shall Require the Media POC to: respond to Journalists about barriers to reporting as they arise, such as movement restrictions, the use of force against Journalists, and Arrests of Journalists; establish effective communication channels to appropriate command personnel and communicate with them to address such issues as they arise; and maintain availability, directly or via a designee, for the duration of the First Amendment Event.

### D.    Public Transparency about MPD's Response to First Amendment Events

165.    For First Amendment Events that are likely to require a significant MPD response, including but not limited to the use of Crowd Control Weapons, issuance of a dispersal order, or other tactics to manage or disperse a crowd, MPD and the City shall develop and implement an effective public information plan that enables adequate communication to the public before, during, and after such First Amendment Events. The plan shall include requirements to disseminate the following information to the public:

    a. For any such First Amendment Event at which MPD officers are deployed, where reasonably possible, timely updates on significant police-related actions, including dispersal orders and curfew orders;

    b. A list of and link to MPD policies related to such First Amendment Events; and

    c. A link to allow the public to submit a complaint electronically.

166.    MPD shall conduct a review of MPD's response to First Amendment Events where MPD used Crowd Control Weapons or issued any orders to disperse. The review shall assess whether MPD's response was consistent with MPD Policy and this Decree; whether and how MPD could have avoided or reduced its use of force; and whether changes to Policy, tactics, and training are appropriate. The review shall be completed and, to the extent the data is classified as public under Minnesota law, publicly posted on MPD's webpage within 60 days of the conclusion of such First Amendment Event.

### E. Training, Supervision and Accountability

167.    MPD shall develop and deliver training to officers, Supervisors, command staff, and Misconduct investigators on the requirements in this Decree and Policy to protect First Amendment rights, including appropriate annual refresher training.

168.    MPD shall Require that, whenever any Supervisor or reviewer assesses an officer's Use of Force against a person, arrest of a person, or complaint about conduct directed toward a person who was engaged in a First Amendment Event, the Supervisor or reviewer shall review and assess the following, with documented reasons:

    a. Whether the officer's conduct constituted Retaliation; and

    b. Whether the officer's conduct violated any other Policy related to First Amendment rights or the First Amendment requirements in this Decree.

F.    **Data Collection**

169.    For each First Amendment Event where MPD used Crowd Control Weapons or issued any orders to disperse, MPD shall collect reliable data to inform MPD and the public about MPD's response, including the following:

    a.  The dates of the event;

    b.  Whether MPD's response included the use of riot gear or SWAT teams;

    c.  The approximate size of the crowd;

    d.  The number of uses of force by force type, if any;

    e.  Any injuries sustained by protesters and by officers, to the extent known at the time of the documentation;

    f.   Any dispersal orders; and

    g.  Any arrests, by charge.

170.    Each calendar year, MPD shall publish a report with data based on the number of incidents identified in the previous year where (a) there was a sustained Policy violation for conduct during a First Amendment Event, and (b) where there was a sustained Policy violation for Retaliation. Reports will be published in a conspicuous place on its publicly accessible webpage. MPD will publish the first annual report within 120 days of the Effective Date. The City will publish annual reports thereafter within 90 calendar days after the end of the calendar year. To the extent permitted under the Minnesota Government Data Practices Act, the report(s) will include statistical data on incidents in which:

    a.  The Police Chief imposed disciplinary and/or non-disciplinary corrective action;

    b.  The Police Chief did not impose disciplinary and/or non-disciplinary corrective action;

    c.   There was final disciplinary action taken, as defined by the Minnesota Government Data Practices Act, and/or non-disciplinary corrective action taken; and

    d.   The disciplinary action imposed by the Police Chief was reversed or decreased, specifying whether it was a complete reversal or the disciplinary action was decreased.

## VI.   PEOPLE WITH BEHAVIORAL HEALTH DISABILITIES

### A.   Response to Behavioral Health Related Calls and Related Coordination

171.    A goal of this Decree is to enhance and increase the capacity and quality of the City's existing emergency response system to serve people with behavioral health needs, including through non-law-enforcement responses and Joint Responses.

172.    The City shall report summary data, as defined in the Minnesota Government Data Practices Act, to the public semiannually.

173.    The City shall have a Mobile Crisis Response program with a goal of providing a timely response to incidents involving people with immediate and apparent behavioral health needs that either do not warrant law enforcement response or that warrant a Joint Response by law enforcement and behavioral health professionals, including incidents received by 911 directly or via the Crisis Hotlines or encountered by MPD officers, subject to Protocols identified in Paragraphs 178–183.

174.    Mobile Crisis Responses shall:

    a.   Be staffed by at least two Mental Health Practitioners or Mental Health Professionals, or at least one Mental Health Practitioner or Mental Health Professional and one paraprofessional, such as a Peer Support Specialist;

b.   Have the skills to provide emergency mental health services and de-escalation, including competencies specifically related to Youth and older adults, such as suicide prevention, trauma, cultural competency, bias, motivational interviewing, and accessing Community-Based Services, and have an understanding of mental health service delivery systems.

c.   Respond face-to-face to engage people with behavioral health needs where the person is located in Minneapolis, such as their home or school, to the extent permitted on the premises;

d.   Resolve the incident without MPD officer involvement when consistent with public safety, and consistent with Paragraphs 178–183;

e.   Screen individuals for behavioral health needs;

f.   Provide behavioral health crisis stabilization without taking the individual to a hospital, whenever possible;

g.   Refer service recipients where appropriate to Community-Based Services and make reasonable efforts to facilitate prompt linkages to necessary behavioral health services to resolve the incident.

175.   The City shall develop and implement a Joint Response plan for incidents that involve risk to safety and merit a Joint Response. Each Joint Response shall operate consistent with the following protocols:

a.   Operate consistent with the Policies and Protocols developed pursuant to Paragraphs 178–183. If the MPD officer and the Mobile Crisis Response conducting a Joint Response determine it is safe for the Mobile Crisis Response to continue without MPD, the MPD officer may leave the scene.

     b.   Refer service recipients where appropriate to Community-Based Services and make reasonable efforts to facilitate prompt linkages to necessary behavioral health services to resolve the incident.

176.    The City and MPD shall Require that Mobile Crisis Response, Joint Response, or MPD officers shall, as appropriate, bring an individual they encounter in need of behavioral health services to an available Crisis Respite facility or a Crisis Stabilization center as an alternative to an emergency department, for further evaluation, observation, treatment, or referral. The City shall seek to coordinate with Crisis Respite facilities and/or Crisis Stabilization centers so that Mobile Crisis Response and/or MPD officers, understand processes, capacity, and criteria for bringing individuals to these units.

177.    The City shall provide information to major Community-Based Service provider organizations and groups and the broader community about the purpose of Mobile Crisis Response and Joint Response.

**B.    Dispatching Appropriate Response**

178.    The City shall update and implement MECC and MPD Policies and Protocols governing the use of Mobile Crisis Response, Joint Response, MPD officers including Enhanced CIT Specialists, and Crisis Triage Specialists in MECC, including on-scene coordination between MPD officers including Enhanced CIT Specialists, Joint Response, Mobile Crisis Response, and the Fire Department.

179.    These Policies and Protocols shall address transfers of calls received by 911; the role and responsibilities of the Crisis Triage Specialists; the criteria for dispatching a Mobile Crisis Response, Joint Response, MPD officers including Enhanced CIT Specialists, or no response; triaging criteria for calls and call response time expectations; transport of persons with behavioral health needs to Crisis Respite, Crisis Stabilization, or a hospital; criteria for

transferring a 911 call to the Crisis Hotlines; when MPD officers should call for a Mobile Crisis Response; the roles and responsibilities of MPD officers and Mobile Crisis Responders during Joint Responses; and transfers of responsibility for leading at the scene as the urgency of law enforcement, health and safety needs, and staffing change.

180.    The City shall conduct an analysis using data on behavioral crisis incidents appropriate for Mobile Crisis Response and Joint Response pursuant to the City's Protocols to evaluate potential needs for Mobile Crisis Response and Joint Response and meet as mutually agreed with the United States and Monitor to discuss.

181.    These Policies and Protocols shall reflect the goal of not using law enforcement officers to respond to people with behavioral health needs where there is not a need for a law enforcement response.

182.    The City's Policies and Protocols shall reflect that, where voluntary transportation of a person with behavioral health needs to a treatment facility is warranted as part of a response to a 911 call, Mobile Crisis Response should be used where available, consistent with public safety.

183.    The City's Policies and Protocols shall not exclude Mobile Crisis Response as a potential response solely because the 911 caller is a third-party or because substance use is involved.

184.    The City shall Require that all MECC Call-Takers, MECC Dispatchers, and their supervisors, complete Competency-Based Training on how to:

      a.    Consistently identify, dispatch, respond to, and appropriately engage in calls for service that involve people with behavioral health needs;

b. Adequately screen, assess, collect information regarding, and respond to MPD requests that Mobile Crisis Response be dispatched to a scene;

c. Handle calls for service in a manner informed by national standards relating to trauma-informed interviewing, telephonic suicide intervention, crisis management and de-escalation, interactions with people with behavioral health needs, and engagement with people experiencing hallucinations and delusions;

d. Gather information when the call may involve an individual with behavioral health needs and relay that information to the responder(s); and

e. Understand behavioral health-related public resources beyond mobile emergency crisis responses.

185. The City shall Require that MECC engage in regular cross-trainings with Mobile Crisis Response, MPD, and the Fire Department to improve operational coordination and compliance with the protocols developed pursuant to this Section. The City shall also invite third-party emergency responders, including EMT, in such cross-trainings. Such cross-trainings may involve MECC giving trainings to these entities, receiving training from these entities, or facilitating joint trainings. The City shall Require that employees of the Fire Department with relevant responsibilities receive training regarding the Policies and Protocols developed pursuant to this Section.

186. The City shall have voluntary roles for Crisis Triage Specialists. MECC shall develop a process for selection and recruit individuals to become Crisis Triage Specialists. MECC shall develop Policies and Protocols for the use of Crisis Triage Specialists for calls related to behavioral health emergencies when practicable. Crisis Triage Specialists' duties

include providing support to MECC Call-Takers with assessing calls related to behavioral health, supporting them in de-escalating over the phone, and dispatching the appropriate response.

187.    The City shall Require that Crisis Triage Program Support shall facilitate or organize the trainings described in Paragraphs 184–185 above, provide support to Crisis Triage Specialists and other MECC staff, consult with MECC on the development of Policies and Protocols pursuant to Paragraphs 178–183, 186, and 205, and assist MECC in advancing compliance with those Policies and Protocols.

188.    The City shall endeavor to coordinate with the operator of the Crisis Hotlines (in particular, 988) to work toward interoperability and compatibility between the Crisis Hotlines and MECC.

189.    The City shall endeavor to have consistency and coordination with the operator(s) of the Crisis Hotlines so that a Mobile Crisis Response may be dispatched when Crisis Hotline callers need an in-person Mobile Crisis Response.

### C.    MPD Training and Crisis Intervention

190.    All MPD officers shall receive at least 40 hours of initial and 8 hours of annual refresher on Competency-Based Training for crisis intervention, including training on responding to people with behavioral health needs. The trainings shall include the following topics:

  a.  Field evaluations and determinations when a Mobile Crisis Response could conduct the response or take the lead during a Joint Response;

  b.  Suicide prevention and intervention;

  c.  Community-Based Services;

  d.  The effects of substance use;

  e.  Perspectives of individuals with behavioral health needs;

f.   Mental health and substance use recovery;

g.   The rights of people with behavioral health disabilities and the stigma and discrimination faced by people with behavioral health needs;

h.   The importance of evidence-based practices and the rejection of the concept of "excited delirium" and stereotypes regarding people with behavioral health needs;

i.   Involuntary hold and civil commitment criteria;

j.   Responding to Youth who have behavioral health needs, including in a school setting;

k.   Strategies for offering and engaging people in voluntary services to community members in need;

l.   The relevant Policies and Protocols that are developed pursuant to this Decree;

m.   How MPD officers can recognize common characteristics and behaviors associated with behavioral health needs to inform how they interact with individuals in this demographic;

n.   When and how to make reasonable modifications under the Americans with Disabilities Act for individuals with behavioral health disabilities;

o.   How to avoid escalating an interaction with individuals with behavioral health disabilities;

p.   How to use trauma-informed de-escalation techniques to increase safety and to avoid using force unnecessarily;

q.   The effects of trauma;

r.   Manifestations of behavioral health crises across different ages, cultures, and periods of neurodevelopment;

s.  Cultural competency substantially reflecting the City's demographics of individuals with behavioral health needs; and

t.  Appropriate response if a Mobile Crisis Response, Joint Response, or Enhanced CIT Specialist is not available.

191.    These crisis intervention trainings shall be developed in consultation with a Mental Health Professional, and the training shall be co-facilitated by a Mental Health Practitioner or Mental Health Professional and MPD. Trainers shall have a demonstrated ability to build competencies in the prioritization of least restrictive crisis responses. The training shall include scenario-based training and individuals with lived experience.

192.    The City shall endeavor to include, in the initial and annual refresher training, training by representatives from relevant partner City and Hennepin County behavioral health service providers, including but not limited to Mobile Crisis Response, regarding their services, referral capabilities, and protocols with regard to their interactions with MPD.

193.    MPD shall review and update this training curriculum annually in consultation with behavioral health service providers, and it shall be informed by relevant MPD incidents or trends.

194.    MPD shall Prohibit encouraging or teaching the concept of "excited delirium," or an equivalent term, in any of its training, including on responding to people with behavioral health needs.

195.    MPD shall Prohibit officers from suggesting or directing any medical personnel, including but not limited to EMS, to sedate or medicate an individual.

**D.    Enhanced Crisis Intervention Team (CIT) Specialists and Coordinator**

196.    MPD shall select a CIT Coordinator to lead the CIT and Enhanced CIT Specialist program.

68

197.    MPD shall Require that the CIT Coordinator shall review prior to delivery all written, e-learning, video, lesson plan, and presentation materials used in MPD training related to behavioral health. MPD shall verify that the delivered trainings conform to the written materials.

198.    MPD shall Require that the CIT Coordinator shall maintain partnerships with 911 and Mobile Crisis Response and major community-based behavioral health service provider organizations so that the CIT program is meeting the goals of this Decree.

199.    MPD will have voluntary roles for Enhanced CIT Specialists. MPD will recruit individuals to become Enhanced CIT Specialists.

200.    MPD shall equip officers, including Enhanced CIT Specialists, to interact with persons with behavioral health needs or in crisis to de-escalate and reduce the use of force and improve safety for officers and the community.

201.    MPD shall assess each Enhanced CIT Specialist applicant's fitness to serve as an Enhanced CIT Specialist. This assessment shall include an interview and an examination of Supervisor recommendations, uses of force, and complaint and discipline history. MPD shall select the appropriate candidates to serve as Enhanced CIT Specialists and shall maintain a list of qualified Enhanced CIT Specialists.

202.    MPD shall Require the CIT Coordinator to facilitate regular mandatory meetings for Enhanced CIT Specialists that are designed to strengthen the Enhanced CIT Specialist program. Such meetings may, for example, highlight evolving best practices in the field, provide relevant updates from Community-Based Service providers and stakeholders, facilitate dialogue with or host presentations from individuals with lived experience, service providers or other stakeholders, discuss challenges and opportunities in ongoing CIT operations with Enhanced CIT

Specialists, and solicit input on program improvements, growth opportunities, and goals from Enhanced CIT Specialists.

203.    MPD shall Require the CIT Coordinator to facilitate site visits to providers of services relevant to the population Enhanced CIT Specialists are focused on serving, such as crisis services and services for people with substance use disorders. MPD shall Require that Enhanced CIT Specialists shall each attend at least one site visit per year.

204.    MPD shall provide regular oversight of the CIT Coordinator regarding implementation of the duties listed in Paragraphs 197–198 and 202–203 and take corrective action if necessary.

205.    The City and MPD shall develop Policies and Protocols to dispatch an Enhanced CIT Specialist for behavioral health emergencies when consistent with public safety and when available and practicable.

206.    MPD shall Require that Enhanced CIT Specialists shall have responsibility when at the scene of the response involving a behavioral health emergency over non-Enhanced CIT Specialist MPD patrol officers.  MPD shall Require that if a non-Enhanced-CIT-Specialist Supervisor of a higher rank has assumed responsibility for the scene, that Supervisor will seek the input of an Enhanced CIT Specialist when feasible.

**E.    Quality Assurance**

207.    The City shall conduct ongoing quality reviews of MECC and of the City, including Mobile Crisis Response and MPD, and their responses to behavioral health-related calls.

208.    The City shall develop, with input from the Monitor and the United States, a Protocol for a Quality System Regulation ("QSR") of calls related to people with behavioral health needs. The QSR shall examine whether sufficient information was obtained to determine

the most appropriate response, whether the appropriate response was sent for the situation, and whether the response complied with the Policies and Protocols developed pursuant to this Decree.

209.    A cross-departmental team comprised of, at a minimum, staff from MECC, MPD, and the Mobile Crisis Response program shall conduct the QSR process. The QSR process shall periodically review a sample of each MECC Call -Taker's and MECC Dispatcher's work regarding behavioral health-related calls. The QSR process shall include calls that may be behavioral health-related, even if not initially designated as such, and shall review every incident involving Lethal Force. The City shall consult with the Monitor in implementing its QSR process.

210.    In conducting the QSR, the City shall examine whether sufficient information was obtained to determine the most appropriate response, specifically whether the appropriate response was sent for the situation and whether the response complied with the Policies and Protocols developed pursuant to this Decree. The City shall analyze the results of the QSR process and take action to improve the City's response to behavioral health-related calls.

211.    The City shall analyze whether calls that could be appropriate for a Mobile Crisis Response or Joint Response are being coded incorrectly. The City will develop Protocols for, train, and provide quality assurance to MECC employees, Mobile Crisis Response, and MPD officers so that incidents appropriate for Mobile Crisis Response or Joint Response are consistently coded in a way to enable such a response.

212.    The City shall collect and evaluate reliable data regarding all incidents involving people with an immediate and apparent behavioral health need. To the extent permitted by law, the City shall track, at a minimum:

71

a. The number of calls MECC identified as involving a person with behavioral health needs and the type of response;

b. The number of incidents MPD identified as involving a person with behavioral health needs and the type of response;

c. For individuals who have received three or more in-person CIT responses, Joint Responses, and/or Mobile Crisis Responses in the last year, the person's history of recorded interactions with MPD and Mobile Crisis Response;

d. The number of Mobile Crisis Response deployments;

e. The locations to which the Mobile Crisis Response were deployed;

f. The locations to which Enhanced CIT Specialists were dispatched;

g. The number and locations of Joint Response dispatches;

h. The number of occasions that only MPD was deployed, broken down by occasions in which only non-Enhanced CIT Specialists vs. Enhanced CIT Specialists responded;

i. The elapsed time from call receipt to physical response for Mobile Crisis Responses, Joint Responses, and MPD responses, including as broken down by MPD Precinct and by shift;

j. The number of Mobile Crisis Response deployments in which the person is no longer at the scene;

k. The length of time of each Mobile Crisis Response and/or Joint Response engagement;

l. The number of times a Mobile Crisis Response, Joint Response, Enhanced CIT-Specialist, or non-Enhanced CIT Specialist MPD officer brought a person with

behavioral health needs to a location other than their residence, and the type of location;

m.  The number of times an MPD officer used force in responding to incidents involving a person with behavioral health needs, and the type of force, broken down by response type;

n.  The number and types of injuries sustained by responders when responding to incidents involving a person with behavioral health needs, broken down by response type;

o.  The number and types of injuries sustained by individuals with behavioral health needs, broken down by response type; and

p.  Outcomes of incidents involving a person with behavioral health needs, including:

    i.  The number of calls de-escalated by a MECC Call-Taker with no in-person response or call transfer needed;

    ii.  The number of calls transferred to a service hotline, including 211 or 988, with no in-person response needed;

    iii.  The number of times Mobile Crisis Responses used de-escalation tactics on scene;

    iv.  The number of people with repeat responses by Mobile Crisis Response, or MPD in connection with behavioral health-related incidents;

    v.  The number of involuntary holds executed; and

    vi.  Available demographic data, including perceived or known race, age, and gender of people who are the subject of behavioral health-related calls and in-person responses.

## VII.    INTERACTIONS WITH YOUTH

213.    MPD shall Require that officers approach interactions with a person the officer knows or reasonably should know through inquiry or observation is a Youth in a manner that is developmentally-appropriate, age-appropriate, and trauma-informed, and considers the individual characteristics of the Youth, if apparent or known, including age, gender, size, developmental and mental status, disability status, and maturity.

214.    MPD shall Require that in interactions with a person the officer knows or reasonably should know through inquiry or observation is a Youth, when appropriate, officers use alternatives in lieu of Arrest, including warnings and Citations, and consider referral to social workers embedded with MPD, if any.

215.    MPD shall develop and implement, as part of its Use of Force Policies, specific Protocols and practices to use in all types of law enforcement encounters with Youth. These Protocols and practices shall include, at a minimum, the following principles:

  a.  When feasible, MPD officers shall employ developmentally-appropriate and trauma-informed de-escalation tactics, including but not limited to, using a calm, neutral demeanor and age-appropriate, non-threatening language;

  b.  MPD officers shall avoid, when feasible, handcuffing a Youth who the officer knows, or reasonably should know through inquiry or observation, is under the age of 14;

  c.  Before using force, MPD officers shall consider and evaluate known or observable individualized factors of the Youth—including age, body size, disability status, developmental and mental status, and strength and other

74

physical attributes of the officer relative to the Youth, and risk posed by the

Youth—and calibrate the level of force used accordingly;

d. In determining whether to use force and the appropriate type of force to use,

MPD officers shall consider the setting of the encounter (e.g., whether it would

occur at a Youth-centric location like a playground, school, or recreation center);

and

e. In case of injury resulting from a use of Reportable Force, MPD officers shall

take immediate steps to provide or obtain, as appropriate, needed medical

attention to the Youth, consistent with the officer's training and experience, as

soon as the officer can safely do so, and shall notify the Youth's parent,

guardian, or other adult who can take responsibility for the Youth as soon as

possible.

216.    MPD shall Require that officers are permitted to use a CEW on a person the

officer knows, or reasonably should know through inquiry or observation, is a Youth, only if de-

escalation techniques and other lower levels of force are not sufficient and the use of a CEW is

otherwise in compliance with MPD Policies.

217.    MPD shall Require that officers receive training on available non-law

enforcement resources to address situations involving Youth victims, witnesses, suspects, and

detained individuals, including social workers embedded with MPD, if any.

218.    MPD shall provide 16 hours of initial and 8 hours of annual training, including

scenario-based training, on Policies related to interactions with Youth. MPD shall incorporate

individuals or organizations with Youth-related expertise (such as community-based instructors,

mental and behavioral health service providers, academics in the field of Youth development,

Youth, Youth organizations, or community resource providers) to participate in the development, delivery, and/or implementation of Youth-specific curricula.

## VIII.    MISCONDUCT AND ACCOUNTABILITY

### A.    General Principles

219.    A goal of this Decree is to have a robust and well-functioning accountability system in which officers are held to the highest standards of integrity; this is a priority to the City and to MPD, as it is critical to the Department's legitimacy. A well-functioning accountability system is one in which the City and MPD: openly and readily receive officer Misconduct complaints reported by civilians and officers and fully, fairly, and efficiently investigate them; support all investigative findings by the appropriate standard of proof and document them in writing; hold accountable all officers who commit Misconduct pursuant to a disciplinary system that is fair, consistent, and provides due process as required under law; and treat all individuals who participate in the City's and/or MPD's internal disciplinary process—including complainants, officers, and witnesses—with respect and dignity.

220.    The City and MPD shall Prohibit all forms of retaliation, interference, intimidation, coercion, or adverse action against any person because that person participated in good faith in a Misconduct complaint or investigation process and consider any such action as Misconduct.

221.    The City and MPD shall Require that no City or MPD communications to complainants or witnesses contain any language that could reasonably be construed as discouraging participation in a Misconduct investigation, such as a warning against making false statements, and shall Require that complainants, witnesses, and subject officers are treated with dignity and respect throughout the complaint and investigative process.  This does not preclude the City and MPD from requiring complainants and witnesses to agree that what they share is

truthful and accurate to the best of their knowledge and belief. The Office of Police Conduct Review ("OPCR") shall advise complainants and witnesses that it is committed to fairly considering all community Misconduct complaints and encourages community members to bring officer Misconduct to the City's attention.

222.     The City and MPD recognize the importance of increasing transparency about their operations, including how they conduct internal investigations into allegations of officer Misconduct. The City and MPD will continue to take steps to increase transparency, where appropriate and permissible under federal and Minnesota law.

**B.     Complaint Processing Authority**

223.     The City and MPD shall continue to vest authority to investigate and review allegations of Misconduct in two distinct entities:

a.  OPCR will process and investigate complaints of Misconduct that are filed by or received from (i) members of the public, including anonymous complainants; (ii) OPCR employees; and (iii) Community Commission on Police Oversight commissioners; and

b.  IAD will process and investigate Misconduct complaints filed by or received from (i) City employees not referenced in Paragraph 223(a) and (ii) anonymous complainants who file a complaint directly with the City's portal described in Paragraph 243.

224.     The City's entity receiving or investigating Human Resources complaints may process and investigate complaints that an MPD employee violated City anti-discrimination, harassment, and/or retaliation policies, or non-MPD City policies.

225.     OPCR and IAD shall process and investigate allegations of Criminal Misconduct in accordance with Paragraph 272.

226.    Except for a Critical Incident and consistent with Paragraph 238, if both an internal complaint and an external complaint of Misconduct are received regarding the same incident, the entity that received the first complaint will investigate the incident, and the scope of the investigation will include all allegations alleged in any subsequent complaints about the incident.

227.    The City and MPD shall prevent actual or perceived conflicts of interest in any Misconduct investigation or disciplinary decision by Requiring that, at a minimum:

    a.    No City or MPD personnel who was involved in or a witness to the incident that gave rise to the Misconduct complaint shall conduct, assist, or issue a decision or recommendation on a Misconduct investigation arising out of the incident;

    b.    No City or MPD personnel who has an external business relationship or close personal relationship, as defined in City or MPD Policy, with a complainant, focus officer, or witness in a Misconduct investigation shall conduct, assist, or issue a decision or recommendation on the Misconduct investigation, or be involved in making any disciplinary decisions related to the Misconduct complaint; and

    c.    No City or MPD personnel shall conduct, assist, or review a Misconduct investigation or be involved in making a disciplinary decision regarding a Misconduct complaint if the focus officer or complainant is an individual to whom the personnel directly reports to in their chain of command.

228.    If IAD, or OPCR cannot staff an investigation under the requirements of the previous paragraph or due to temporary backlog and/or understaffing, it shall refer the investigation to the other investigative component or a qualified outside investigator entity, who

is approved by the Monitor to investigate Misconduct complaints. The Monitor shall provide the United States a reasonable opportunity to provide feedback regarding the proposed investigator entity before issuing approval; this approval opportunity does not apply to investigator entities which already have been approved in relation to the State Court Agreement, but does apply to any extension of terms of service for such entities. An outside investigator entity will act as agents of IAD and/or OPCR and be subject to the applicable requirements of this Decree.

229.    Nothing in this Decree Prohibits the OPCR, IAD, and the City from receiving or investigating human resources complaints or from sharing knowledge with each other about complaints and investigations within their jurisdiction or the fact that an investigation is occurring, as permitted under law.

### C.    Staffing and Training

230.    The City and MPD shall Require that all Misconduct investigators are trained on investigative skills, and that all Misconduct investigators and intake personnel operate with high standards of integrity and the ability to be fair and objective.

231.    The City and MPD shall provide all Misconduct investigators and Supervisors with a minimum of 40 hours of initial and 8 hours of annual training on conducting Misconduct investigations, including the applicable requirements of the Decree, delivered by a qualified trainer. The initial training shall cover at least the following:

  a. Investigative skills, including sound interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;

  b. The particular challenges of law enforcement Misconduct investigations, including identifying Misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation;

    c.  Weighing the credibility of witnesses, including properly weighing the credibility of civilian statements against officer statements;

    d.  Using corroborative evidence to resolve inconsistent statements;

    e.  Relevant state and federal law;

    f.  Relevant MPD Policies and Procedures, including Protocols for coordinating with OPCR and IAD;

    g.  Appropriate classification of complaints; and

    h.  Proper application of the standards of proof.

**D.    Disciplinary Matrix**

232.  To provide consistency in the imposition of discipline, MPD shall adopt a disciplinary matrix and related Policies that establishes categories of violations based on the seriousness of the violation and the culpability of the officer. The disciplinary matrix shall:

    a.  Define the lowest category ("Category A") to solely include conduct that, while against Policy, is isolated in nature and has or risks a minimal negative impact on public safety or on MPD's overall operations or professional image. Category A may include violations that are not willful, meaning unavoidable infractions, inadvertent infractions, or infractions where the officer reasonably believed either that they were complying with Policy or that they were acting in the best interest of the public and consistent with MPD's mission. These violations may include, for example, violations concerning improper attire/appearance or failure to properly inspect a vehicle. Category A shall not include Policy violations that involve the Use of Force; untruthfulness or false statements of any material facts; Stops, Searches, or Arrests that violate Policy; acts of bias, discrimination or retaliation as described in MPD Policy; Policy violations with respect to members

of the public at First Amendment Events; or violations of Policy that are willful or repeated;

b.  Specify a range of discipline for each category of violation higher than Category A, including minimum, presumptive, and aggravated levels of discipline;

c.  Increase the presumptive discipline based on an officer's prior violations within a defined period of time prior to the Misconduct;

d.  Set forth mitigating and aggravating factors;

e.  Prohibit consideration of the officer's legally-protected statuses;

f.  Prohibit taking only non-disciplinary corrective action where, based on the individual facts and circumstances of a case, the disciplinary matrix calls for discipline;

g.  Require each sustained Misconduct allegation to be treated as a separate violation for purposes of determining discipline, except if the same conduct results in overlapping Policy violations, in which case the highest Policy violation may be considered for determining corrective action;

h.  Require discipline determinations to be based solely on the investigative findings, the facts and circumstances of the situation, the presence of mitigating or aggravating factors, and the application of any progressive discipline policy (which may include that, although discipline will normally be administered progressively, progressive discipline does not require that each form of discipline be applied, nor must it be applied, in any particular order); and

      i.    Require any departures by the Chief from the presumptive discipline, including any downward departures from the minimum discipline, to be justified based on the facts and circumstances of the situation and documented in writing.

233.    The City and MPD shall develop a publicly available Protocol to govern the process for classifying Misconduct that will:

      a.    List and define Misconduct types, with adequate specificity to classify all potential Misconduct, including unlisted violations;

      b.    Establish Procedures for the prompt and accurate classification of each potential violation raised in a complaint and document the classification in its electronic case management system; and

      c.    Establish Procedures for when additional possible Misconduct types are identified during the course of an investigation.

**E.    Cooperation & Anti-Retaliation**

234.    The City shall Require all City officials, departments, and employees to cooperate with lawful requests from personnel engaged in the investigation activities described in this Section by providing full, free, and unrestricted access to the extent authorized by law to all requested information. The City shall deem the failure by any official or employee to comply with lawful requests for information or access to be an act of misconduct, unless there is a lawful basis to not comply with the request, such as that the information at issue is subject to the attorney-client or work product privileges, or other privileges or restrictions on access that are recognized under law.

235.    MPD shall Require their personnel to fully cooperate in Misconduct investigations, to the extent permitted by law, including appearing for an interview when requested by an OPCR or IAD investigator, answering questions at such an interview, and

providing all relevant evidence under the person's custody and control, unless the information or evidence is subject to the attorney-client or work product privileges, or other privileges or restrictions on access that are recognized under law. MPD shall Require that an investigator requesting that an officer appear for an interview shall notify the officer's Supervisor, who shall facilitate the officer's appearance.

236.    To the extent permitted by law, MPD and the City shall Prohibit knowing or intentional interference with a Misconduct investigation—including but not limited to: (i) being untruthful in an investigation into Misconduct, (ii) destruction of evidence, (iii) witness tampering, or (iv) colluding with other individuals to undermine such an investigation—and consider such interference as misconduct.

### F.    Filing a Misconduct Complaint

237.    The City and MPD shall enable people who wish to file Misconduct complaints to do so through a convenient and accessible complaint intake process that protects complainants from retaliation.

238.    Excluding employment discrimination lawsuits, claims, demand letters, and charges, the City and MPD shall promptly forward to OPCR all civil lawsuits, claims, and demand letters that allege Misconduct, wherein the matter will be treated consistent with Paragraph 223, and to IAD all administrative charges of discrimination that allege Misconduct and shall consider them all as signed complaints.

239.    The City Attorney's Office ("CAO") shall create a *Brady* email box. CAO shall send a memorandum to the Hennepin County Attorney's Office and the United States Attorney's Office for the District of Minnesota requesting that they provide written notice to the CAO via its *Brady* email box when they become aware that a court has made an affirmative finding with respect to an MPD officer during the course of a criminal proceeding, including at a suppression

hearing, of: untruthfulness; a Constitutional violation; or a negative credibility determination. CAO shall notify IAD when CAO receives such written notice from the Hennepin County Attorney's Office or the United States Attorney's Office via its *Brady* email box.

240.    The City and MPD shall enable people to submit complaints in multiple ways, including in-person or anonymously, by telephone, and online. The City and MPD shall:

    a.    Make complaint forms widely available, including on the City and MPD webpages and at City buildings throughout the City, through the Community Commission on Police Oversight, and to community groups;

    b.    Provide a web-based form for electronic complaint intake;

    c.    Accept complaints at all publicly-accessible MPD offices and facilities, as well as any OPCR office;

    d.    Require that all MPD officers carry complaint forms in their MPD vehicles and provide them to anyone who requests one or wishes to make a complaint. Officers shall provide their name and badge number upon request and shall not attempt to discourage a person from filing a complaint;

    e.    Require that MPD employees, the entity processing or investigating Human Resources complaints, or OPCR promptly provide information about how to file a complaint upon request; and

    f.    Conduct community outreach regarding the complaint intake process.

241.    The City and MPD shall Require that each complainant have access to a summary of the complaint procedure as set forth in MPD Policy.

242.    The City and MPD webpages and printed materials regarding the submission of complaints and their printed and online complaint forms shall:

    a.   Clearly display information about the telephone hotline, online form, and locations at which complaints may be submitted in person;

    b.   Include a statement that the City and MPD investigate unsigned and anonymous complaints; and

    c.   Be available in at least English, Spanish, and Somali.

243.    The City shall maintain a webpage or online portal for MPD and City employees to report (including anonymously) officer Misconduct. The City will develop a Policy on how and when MPD and City staff will be required to report officer Misconduct. Anonymous reports of officer Misconduct through this webpage do not relieve MPD officers of their duty to report specific conduct under MPD Policy.

244.    The City shall consider complaints signed if they are submitted through email or an online portal and include a complainant name. If required by law to take an officer's formal statement, the OPCR Director or IAD Commander may substitute their signature to constitute a signed complaint.

245.    The City and MPD shall promptly advise complainants if and when their Misconduct complaint has been closed and, to the extent permitted by Minnesota law, the outcome of the complaint.

    **G.**    **Intake of Misconduct Complaints**

246.    Other than as provided in Paragraph 224, the City will Require that all complaints of Misconduct are processed as follows:

    a.   The City shall Require that Misconduct complaints are documented and formally filed within three business days of receipt, and that a unique tracking number is assigned promptly.

    b.   The City shall Require that within seven business days of receipt of a Misconduct complaint or concern, OPCR/IAD will notify, in writing, non-anonymous complainants that it has received the complaint or concern. The written notification will include the tracking number or barcode originally assigned to the complaint that the complainant may use to track the status of their complaint online from the intake process through final disposition, to the extent permissible under Minnesota law. The written notification will also include contact information for the investigator if one has been assigned within seven days. The written notification will not contain any language that could reasonably be construed as discouraging participating in the investigation, consistent with Paragraph 221.

247.    After receiving an unsigned complaint from a complainant who provides contact information, the City shall Require OPCR and MPD staff to make reasonable attempts to secure a signature on the complaint form from the complainant within 30 calendar days of receiving the complaint. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status.

248.    The City shall consider complaints signed if they are submitted through email or an online portal and include a complainant name.

    a.   If intake staff are unable to obtain a signed complaint despite having made reasonable attempts to do so, it will assess whether the evidence collected in the intake classification process set forth in Paragraph 249, such as review of body-worn camera footage, is sufficient to continue the investigation; and

b. If the intake classification process suggests it is necessary and appropriate for a Misconduct investigation, the City and MPD will develop and implement a Policy requiring the Commander of IAD or the Director of the OPCR to sign an official complaint document where necessary to accept and investigate an anonymous or unsigned complaint.

249. The City and MPD will develop a Protocol to Require that all complaints are properly classified as follows:

a. The Protocol will list the allegation types and provide examples of officer conduct that fits each allegation type. The Protocol will be publicly available on MPD's webpage.

b. The IAD Commander and OPCR Director will coordinate the initial classification of Misconduct complaints within their respective jurisdictions and classify them consistent with the complaint classification Protocol.

c. Within 30 days of entering a complaint into its electronic case management system, as required in Paragraph 288, OPCR or IAD shall promptly identify, collect, and consider all existing available evidence at their disposal other than that potentially available or discoverable through investigatory interviews, including any audio or video recordings, and shall identify each alleged or otherwise identifiable act of potential Misconduct into an internal complaint form, classifying each act with the implicated MPD Policies and levels of MPD's Disciplinary Matrix;

d.  When an allegation of Misconduct implicates multiple categories of offenses or multiple separate Policy violations, all applicable Policy violations shall be charged;

e.  All allegations that, if true, would violate Policy, must be captured and classified appropriately even if the complainant does not affirmatively identify the violation;

f.  Any time an investigator determines that there may have been additional Misconduct or violations beyond those initially alleged or identified, all necessary steps shall be taken so that such Misconduct is fully and fairly documented, classified, and investigated; and

g.  The OPCR Director and IAD Commander shall refer an internal complaint form for investigation of each act of potential Misconduct, unless otherwise provided in Paragraphs 250, 252, or 255.

250.  At intake, OPCR and IAD may designate a complaint for dismissal only as follows:

a.  For lack of jurisdiction when it does not involve conduct of an MPD officer;

b.  For failure to state a claim when all allegations in a complaint (taken as true) and obtainable information fail to indicate potential Misconduct; or

c.  For "no basis" if all allegations are established as false by irrefutable evidence.

251.  OPCR and IAD may identify policy gaps that contributed to the incident that led to the complaint and may refer the complaint to the Chief of Police or designee for further action, with an anonymized summary describing the policy gap provided to the Community Commission on Police Oversight ("CCPO"), if feasible under the Minnesota Government Data Practices Act. Such referral shall not constitute a basis for dismissal.

252.    At intake, OPCR and IAD may refer a Misconduct complaint matter for coaching, training, or (for police Misconduct complaints involving a community member) mediation in lieu of formal investigation, only for Category A violations that involve (i) isolated incidents that (ii) have had or may have a negligible impact on community trust of MPD and/or MPD operations.

253.    Matters or allegations designated for dismissal pursuant to Paragraph 250 or referred for coaching, training or (for police Misconduct complaints involving a community member) mediation in lieu of formal investigation, pursuant to Paragraph 252 must be:

    a.    Documented by the Unit Head of OPCR and IAD, setting forth in detail the basis for the decision; and

    b.    Referred to the MPD Chief or designee at Deputy Chief rank or above for a final determination to take place within seven calendar days of receipt.

254.    The City and MPD shall Require that a Misconduct complaint involving the following allegations of Misconduct is not dismissed or closed because the focus officer has resigned or retired; the City and MPD will continue processing and investigating the complaint and reach a finding based on the available evidence, to the extent achievable based on reasonable efforts:

    a.    Excessive Uses of Force;

    b.    Discriminatory policing;

    c.    On-duty impairment or intoxication;

    d.    Pursuit or emergency driving conduct that results in injury;

    e.    Failure to report uses of Level 2 or 3 Reportable Force;

    f.    Untruthfulness;

    g.   Negligent or reckless handling of a firearm resulting in a discharge likely to cause bodily injury or death;

    h.   False arrest;

    i.   False search or planting evidence;

    j.   Unwarranted threats of harm;

    k.   Work-related sexual misconduct;

    l.   Improper handling of money, narcotics, or evidence;

    m.   Work-related sexual harassment, protected class harassment and related retaliation;

    n.   Criminal conduct in the course of duty;

    o.   Policy violations with respect to members of the public at First Amendment Events; and

    p.   Failure in duty to intervene or duty to report related to any above-listed allegation.

255.    At intake, IAD and OPCR may refer for expedited disposition a Misconduct complaint assigned to them if the complaint (1) involves a violation supported by clear and objective factual support and low likelihood of factual dispute; and (2) does not and cannot involve allegations of untruthfulness, excessive Use of Force, discrimination, failure to report Misconduct, a failure of a duty to intervene, or an intentional and knowing violation of MPD Policy that resulted in harm to another. Before referring an external complaint for an expedited disposition, OPCR must make reasonable efforts to communicate with the complainant to better understand the nature of the allegations raised by the complaint. A complaint referred for expedited disposition must be approved for such disposition by the Chief, taking into account mitigating and aggravating circumstances, if any, including the presumed cooperation by the

focus officer in the expedited disciplinary process and must result in an offer of a disciplinary outcome to the focus officer that is consistent with the Disciplinary Matrix. The Chief may not negotiate the allegations or discipline with the focus officer but may consider any mitigating circumstances that the officer requests be taken into account in finalizing an offer of discipline that is consistent with the Disciplinary Matrix. If the focus officer does not accept the finalized offer, the complaint shall be referred for an investigation as set forth in Paragraph 249(g).

256.    If at any time during the complaint intake process or during an investigation, the Misconduct investigative entity determines that there may have been Criminal Misconduct by MPD personnel, that entity shall immediately notify IAD.

### H.    Misconduct Complaint Intake Auditing

257.    The City, in consultation with MPD, shall conduct an audit at regular intervals to assess Misconduct complaint intake by OPCR and IAD personnel. The City shall Require that the auditor has adequate training to conduct a reliable audit. The audit shall include an evaluation of whether complaints are correctly classified. The City shall produce regular public reports of the audit.

### I.    Coaching Process

258.    MPD shall Require that Misconduct complaints referred for coaching pursuant to Paragraph 252 shall be processed as follows:

    a.    IAD or OPCR shall prepare a coaching file that includes all identified witness contact information and a complete summary of the complaint and allegations, as well as a draft coaching document.

    b.    On approval by the Chief or designee at Deputy Chief rank or above, the coaching file and draft coaching document shall be sent by the Chief or designee to the highest-ranking Supervisor in the focus officer's precinct or division.

c.   Within 30 days of receipt, the highest-ranking Supervisor in the focus officer's precinct or division shall require that the focus officer's direct Supervisor conducts and documents a review sufficient to determine whether a policy violation has occurred, and provides coaching designed to remediate any sustained Policy violation.

d.   On completion, the coaching document will be returned to the Chief or designee at the rank of Deputy Chief or above. If the officer was initially designated for coaching by OPCR, the coaching document will also be sent to the OPCR Director.

e.   The coaching document may be returned to the Supervisor by the Chief, designee, or OPCR Director for further action if not accurate or complete.

**J.    Mediation**

259.    The City and MPD may develop and implement a mediation program as an alternative to the investigation of certain minor police Misconduct complaints involving community members that meet a category identified in Paragraph 252. Any mediation program shall be designed to increase understanding and trust between community members and officers and to prevent future Misconduct. If the City and/or MPD determines to develop a mediation program, it shall develop Policies and Procedures for a mediation program, subject to feedback by the United States and approval by the Monitor, pursuant to Paragraphs 378–380.

260.    Referrals of complaints to mediation and the results of the mediation shall be documented in the case file. If mediations are conducted, the City shall conduct periodic audits so that mediations comply with the terms of this Decree.

### K.    Misconduct Investigations

261.    OPCR and IAD shall fully investigate each Misconduct complaint assigned to them, unless it has been dismissed pursuant to Paragraph 250, referred under a protocol governing the imposition of discipline in an expedited manner pursuant to Paragraph 255, or referred for coaching, mediation, or training pursuant to Paragraph 252. The City and MPD shall Require that all OPCR and IAD personnel responsible for investigating Misconduct complaints conduct objective, comprehensive, and timely investigations of all Misconduct allegations. The City and MPD shall Require that all OPCR and IAD investigators' findings are based on the appropriate standard of proof and shall clearly delineate these standards in Policies, training, and Procedures. The City and MPD shall Require that officers who have been informed that they are under investigation or are a witness in a Misconduct investigation do not review any investigative files, reports (except for reports authored by the officer), body-worn camera footage, or other evidence related to the incident in which they are the officer alleged to have committed Misconduct or a witness unless the officer is in the presence of the investigator. This provision does not apply if the review is necessary to prepare for a criminal or civil proceeding or except as otherwise provided by law. In the event an officer has reviewed such data, the investigator shall document the date(s) and duration of review and consider the review when assessing the officer's credibility.

262.    The City and MPD shall Require that in each OPCR or IAD Misconduct investigation, investigators shall, at a minimum:

    a.    Conduct thorough investigations designed to determine the facts;

    b.    Evaluate all relevant officer activity in the incident and any evidence of potential Misconduct, including Criminal Misconduct, uncovered in the investigation, whether or not the potential Misconduct was part of the original allegation;

c. Promptly identify, collect, and consider all material evidence, including any audio or video recordings, and take all reasonable steps to locate and interview all material witnesses;

d. Audio-record all interviews to the greatest extent possible;

e. Make credibility assessments about civilian, officer, and witness statements based on independent, unbiased, and credible evidence and:

    i. Shall not assume an officer's statement is independent, unbiased evidence;

    ii. Shall not disregard a witness' statement solely because the witness (including a complainant) has a criminal history;

    iii. Shall not disregard a witness' statement solely because the witness has some connection to the complainant or an involved officer (however, such connection can be considered to assess impartiality);

    iv. Shall take into account the known record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, Misconduct investigation, or other investigation; and

    v. Shall make all reasonable efforts to resolve material inconsistencies between officer, complainant, and witness statements.

263. An OPCR or IAD investigator may consider a report or finding from the Force Investigation Team or Force Review Board during the course of conducting a Misconduct investigation but is not required to accept such report or finding or be otherwise bound by it.

264. The City and MPD shall Require that OPCR and IAD investigators shall maintain a centralized electronic case file that includes:

a.  Documentation of all evidence gathered, and copies (or cloud access) of all documents and files relevant to the investigation, including photographs and audio and video recordings and all recordings and interview transcripts;

b.  Copies of each relevant Policy provision in effect at the time of the conduct under investigation;

c.  If a weapon was used, documentation of whether the officer's certification and training for the weapon were current;

d.  The officer's disciplinary record at the time of the complaint; and

e.  Documentation of each witness identified and of efforts made to identify witnesses.

265.  The City and MPD shall Require that OPCR and IAD investigators shall not:

a.  Ask leading questions in interviews that suggest a justification for officer conduct;

b.  Discourage any person from providing a full account of an incident; or

c.  Seek to close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate.

266.  The City and MPD shall Require that, at the conclusion of each Misconduct investigation, the OPCR or IAD investigator shall prepare a report ("Investigation Summary Report") which shall include:

a.  A description of the incident, including a detailed description of the evidence that weighs in favor of and/or against a finding that Misconduct occurred;

b.  A list of allegations of potential Misconduct investigated;

c.  A summary of investigative actions taken and evidence gathered;

    d.   A description of and basis for each credibility assessment;

    e.   Where material inconsistencies must be resolved among witnesses, an explanation of resolution of each inconsistency; and

    f.   The investigator's evaluation of the facts of the incident based on the evidence, including recommended findings of fact related to each factual allegation investigated and an explanation of how the evidence supports each factual finding, based on the applicable burden of proof.

267.    The City and MPD shall Require that OPCR and IAD supervisors shall regularly meet with investigators they supervise to so that investigations are conducted in a manner that is rigorous, timely, and otherwise in compliance with the Decree.

268.    The City and MPD shall Require all OPCR and IAD Misconduct investigations to be completed within 180 days of initiation of the investigation unless an extension of time is justified based on the complexity of the investigation or other factors outside of OPCR and IAD's control; extensions shall be approved in writing by the director of OPCR or commander of IAD or above, depending on which agency is processing the complaint.

269.    The City and MPD shall Require OPCR and IAD supervisors to review Investigative Summary Reports and key relevant evidence, which may include any audio or video footage, for accuracy, completeness, and compliance with City and MPD Policy. The City and MPD shall Require OPCR and IAD supervisors to also review full investigative files, if necessary. The City and MPD shall Require OPCR and IAD supervisors to order additional investigation when it appears that additional relevant evidence may assist the investigation, for example in resolving inconsistencies or improving the reliability or credibility of the Investigative Summary Report. The City and MPD shall Require the OPCR or IAD supervisor to

document in writing the need and basis for that additional investigation; in such a case, the OPCR or IAD supervisor must provide a date by which the additional investigation will be complete, and the Investigative Summary Report will be submitted for review and approval. The City and MPD shall Require that any supervisory review and approval of investigative files and Investigative Summary Reports is complete within 15 calendar days of an investigator completing their investigation and the Investigative Summary Report, unless additional investigation is needed.

270.    The City and MPD shall Require that, based on their review of the completed and approved Investigative Summary Report, the OPCR Director or IAD Commander, respectively, evaluate the incident for Policy, training, tactical, or equipment concerns, and, based upon the findings of fact in the Investigation Summary Report, make one of the following recommendations for each allegation of a Policy violation:

a.    "Sustained," if the investigation determines by a preponderance of the evidence that alleged Misconduct occurred;

b.    "Exonerated," if the investigation determines by a preponderance of the evidence that alleged conduct occurred but did not violate policy;

c.    "Unfounded," if the investigation determines by clear and convincing evidence that alleged conduct did not occur or did not involve the accused officer; or

d.    "Not sustained," if the investigation is unable to determine by a preponderance of the evidence whether the alleged Misconduct occurred.

271.     The City and MPD shall not use the "reckoning period expired" disposition and shall only use the "closed by exception" disposition for complaints subject to Paragraph 254. The City and MPD shall not otherwise close any OPCR or IAD Misconduct investigation or

dismiss an allegation referred for OPCR or IAD Misconduct investigation without making a recommendation as set forth in Paragraph 270 as to each allegation, except that an allegation may be dismissed during the investigation if it (a) involves a Policy violation that is encompassed by an allegation of a more severe Policy violation; and (b) is documented in writing and approved consistent with the process set forth in Paragraph 253.

### L.    Criminal Referrals

272.    The City and MPD shall Require that Misconduct complaints that involve potential Criminal Misconduct shall be processed as follows:

a.    To the extent the case falls within MPD's jurisdiction, any criminal investigation into potential MPD officer Misconduct is performed by an impartial and competent investigator. The investigator may be employed by MPD or a separate agency.

b.    OPCR and MPD shall develop a Protocol to govern when to refer allegations of Misconduct to another law enforcement agency or qualified outside investigator to conduct a criminal investigation. The Protocol will specify the criteria to be considered in making the referral, including how to select the agency or outside investigator to conduct the investigation.

c.    Whenever OPCR or IAD opens a Misconduct investigation and there is an ongoing criminal investigation, OPCR and IAD shall resume the Misconduct investigation upon the conclusion of or with the consent of the criminal investigators and/or prosecuting agency. The Protocol shall specify that any acquittal or dismissal of a criminal case will not determine the outcome of a corresponding Misconduct investigation.

d.  All referrals to a prosecuting agency must be documented in the Misconduct case file, including the date of the referral and any recommendations made.

e.  When a prosecuting agency other than the Minneapolis City Attorney's Office declines prosecution or dismisses a case involving potential Criminal Misconduct after initiating criminal charges, OPCR and MPD shall request an explanation for the decision and document any response in the Misconduct case file.

f.  If a criminal investigation performed by MPD into potential Criminal Misconduct is closed with no referral to a prosecuting agency, OPCR or MPD shall document the Misconduct case file with the rationale for no referral. If a criminal investigation performed by another law enforcement agency into potential Criminal Misconduct is closed with no referral to a prosecuting agency, OPCR or MPD shall request an explanation for the decision and document any response in the Misconduct file.

**M.    Investigation Review**

273.    The City and MPD shall Require that following the completion of an OPCR or IAD Misconduct investigation and approval by the OPCR director or IAD commander, the investigative file, the Investigation Summary Report, and the recommendation by the OPCR Director/IAD Commander as set forth in Paragraph 270, shall be forwarded to the police oversight review panel to recommend a finding consistent with the categories in Paragraph 270 a-d and recommend corrective action for each allegation for which the review panel recommends a Sustained finding. A panel shall have access to the complete investigation file (which may have irrelevant information about legally protected class status or legally protected activity redacted, and which may have irrelevant information about City/MPD employees' medical information

redacted) for at least one week, meet within 30 days of the approval of the investigation report, and issue its recommendation within three (3) business days of the adjournment of its meeting.

274.    The City shall Require that police oversight review panels must:

    a.    Prior to deliberations, be provided oral instructions on how to evaluate and weigh evidence;

    b.    Not consider evidence or information outside of the investigative record, including any prior experience with the complainant or focus officer;

    c.    If the review panel recommends a finding that the allegation of Misconduct be Sustained, recommend an appropriate range of corrective actions consistent with the appropriate classification under the MPD Disciplinary Matrix; and

    d.    If the recommendation of the review panel differs from the recommendations of the IAD Commander/OPCR Director, the review panel shall provide a detailed, written explanation of the basis for the recommendation, which shall be added to the Misconduct case file.

**N.    Chief Determination**

275.    Within 30 days of receipt of a police conduct review panel's recommendation, the Chief shall render a final decision, documented in writing in the Misconduct case file, or if necessary, a direction to the OPCR or IAD to conduct further investigation. If the final decision differs from the recommendation of the review panel, the Chief shall provide a detailed, written explanation of the basis for the decision, which shall be added to the Misconduct case file.

276.    The Chief shall base the decision solely on information contained in the investigative report and case file. If in making the decision, the Chief adopts any evidence or argument offered by a focus officer that was not available to the investigator during the investigation, the investigating entity shall have an opportunity to address such evidence and

argument before the Chief makes a decision. In such event, the investigation is not required to be re-submitted to the review panel.

277.    In exceptional cases in which a review of the investigation within 30 days is not possible, the Chief may extend this deadline an additional 30 days. The Chief shall document the reasons for the extension in the Misconduct case file.

278.    The Chief's decision as to an allegation is limited to the decision categories in Paragraph 270 a–d.

279.    When the Chief Sustains any finding of Misconduct, MPD shall provide written notice to the CAO via the CAO's *Brady* email box.

**O.    Accountability**

280.    The City and MPD shall Require that corrective action be taken consistent with the Disciplinary Matrix with respect to Sustained allegations of Misconduct. Any discipline shall be consistently applied, fair, and appropriate for the nature of the conduct. The City and MPD shall Require that mitigating and aggravating factors shall be consistently applied and documented.

281.    The City and MPD shall Require that officers serve suspensions promptly.

282.    The City and MPD shall Require that all disciplinary matters are thoroughly documented in a Misconduct case file, including:

a.    All discipline decisions by the Chief, and disciplinary recommendations received by the Chief, with an explanation of reasoning, including the presumptive range of discipline under the Disciplinary Matrix, any mitigating or aggravating factors considered, and the officer's disciplinary history;

b.    An explanation of reasoning for any departure by the Chief from the discipline recommendations ; and

      c.   The completion of any discipline, including the dates on which it was completed.

283.    The City and MPD shall Require that all Misconduct complaints, Misconduct investigation reports and files, and documentation of Misconduct complaint outcomes shall be maintained for the duration of the officer's employment with MPD; once the officer leaves MPD employment, that officer's disciplinary record will be maintained as a personnel record in the normal course of business.

**P.    Civilian Oversight Commission**

284.    The City shall develop a written Protocol consistent with Minnesota law for the Community Commission on Police Oversight ("CCPO") to receive information and cooperation necessary to carry out its duties.

285.    The City shall provide the CCPO:

      a.   Sufficient training on MPD Policies and Practices, the Disciplinary Matrix, constitutional standards for the Use of Force, and community expectations; and

      b.   Adequate OPCR staff support to fulfill its research and study duties.

286.    If the CCPO transmits policy or training recommendations to the Chief designed to improve MPD's performance or operations, then within 45 days of receiving any such recommendations, the Chief or designee shall provide a written response to the CCPO explaining whether MPD will accept them, and if not, its reasons.

**Q.    Data, Transparency, and Documentation**

287.    MPD shall participate in the National Decertification Index administered by the International Association of Directors of Law Enforcement Standards and Training (IADLEST), and shall provide the Minnesota Peace Officers Standards and Training ("POST") Board all POST Board-required information regarding sustained Misconduct findings about any officer who is terminated or resigns while a Misconduct investigation is pending.

288.    OPCR and IAD shall use an electronic case management system that shall:

    a.    Track each allegation of Misconduct which OPCR and IAD investigates, regardless of outcome, from initial intake to final conclusion, including the nature of the allegation, recommended disposition of the IAD Commander/OPCR Director, recommendation of the police oversight review panel, final determination by the Chief, assessed discipline, and final disposition of discipline;

    b.    Track each allegation of Misconduct which OPCR and IAD refers for coaching, including the nature of the allegation, the merit finding of the assigned Supervisor, whether coaching was performed, and the date the coaching referral was completed;

    c.    Maintain complete case files for all OPCR and IAD matters, including all notices to and records of correspondence with complainants, respondents, and witnesses; and

    d.    Routinely compile aggregate data regarding the number, nature, and status of Misconduct allegations, from initial intake to final conclusion, including investigation timeliness and notifications to the complainant and focus officer.

289.    The City and MPD shall enable complainants and the public to check and track the status of OPCR and IAD Misconduct complaints, to the extent consistent with the Minnesota Government Data Practices Act.

290.    The City and MPD shall routinely compile and make available to the public data on Misconduct investigations and discipline, including at least the following, to the extent permitted by the Minnesota Government Data Practices Act:

a.  Summary data, as defined in the Minnesota Government Data Practices Act, on complaints received from the public, including breakdowns by at least the following categories:

   i.   Nature of the Misconduct allegation(s);

   ii.  Complaint source (i.e., internal, a member of the public, or anonymous);

   iii. Entity processing the complaint (e.g., IAD or OPCR)

   iv.  Demographic information of the complainant; and

   v.   Assigned unit, rank, and years of service categories.

b.  Summary data, as defined in the Minnesota Government Data Practices Act, on the processing and investigation of complaints, including breakdowns by investigating entity (OPCR or IAD) of at least the following categories:

   i.   For dismissed complaints, average and median times from receipt of a complaint to dismissal;

   ii.  For complaints referred to coaching, average and median times from receipt of a complaint until completion of coaching processing, the number of allegations sustained, and the percentage of coaching referrals that result in coaching;

   iii. For complaints referred to mediation, average and median times from receipt of a complaint until completion of the mediation process, and the percentage of mediation referrals that result in a successful outcome;

   iv.  For investigated complaints, average and median times from receipt of a complaint until initial contact with the complainant, submission for supervisory review, approval of completed investigation, completion of

police oversight review panel process, final determination by the Chief, and final disposition of discipline, as defined by the Minnesota Government Data Practices Act.

c.  Summary data, as defined in the Minnesota Government Data Practices Act, on the outcomes of Misconduct investigations by allegation, including at least the following categories:

   i.  Nature of the Misconduct allegation(s);

   ii.  Allegations Sustained, Not Sustained, Exonerated, and Unfounded (as defined in Paragraph 270 a–d);

   iii.  Sustained allegations resulting in a non-disciplinary outcome, written reprimand, suspension, demotion, and discharge;

   iv.  Allegations where the IAD Commander/OPCR Director's recommended disposition was not adopted by the policy oversight review panel or the Chief or designee;

   v.  Allegations where police oversight review panel's merit/no merit recommendations were not adopted by the Chief or designee;

   vi.  Discipline appealed through a collectively bargained grievance process, including whether the discipline was affirmed, reversed, or reduced, and the final disposition of discipline, as defined by the Minnesota Government Data Practices Act; and

   vii. Dispositions and discipline imposed, broken down by race, ethnicity, and gender of the complainant, and whether discipline was the result of the expedited disposition process or the subject of a labor grievance;

d.  Summary data, as defined in the Minnesota Government Data Practices Act, on officer Misconduct, including the following categories:

i.  The number of officers who have been the subject of three or more completed Misconduct investigations in the previous 12 months;

ii.  The number of officers who have been the subject of three or more complaints of Misconduct in the previous 12 months;

iii.  The number of officers who have had two or more Sustained complaints in the previous 12 months, including the number of Sustained complaints;

iv.  The number of criminal prosecutions of officers, broken down by criminal charge; and

v.  The number of officers who resigned while Misconduct complaints were pending.

e.  Discipline decisions in final disposition as defined by the Minnesota Government Data Practices Act and the related Police Chief's written discipline memoranda will be made promptly available to the public, to the extent permitted by Minnesota law, via the City's website through a searchable database by precinct where the violation occurred and the precinct or command to which the officer was assigned, the type of violation, and the officer's name.

## IX.  POLICY DEVELOPMENT TEAM

291.  MPD shall create and maintain a Policy Development Team that shall have primary responsibility to draft, revise, maintain, and distribute Policies in the MPD Policy and Procedure Manual. MPD shall staff the Policy Development Team with personnel who have strong writing, analytical, and communication skills.

292.     MPD shall Require that Policies are accurate, clearly written in plain language to the extent feasible, presented in a consistent, and easy-to-follow format, and consistent with operational needs, legal requirements, and this Decree.

293.     MPD shall Require that the Policy Development Team shall create and publicly maintain on MPD's webpage a written process for initiating the review, development, and updating of Policies in MPD's Policy and Procedure Manual. The process shall include, at a minimum:

   a.   A method permitting any MPD personnel or community member to contact it to ask MPD to create or change a Policy; and

   b.   A process for the regular review and development of Policies in consultation with the Chief, MPD command staff, and representatives of the Audit, Data Analytics, and Consent Decree Implementation functions.

294.     MPD shall Require that the Policy Development Team shall review and revise Policies in MPD's Policy and Procedure Manual promptly as necessary upon notice of a significant policy concern or deficiency.

295.     MPD shall Require that the Policy Development Team shall maintain an up-to-date, complete version of MPD's Policy and Procedure Manual on the MPD webpage, with reasonable exceptions or redactions for Policies that are law enforcement-sensitive, such as Procedures regarding undercover officers or operations.

296.     For any Policies required by this Decree other than those described in Paragraph 19, MPD shall Require that the Policy Development Team shall facilitate community engagement on such Policies as follows:

a.   Notify MPD personnel and post on MPD's webpage when a Policy required by this Decree is being revised or created, provide a copy of the draft Policy, and allow at least 30 days for written comment prior to implementation;

b.   Maintain a subscription option or an email list of people and organizations that have requested to receive notice of new draft Policies and Policy revisions required by this Decree, and send emails providing a link to the draft Policy on MPD's webpage, including a deadline by which comments must be submitted on MPD's webpage;

c.   MPD, the United States, and the Monitor shall review and consider all input received during the public comment period and MPD shall change the draft Policy as appropriate;

d.   Retain comments received outside the public comment period to read and consider the next time the Policy is reviewed; and

e.   Following a public comment period, post on MPD's webpage a redlined version of the draft Policy showing revisions made after it was posted for comment.

297.   For the Policies described in Paragraph 296, MPD may make changes pursuant to Paragraph 20–21, when applicable.

298.   MPD shall Require that the Policy Development Team shall internally announce when a new or revised Policy in MPD's Policy and Procedure Manual has been approved, send the final version to MPD personnel, and post the final version to MPD's webpage. MPD shall Require that applicable MPD personnel shall electronically sign a statement that acknowledges they received and read the Policy before its effective date.

299.    MPD shall Require that the Policy Development Team shall promptly update MPD's Policy and Procedure Manual when a new or revised Policy becomes effective and the Team shall maintain a record of all previous Policy versions. MPD shall provide applicable MPD personnel ready access to all Policies in MPD's Policy and Procedure Manual in a usable electronic format.

300.    The Monitor shall review and approve all Policies required by this Decree prior to final publication and implementation.

## X.    SUPERVISION

### A.    Duties of Supervisors

301.    MPD shall Require that Supervisors model appropriate conduct, including adhering to the Constitution, laws, Policy, and this Decree; and consistently demonstrate professionalism, courtesy, and respect.

302.    MPD shall Require Supervisors to provide close, effective supervision, including:

  a.  Enforcing MPD's core values;

  b.  Providing leadership, counseling, direction, and support to officers;

  c.  Requiring that officers work actively to engage the community and increase public trust in MPD;

  d.  Responding to, documenting, reviewing, and investigating Stops, Searches, Citations, Arrests, uses of Reportable Force, and other officer conduct to the extent required by this Decree and Policy;

  e.  Identifying Misconduct and requiring that it is addressed through corrective action, training, or referral for investigation;

  f.  Identifying training and professional development needs and opportunities on an individual, squad, unit, precinct, and department-wide level; and

g.  Reviewing incidents to identify performance issues, training needs, or potential Misconduct that should be investigated or referred for investigation.

303.    MPD shall implement unity of command by requiring that Sergeants and Lieutenants (including investigative unit Sergeants and Lieutenants) be assigned to work substantially the same shifts as the officers they are assigned to supervise (absent unusual circumstance or when the Sergeant or Lieutenant is on leave) to facilitate close and effective supervision.

304.    MPD shall implement span of control by requiring that patrol officers are assigned to a single consistent Supervisor for each bid year, except for transfers or promotions as provided in the collective bargaining agreement. First-line patrol Supervisors shall be assigned to supervise no more than eight officers, absent temporary deviations to account for increased patrol hiring, or minor gaps due to transfers or promotions. MPD will enact hiring and promotions Policies to maintain this ratio to the maximum extent possible. MPD shall Require that on-duty Supervisors shall be available to respond to the field to supervise officers under their command and to assist other units.

305.    MPD shall hold Supervisors accountable for the quality and effectiveness of their supervision.

306.    MPD shall develop and implement at least 40 hours of an inaugural supervisory training for all new and current Supervisors. The training will cover at least the following topics:

a.  Techniques for effectively guiding and directing officers and promoting effective and constitutional police practices;

b. Strategies for effectively directing officers to minimize force, de-escalate conflict, and intervene effectively to prevent or stop objectively unreasonable force;

c. Evaluating written reports, including identifying boilerplate or conclusory language;

d. Investigating uses of Reportable Force and supporting officers who report or intervene to prevent unreasonable force;

e. Building community partnerships and guiding officers on this requirement;

f. Understanding supervisory tools such as BWCs and the Early Intervention System;

g. Evaluating officer performance;

h. Responding to, reporting, and investigating allegations of officer Misconduct, consistent with Supervisors' job responsibilities.

i. MPD's public safety strategies;

j. Procedural justice; and

k. How to identify and report discriminatory practices.

307. MPD shall Require that all new Supervisors undergo Supervisory training covering the topics in Paragraph 306 within a reasonable time after a promotional assignment.

308. MPD shall Require that all Supervisors attend annual in-service Supervisor training, which may include updates and lessons learned related to topics covered in Supervisor training, as described in Paragraph 306, and other areas covered in this Decree.

309. MPD shall develop and implement a peer mentoring program for new Supervisors to help them better understand the requirements of their positions.

### B.    Early Intervention System

310.    MPD will develop an Early Intervention System ("EIS") as a flexible management tool to promote Supervisory awareness and proactive identification of potentially problematic behavior and Require the delivery of interventions to correct problematic or potentially problematic behavior.

311.    The EIS shall be:

    a.    Customizable to MPD's particular needs;

    b.    Adaptive as new information becomes available;

    c.    Able to be audited and validated to improve accuracy, reduce false outcomes, and enable timeliness of intervention;

    d.    Able to prioritize officers for intervention; and

    e.    Able to assess the efficacy of the intervention.

312.    The EIS shall include a computerized relational database that will be used to collect, maintain, integrate, and retrieve department-wide, division-wide, and unit-wide data, as well as data for each officer.

313.    MPD shall develop and implement Policies regarding:

    a.    The specific information the EIS will capture;

    b.    Data storage and retrieval;

    c.    Access to the system;

    d.    Confidentiality of personally identifiable information;

    e.    Audit procedures;

    f.    Data analysis, pattern identification, and use by Supervisors;

    g.    Supervisory reviews and interventions;

    h.    Documentation of reviews and interventions;

       i.    Levels for Supervisory review based on the EIS indicators; and

       j.    Peer-group comparisons between officers with similar assignments and duties.

314.    MPD shall Require that all Supervisors are trained on how to use the EIS system, interpret its outputs, and perform appropriate reviews and interventions. MPD will provide all officers with information regarding the scope and function of the EIS.

315.    MPD shall Require auditing that regularly reviews EIS data to evaluate officer performance across ranks, units, and shifts and assess Supervisor and officer trends.

316.    MPD shall maintain all EIS data necessary for non-individualized aggregate statistical analyses for the entire term of the officer's MPD employment plus 7 years.

## XI.    BODY-WORN CAMERAS

317.    To promote transparency and accountability, MPD shall Require that all officers use body-worn cameras ("BWCs") during law enforcement activities, as provided below.

318.    All officers shall be issued a BWC, and MPD shall Require it is functioning properly and fully charged prior to and throughout each tour of duty, including during overtime and secondary employment in a law enforcement capacity.

319.    MPD's BWCs shall capture at least 60 seconds of pre-activation audio and video. All new BWCs shall have at least 60 seconds buffering capacity.

320.    Subject to the exceptions provided in this Section, MPD shall Require that officers activate their BWC prior to initiating any law enforcement activities, including any of the following activities:

       a.    Upon beginning a response to a call for service or to any request for law enforcement assistance;

       b.    Beginning a field interview;

c.  Upon developing reasonable, articulable suspicion for a Stop;

d.  Conducting or attempting to conduct a Stop, Search, or Arrest;

e.  Using force;

f.  Executing a warrant;

g.  Conducting a transport;

h.  Any other activity likely to require immediate enforcement action.

321.  Officers do not need to activate BWCs prior to the activities listed above if MPD's BWC Policy expressly permits officers not to record.

322.  Unless Policy expressly authorizes otherwise, MPD shall Require that once activated, officers shall not deactivate the BWC unless the officer leaves the scene and anticipates no further involvement in the event (including any transport) or no further involvement in the immediate investigation of the event.

323.  MPD shall Require that officers shall report to their Supervisor, and document in written reports, any nonrecorded event that should have been recorded via BWC under Policy, as well as any delays in activations, interruptions, or early terminations of BWC recordings.

324.  MPD shall Require that officers properly position their BWC and not intentionally obstruct any BWC.

325.  MPD shall Require officers to inform individuals that they are being recorded unless doing so would be unsafe, impractical, or not feasible.

**A.    BWC Documentation, Access, and Review**

326.  MPD shall Prohibit MPD personnel from tampering with or editing original BWC footage.

327.  MPD shall Require that officers document the existence of any BWC footage on all reports related to the incident.

114

328.    For Level 3 Reportable Force, MPD will Prohibit officers from reviewing any recordings including BWC footage prior to completing any interviews or any use of force documentation, unless doing so is necessary to address an imminent threat to life or substantial bodily harm while in the field. After completing required reports, officers may review recordings and complete a supplemental report, noting that the supplemental report was made after viewing the recording(s), subject to the requirements of Paragraph 261.

329.    OPCR and MPD shall Require that officers who have been informed that they are under investigation do not review any investigative files, reports (except for reports authored by the officer), BWC footage, or other evidence related to the incident in which they are the officer alleged to have committed Misconduct or a witness unless the officer is in the presence of the investigator. This provision does not apply if the review is necessary to prepare for a criminal or civil proceeding or except as otherwise provided by law.

330.    MPD shall Require that officers who have viewed footage before writing any report state that in the report.

**B.    BWC Policies**

331.    MPD's BWC Policies shall address:

a.    Supervisory review and periodic reviews and audits of BWC recordings to assess whether officer activity was consistent with Policy;

b.    Appropriate retention of recordings consistent with Paragraph 422;

c.    Information about the timing and procedures for release of BWC footage under Minnesota law; and

d.    Privacy issues concerning BWC use.

**XII.    TRAINING**

### A.    Training Coordination and Planning

332.    MPD shall deliver effective training to all sworn officers so that they understand, follow, and fulfill the requirements of the Decree consistent with their job responsibilities. The MPD Training Division shall be the central coordination point for MPD officer training.

333.    MPD shall assign an adequate number of qualified instructors and professional staff (e.g., curriculum development specialists) to the Training Division via employment or contract to maintain class sizes at a level consistent with effective Adult Learning of the skills and concepts taught.

334.    MPD shall create a full-time Civilian Training Director position within the Training Division. The Training Division will be responsible for curriculum design; an instructor certification course; requiring curricula to be based on Adult Learning Techniques; and coordinating with internal and external stakeholders about MPD training needs.

335.    MPD shall develop and maintain an annual written training plan. The training plan shall:

    a.  Identify training priorities, principles, requirements, and goals consistent with this Decree;

    b.  Include delivery of academy, in-service, roll-call, and remedial training;

    c.  Coordinate the topics of academy training and in-service training with FTO training;

    d.  Establish the frequency and subject areas for academy and in-service training;

    e.  Identify available training delivery and related resources, as well as unmet needs;

    f.  Coordinate with the City and others to assist in obtaining necessary training resources; and

Establish a method for assessing the content and delivery of training and measuring officer reaction to, and satisfaction with, the training.

336.    MPD shall conduct annual training needs assessments, taking into consideration: student-to-instructor ratios; effectiveness of past training; recommendations, if any, from the City Internal Audit Department, the Force Review Board, and other MPD units; feedback from MPD Supervisors; trends in Uses of Force, Stops, Searches, Arrests, and Misconduct complaints; data regarding racial disparities in enforcement or other potential indicia of discriminatory policing; input from officers and community members; law enforcement trends and Adult Learning Techniques; and changes to state or federal law or MPD Policy.

337.    MPD shall review all training curricula and lesson plans for consistency, quality, and compliance with applicable law, MPD Policy, and this Decree. MPD shall Require that training incorporates Adult Learning Techniques.

338.    MPD shall actively seek highly qualified instructors from outside MPD to supplement the skills of Training Division staff.

339.    MPD shall Require that all internal and contract professional training instructors are highly qualified and experienced, are proficient in their subject area, and are proficient in instruction using Adult Learning Techniques. MPD shall consider an officer's performance evaluations, past performance as a police officer, and complaint and disciplinary history in selecting instructors.

340.    MPD shall consider incorporating non-law-enforcement perspectives into training development and/or delivery (e.g., in person, by video, or some other asynchronous module) from those with relevant subject-matter expertise, such as perspectives from community members, crime victims, community-based instructors, mental and behavioral health service

providers, academics, individuals or organizations with Youth-related expertise, or community resource providers.

341.    MPD shall develop and implement a training data tracking system. The training data tracking system will include a central and comprehensive database containing information on all trainings attended by each officer. The data tracking system will include: information on which officers require trainings and class attendance, including missed classes; and performance data and students' results on any assessments, tests, or scored evaluations. The system will be readily available to Supervisors throughout MPD to facilitate their Supervisory duties.

342.    MPD shall develop and implement accountability measures to Require that all officers successfully and timely complete all required training.

### B.    Field Training Officer Program

343.    MPD shall implement a Field Training Officer ("FTO") program for new recruits that trains them to police in a manner consistent with the Decree. The FTO program shall incorporate Adult Learning Techniques. MPD shall designate a FTO Coordinator to be responsible for the quality and administration of the FTO program.

344.    MPD shall select high-quality officers to serve as FTOs and implement FTO eligibility and selection criteria based on, at a minimum, written applications, performance evaluations, input from the applicant's Supervisors, knowledge of MPD Policies, experience, leadership skills, and complaint and disciplinary histories. MPD shall not allow officers to serve as FTOs if the officer is under investigation for a serious Policy violation. MPD shall review the performance of FTOs at least annually and take prompt corrective action in response to poor performance.

345.    MPD shall empower recruits to participate actively in their field training, including questioning deviations from Policy and raising other concerns, without fear of retaliation. MPD shall obtain from recruits confidential feedback and suggestions regarding the quality of their field training and shall implement improvements in response to feedback and suggestions.

346.    MPD shall provide all FTOs 40 hours of initial and 8 hours of annual training for competency in MPD Policies and Procedures, familiarity with academy curriculum, MPD and community behavioral health resources, and Adult Learning Techniques.

## XIII.  SECONDARY EMPLOYMENT

347.    A goal of this Decree is that officers' off-duty secondary employment does not compromise or interfere with the integrity and effectiveness of MPD officers' primary work as sworn officers serving the entire Minneapolis community.

348.    In service of the goal of this Decree as set forth in Paragraph 347, MPD shall Require that no sworn MPD employee is permitted to schedule or facilitate or provide access to secondary employment for another sworn MPD employee of higher rank or perform administrative or supervisory duties for the secondary employment of the higher-ranking employee.

349.    To work secondary employment, MPD shall Require that a sworn MPD employee receive authorization from their direct Supervisor and unit commander. Secondary employment authorizations shall be valid for no more than one calendar year. MPD shall regularly review its secondary employment policies and adjust as necessary to serve the goal of this Decree set forth in Paragraph 347.

350.    MPD shall Prohibit sworn MPD employees who are serving a suspension, are on investigatory leave, or are otherwise not authorized to work in uniform for MPD from working secondary employment.

351.    The City and MPD shall Require preapproval for any uses of MPD equipment, including squad cars, for secondary employment. The City and MPD shall only authorize the use of MPD equipment during secondary employment when this would not impede the MPD's ability to perform its functions for the public.

352.    Because rested employees are necessary, and a limitation on the number of hours of secondary employment is necessary so secondary employment does not compromise or interfere with the integrity and effectiveness of MPD officers' primary work as sworn officers serving the entire Minneapolis community, MPD shall limit the number of hours worked by officers to 16 hours per day and 74 hours per week. These hours are cumulative and include normal scheduled work hours, overtime, secondary employment, and outside employment. MPD shall Require that officers must notify their commander or Inspector if they work more than 64 hours per week. MPD shall also Require that officers may only work more than 74 hours per week with approval of the Police Chief or the Chief's designee at the level of Deputy Chief or above.

353.    MPD will maintain a system so that on-duty MPD patrol Supervisors are aware of each secondary employment position within that Supervisor's geographical coverage area and the identity of each employee working each secondary employment position.

354.    On an annual basis, the City and MPD shall publicly release the following information:

a. The number of MPD employees who worked secondary employment by precinct and by rank; and

b. The average number of secondary employment hours worked by precinct and by rank.

## XIV.   PERFORMANCE EVALUATIONS AND PROMOTIONS

### A.   Performance Evaluations

355.   MPD shall develop and implement a formalized system documenting performance evaluations, conducted annually for officers and quarterly for probationary officers, by each officer's direct Supervisor. MPD shall Require that an officer's direct Supervisor:

a. Prepares a specific written evaluation of the officer's performance during the rating period that identifies areas of achievement and areas needing improvement through further training and supervision; and

b. Meets with officers to discuss their evaluations.

356.   When evaluating officer performance, MPD shall Require that Supervisors consider at least the following factors:

a. Demonstrated integrity and ethical decision-making;

b. Communication and decision-making skills;

c. Demonstrated commitment to community engagement and building trust with communities, and effective use of community-policing and neighborhood problem-solving strategies;

d. Demonstrated commitment to impartial policing;

e. Use of force decision making and effective use of de-escalation and crisis management techniques;

f. The quality and accuracy of written documents, such as incident reports, force reports, and search warrants and supporting affidavits or declarations;

g. Commendations, complaints, and community compliments; and

h. Disciplinary actions.

357. MPD shall Require that Supervisors normally meet with their officers on a monthly basis to discuss the officer's performance and document the Supervisor's efforts and communication regarding the officer's performance, challenges, and areas of growth.

358. In performance evaluations for all Supervisors, MPD shall include an assessment of the Supervisor's ability and effectiveness in conducting the Supervisory activities required by the Decree.

**B. Promotions**

359. MPD shall Require that clear criteria that prioritize effective, constitutional, and community-oriented policing are factors in promotion. Factors shall include integrity, communication and interpersonal skills, commitment to community engagement, including with Youth and individuals with behavioral health disabilities, and effective use of community-policing and neighborhood problem-solving strategies, adherence to MPD Policy, and quality of written reports and documentation.

360. MPD shall Require that if a candidate for promotion has serious Misconduct allegation(s) pending against them, that candidate shall be presumptively ineligible for hire or promotion during the pendency of the investigation. If a candidate for promotion has had any sustained Misconduct complaints made against them, MPD shall evaluate the findings of such complaints to determine whether the officer meets the criteria for promotion in this Decree.

## XV.    RECRUITMENT AND HIRING

361.    To promote constitutional, effective policing, the City shall develop and implement a recruitment, hiring, and retention program to enable MPD to successfully attract and retain a broad group of well-qualified individuals, including individuals from under-represented and diverse backgrounds.

362.    The City's recruitment and hiring plan for MPD shall include a timeline, objectives, and action plans for attracting and retaining a quality work force that reflects the diversity of the community. The City's recruitment and hiring program for MPD shall include:

a.    Lawful and job-related minimum standards for recruits and lateral hires;

b.    Recruitment outreach to a broad spectrum of community stakeholders, aimed at increasing the diversity of candidates who demonstrate problem-solving skills, public service orientation, a commitment to community policing, and live or have lived in Minneapolis;

c.    Broad distribution of recruitment information; and

d.    Opportunities or incentives for officers, civilians, and members of the Minneapolis community to assist the City's efforts to attract a broad group of qualified candidates for MPD.

363.    Prior to MPD's hiring of any officer, the City shall conduct a thorough background investigation that includes an individualized assessment of the circumstances presented in the applicant's background and how the information revealed in the background investigation affects the applicant's ability to perform the job. The background investigation will include, at minimum, the following:

a.  An evaluation of criminal records, protective or restraining orders against the candidate, employment history, and driving records;

b.  Education and military history verification;

c.  A review of available personnel files from candidates' previous employment;

d.  A review of history of employment-related civil litigation in which the candidate was a defendant;

e.  A reference check with candidates' previous employers, to the extent available;

f.  For candidates with prior law enforcement experience, a review of:

    i.  Reasonably available information about a candidate's history of using unauthorized, unreasonable or excessive force;

    ii.  Training records; and

    iii.  Complaints and corrective action.

g.  A review of the candidate's peace officer license status and disciplinary history with any peace officer standards boards that may have licensed the candidate;

h.  Checking national databases, including the National Decertification Index administered by the International Association of Directors of Law Enforcement Standards and Training (IADLEST) and, after its launch, the National Law Enforcement Accountability Database to be administered by IADLEST;

i.  Reviewing candidates' social media accounts, platforms and groups in which the candidate has participated, to the extent job-related and permitted by federal and Minnesota law. The candidate is not required to provide login information. The City shall develop a Policy to guide the social media review.

364.    MPD shall Require candidates who receive a conditional offer of employment to submit to a full in-person psychological screening by an appropriately qualified and trained psychiatrist or psychologist.

365.    The City shall create a retention plan to identify challenges and recommend solutions to improve MPD's retention of employees.

366.    The City shall conduct annual assessments of its recruitment, hiring, and retention efforts to determine whether MPD is attracting and retaining a workforce of highly qualified officers. Assessments will include review of application and hiring information and the effectiveness of recruitment, hiring, and retention efforts, review of the effectiveness of the background investigation system, and analyses of officer exit interviews. The City will identify deficiencies and opportunities for improvement, implement appropriate corrective action, and document measures taken.

## XVI.    OFFICER AND EMPLOYEE ASSISTANCE AND SUPPORT

367.    The City shall provide readily accessible confidential counseling and mental health wellness services to MPD officers, including: crisis counseling, stress management counseling, and mental health evaluations.

368.    MPD shall Require its peer-to-peer program to provide officers with training, based on principles of active bystandership, to (1) safely intervene to prevent an officer from engaging in Misconduct; (2) accept an intervention from another officer; and (3) provide emotional, social, and practical support to officers who intervene to prevent or end Misconduct.

369.    The City shall offer to all MPD officers clinically appropriate and readily accessible mental health services before returning to full duty following a traumatic event or

critical incident (e.g., serious injury or death). MPD shall Require that these services be mandatory for an officer if directed by the MPD Chief.

370.    MPD shall develop and implement well-being Protocols for officer deployments during First Amendment Events or Civil Disturbances, taking into account the size and circumstance of the Event or Disturbance, including:

    a.    Close monitoring and periodic affirmative checks of officers' well-being by Supervisors, including monitoring officer fatigue and indications of stressors;

    b.    Availability of mental health professionals to provide care to officers;

    c.    Inclusion of health and safety guidance during pre-deployment briefings;

    d.    Measures so that officers are given adequate time off to rest and recover; and

    e.    During prolonged periods of demonstrations or unrest, access to counselors or psychologists to provide individual counseling to officers.

371.    The City and MPD shall provide information about officer and employee support services in all MPD facilities and relevant City facilities and circulate it by email, website, and other means.

372.    MPD shall train command and Supervisory personnel in officer support services Protocols sufficient to promote wide availability and encourage the use of officer support services.

373.    MPD shall incorporate discussion of currently available officer support services, and how to access those services, into annual officer in-service training.

374.    The City shall develop and implement Protocols for annually assessing the City's employee assistance and support programs so that officers can readily access and receive adequate support to maintain their physical and mental health. As part of this assessment

process, the City and MPD shall identify deficiencies and opportunities for improvement; implement appropriate improvement measures; and assess the effectiveness of any measures taken.

## XVII.  DATA MANAGEMENT

375.    For all information and data that MPD must collect, maintain, or publish pursuant to this Decree, including but not limited to information and data related to law enforcement activity, Misconduct and complaint investigations, disciplinary decisions, and officer personnel history, MPD must do so in a manner that is easily searchable by date, officer name, officer badge number, and all related case identification numbers. MPD shall also Require that:

a.  All documents related to any particular incident (e.g., related force investigations, disciplinary decisions, etc.) can be easily identified, linked, and gathered;

b.  All records relevant to an officer's conduct, including but not limited to personnel files; records of adverse credibility determinations by a court; and disciplinary decisions can be easily identified, linked and gathered.

## XVIII. IMPLEMENTATION AND MONITORING

### A.    Implementation

### *1.    Staffing and Resources to Facilitate Implementation and Compliance*

376.    The City will be responsible for providing necessary and reasonable financial resources for its implementation of this Decree and to fulfill MPD's and the City's obligations under this Decree.

377.    The City and/or MPD shall maintain an Implementation Unit(s) to facilitate implementation of the Decree and shall staff the unit(s) with sufficient personnel with the skills and abilities necessary to achieve timely implementation. The Implementation Unit(s) shall assist

with the implementation of and compliance with the Decree. The MPD's Implementation Unit will coordinate MPD's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Monitor and MPD personnel; maintain all data, documents, and records required by the Decree in a usable format; and assist in assigning implementation and compliance-related tasks to MPD personnel. Nothing in this Decree precludes or limits the role of the Minneapolis City Attorney's Office in the implementation of the Decree.

### 2.    Collaboration, Submission, and Approval

378.    The Parties agree to work collaboratively on all Policies and trainings required by this Decree, and the Annual Implementation Plans will include timeframes and deadlines that provide sufficient time to collaboratively work on these materials. After any such collaboration period, the City and/or MPD shall formally submit all new Policies and trainings required by this Decree, or revisions to such materials, to the United States for review and comment and to the Monitor for approval. Along with such materials, the City and/or MPD will submit any comments either has received from officers or the public, where applicable.

379.    The process for the United States' review and the Monitor's approval of a formal submission of a Policy and/or training required by the Decree is as follows:

   a.    The United States and the Monitor shall complete their review of the Policy and/or training within 30 days of the City and/or MPD formally submitting a Policy and/or training;

   b.    The City and/or MPD will consider the comments provided by the United States and the Monitor and, if needed, make changes to the Policy and/or training; and

c.  A Policy and/or training required by this Decree shall not go into effect unless the Monitor provides approval, and approval will not be unreasonably withheld. A proposed Policy and/or training subjected to the process outlined in this Paragraph will be deemed approved by the Monitor if no substantive response has been provided by the Monitor within 30 days.

380.    If after the formal submission of a Policy and/or training pursuant to Paragraph 378, the United States reasonably determines that the Policy or training is inconsistent with the Decree or has no reasonable likelihood of achieving compliance or progressing toward compliance, the United States may lodge a complete or partial written objection within 14 days of receiving the Policy or training. Such objection tolls the time periods set forth in Paragraph 451. The Monitor, the City, and United States must meet and confer concerning the objection within 10 days. If no resolution is reached, the Monitor must provide a written tentative decision on each remaining area of disagreement within 10 days. The Policy and/or training is deemed approved if the United States has not filed a motion with the Court within 30 days after receiving the Monitor's tentative decision (which the Parties may stipulate to extend). If the Monitor determines the United States' objection is unreasonable, it can authorize the City to implement the Policy and/or training during the pendency of any proceedings. The Parties and the Monitor may adjust the timelines in this Paragraph upon agreement.

**B.    Independent Monitor**

*1.    Selection*

381.    The Parties acknowledge that an Independent Evaluator and team were selected in the state court action *State of Minnesota by Rebecca Lucero, Commissioner of the Minnesota Department of Human Rights v. City of Minneapolis*, No. 27-CV-23-4177 (4th Dist. Ct., Minn. filed Mar. 31, 2023) to monitor the State Court Agreement before the effective date of this

Decree. By agreement of the Parties, the Court shall appoint the Independent Evaluator and team for the State Court Agreement as the independent monitor ("Monitor") and team for this Decree. The Parties may agree to propose additional team members and shall do so if necessary to effectively monitor the requirements of this Decree. If so, the Parties and the Monitor shall agree on the additional team members.

382.    The Monitor team shall include appropriate expertise in each area of the Decree, including a designated community liaison. The Monitor team shall include people with an understanding of and willingness to engage with the communities and stakeholders of the City. The Monitor team shall include a member experienced in conducting statistical analyses, evaluating quantitative data, and developing audit methodologies with sufficient expertise to monitor compliance with the requirements of this Decree. The Monitor team shall also include a member experienced in behavioral health, crisis systems, mobile crisis response, and emergency dispatch with sufficient expertise to monitor compliance with the related requirements of this Decree.

383.    The Monitor shall be an agent of the Court and subject to the Court's supervision and orders, consistent with this Decree. The Monitor shall have only the duties, responsibilities, and authority conferred by this Decree. The Monitor shall not, and is not intended to, replace, or assume the role or duties of the City or MPD, or their employees. The Parties recognize that there may be multiple ways to implement the terms of this Decree. The City and MPD may choose implementation strategies they deem appropriate so long as they are consistent with achieving compliance with the terms of this Decree. The Monitor may provide advice to the Parties regarding its views on the most effective strategy but is not authorized to require

implementation in a manner that requires more or different actions on the part of the City or MPD than are required by the terms of this Decree.

### 2.    *Term of the Monitor*

384.    The Monitor shall be appointed for a period to coincide with the appointment of the Independent Evaluator under the State Court Agreement (so long as the State Court Agreement is in effect), subject to an evaluation by the Court at the request of either Party. The Court's evaluation shall consider the Monitor's performance, including whether the Monitor is providing timely and fair assessments of compliance and implementation, adequately engaging the community, completing its work in a cost-effective manner, on time and on budget, and is working effectively with the Parties to facilitate compliance with the Decree, including by providing appropriate and cost-effective technical assistance. The Court may remove the Monitor or any member of the Monitoring team for good cause at any time, on motion by either of the Parties or the Court's own determination.

### 3.    *Fees and Costs*

385.    Once the Monitor is appointed, the City shall pay the Monitor a maximum of $750,000 per year ("annual budget cap") for performing all the Monitor's duties under this Decree. The amount of this annual budget cap is in recognition of the fact that the Monitor also has an annual budget not to exceed $1.5 million under the State Court Agreement and there is substantial overlap between the monitoring and technical assistance required under the State Court Agreement and that which is required under this Decree. Should the State Agreement terminate before this Decree, the parties shall agree on an annual budget cap that reflects the work remaining under this Decree. If the State Court Agreement is terminated, the Parties will meet and confer to determine the annual budget cap based on the status of implementation as

informed by the Revision process set forth in Paragraph 398, with the goal of increasing the cost-effectiveness of monitoring. If the Parties are unable to agree, any Party may petition the Court to resolve the dispute.

386.    The Monitor shall submit a proposed budget annually to the Court for approval, including an accounting of the previous year's actual budget. Fees and costs shall be a factor to consider in the Court's approval of the Monitor's proposed budget, including the ability to offer pro bono time or reduced rates, affiliation with academic institutions or non-profit organizations, and willingness to enter an "alternative fee" arrangement that reduces costs and promotes efficiency by, for example, decreasing fees as provisions of this Decree become subject to partial termination. The Monitor shall post its proposed budget and accounting to its public website. If a dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, the City, the United States, and the Monitor shall attempt to resolve the dispute cooperatively before seeking the Court's assistance. The City shall not be responsible for paying for non-working travel time.

387.    The Monitor may, at any time after its initial selection, request to hire or retain additional persons or entities that are reasonably necessary to perform the monitoring tasks in this Decree, or to replace any persons on the Monitor's team. The Monitor shall notify the Parties in writing of its request, identify the monitoring tasks to be performed, and present to the Parties at least two highly qualified candidates for each position. Within 14 days, the Parties shall notify the Monitor whether they agree to the appointment of one or more candidates. If the Parties agree on a candidate, the Monitor may hire the candidate and shall file a notice with the Court. If the Parties and the Monitor are unable to agree, then either Party or the Monitor may seek the Court's intervention. Any fees or costs eligible for reimbursement charged by the candidate shall

count toward the Monitor's annual budget cap. Any person or entity hired or otherwise retained as part of the Monitor's team shall be subject to the provisions of this Decree.

388.    The Monitor shall post its itemized monthly statements on the Monitor's public website.

389.    If the Monitor is no longer able to perform its functions or is removed, within 60 days thereof, the City, MPD, and United States shall jointly select a replacement Monitor acceptable to all and advise the Court of the selection. The Parties shall select a replacement Monitor pursuant to the selection process described in the State Court Agreement (Paragraph 391 of the State Court Agreement), except that if the Parties cannot agree on a replacement Monitor within 90 days of the Monitor becoming unable to perform its functions or removal, each Party shall submit to the Court up to two candidates along with resumes and cost proposals, and the Court shall then select the new Monitor.

390.    If either Party determines that the Monitor has exceeded its authority or failed to satisfactorily perform the duties required by this Decree, the Party shall notify the Monitor and the other Party in writing. The Monitor shall have 14 days to respond to the concerns in writing. The Parties and the Monitor thereafter shall attempt to resolve any concerns amicably. If concerns remain, either Party may petition the Court for appropriate relief, including removal of the Monitor or any member of the Monitor team.

### 4.    *Compliance Reviews*

391.    The Monitor shall conduct Compliance Reviews in a reliable manner based on accepted and trustworthy means and methods. This Decree does not require the City and MPD to satisfy a specific numerical test to demonstrate compliance. Any statistical analyses used as part

of a Compliance Review must conform to statistical techniques that are accepted in the relevant field.

392.    The Annual Implementation Plan shall identify the Compliance Reviews that the Monitor shall conduct each year.  The Monitor will conduct a Compliance Review for every Discrete Section at least every year after the implementation of relevant Policies, unless otherwise stated in the Annual Implementation Plan. The Monitor shall conduct Compliance Reviews, to coincide with the timing of such reviews under the State Court Agreement, to determine the extent to which the City and MPD have implemented the requirements of this Decree.

393.    The Monitor will provide a copy of the Compliance Review reports to the Parties in draft form at least 30 calendar days prior to public release of the reports to allow the Parties to comment on the reports. The Parties will have 15 days to provide comments. The Monitor will have 15 days to make any revisions that it deems appropriate in light of the Parties' comments. The Monitor will post the final reports, along with comments from the Parties that the Parties request be posted, and the Monitor's response, if any, to its website. The Monitor shall provide the Parties with the underlying analysis, data, methods, and sources of information relied upon in a Compliance Review when it sends the Compliance Review in draft form.

### 5.    *Annual Implementation Plans*

394.    Within two months of appointment as Monitor, the Monitor, in conjunction with the Parties, shall develop an Annual Implementation Plan. The first Annual Implementation Plan shall provide for aligning the evaluation periods, Compliance Reviews, Semiannual Progress Reports, Assessments, and subsequent Annual Implementation Plans with the evaluation periods and compliance assessment plans established for the State Court Agreement. This Plan shall:

a.  Provide an overview for how the City and MPD can reach Full and Effective Compliance (as defined in Paragraphs 450–451) with all requirements of the Decree. This overview shall include a specific schedule (setting forth milestones such as developing specific Policies and training) and deadlines for the upcoming year and a general schedule for successive years, including those deadlines for subsection (b), below, that shall extend beyond the first year;

b.  Set forth a mechanism for extending deadlines when agreed to by the Parties and the Monitor; and provisions describing the consequences for failing to meet the deadlines, including but not limited to notifying the Court and public of missed deadlines;

c.  Identify the methodology the Monitor shall use to evaluate whether the City and MPD have implemented the requirements of the Decree;

d.  Identify the Compliance Reviews that shall be performed during the year to assess Full and Effective Compliance with the requirements of the Decree, including whether particular provisions shall be assessed collectively or separately;

e.  Delineate the roles and responsibilities of the Monitor team members, including identifying a Deputy Monitor with authority to act in the Monitor's absence and identifying team leads for monitoring each section of the Decree;

f.  Describe a protocol for communicating, engaging, and problem-solving with the City, MPD, and the United States; and

g.  Describe a protocol for communicating, engaging, and problem-solving with the public, and for receiving public input, which shall include at least one in-person meeting every four months in varied areas of the City.

395.    The Monitor shall submit each Annual Implementation Plan to the Parties for review and approval. The Parties shall have 30 days to either approve or propose changes to the Annual Implementation Plan. The Parties shall hold at least one joint meeting with the Monitor to discuss each Annual Implementation Plan. Either Party may propose changes to the Plan. The Monitor shall have 15 days to accept or reject those changes and provide the Parties with a final version of the Plan. The Parties shall have 15 days to either approve the Plan or petition the Court for relief.

396.    The Monitor shall submit each final version of the Annual Implementation Plan to the Court for approval after it is approved by the Parties or the Parties' objections have been resolved. If, after good faith attempts, disagreement remains unresolved between the Parties and/or the Monitor and the Parties have not approved the Plan, the Monitor shall submit the Plan to the Court for approval, noting the areas of disagreement, and either Party may petition the Court to resolve the disagreement and approve a revised Plan, which shall be available to the public.

397.    To promote flexibility in implementing the Decree, the Parties and the Monitor may change a provision in the Annual Implementation Plan at any time without Court approval, so long as the Parties and the Monitor agree to make the change and, if the change is greater than 60 days after the original deadline, the Monitor files a written notice of the change to the Court within five days of the agreement. The notice shall include the reasons for the change, when the change was made, and a statement that the Parties and the Monitor agree with the change. The Monitor shall post the notice to the Monitor's website.

398.    For each subsequent year, the Monitor shall revise and update the Annual Implementation Plan pursuant to the process described above. The Monitor shall initiate the

development of the Plan for the upcoming year at least 90 days before the previous year's Plan shall conclude. If the State Court Agreement is fully or partially terminated, the Monitor shall submit to the Parties within two weeks a revision ("Revision") to the Implementation Plan. The Revision shall describe all appropriate reductions in monitoring methodology, tasks, and expenses for any Decree requirements impacted by the full or partial termination of the State Court Agreement. The Parties shall meet and confer to consider the Revision and either Party may invoke the Dispute Resolution provisions of Paragraph 440.

399.    At least 60 days before initiating any Compliance Review required by the Annual Implementation Plan, the Monitor shall submit a description of the proposed methodology to the Parties. The Parties and the Monitor shall have 30 days to meet and confer about the proposed methodology. If, at the end of this period, any Party has unresolved concerns about the proposed methodology, the Party may submit the concerns in writing to the Monitor. Within 15 days, the Monitor shall modify the methodology as necessary to address any concerns or shall inform the Parties in writing of the reasons it is not modifying its methodology. If any Party objects to the Monitor's decision, the Party may petition the Court for relief.

400.    Upon (i) recommendation of the Monitor, (ii) agreement of the Parties; or (iii) termination or partial termination of the State Court Agreement (in conjunction with the Revision process set forth in Paragraph 398), the Monitor shall modify monitoring of this Decree as agreed upon by the Parties or as determined through the Dispute Resolution provisions of Paragraph 440, including by refraining from conducting Compliance Reviews of requirements of this Decree previously found to be in compliance by the Monitor.

### 6.    Recommendations and Technical Assistance

401.    The Monitor may make recommendations to the Parties regarding measures to enable timely Full and Effective Compliance with this Decree. The Monitor has no authority to add or modify requirements of this Decree. For example, the Monitor may recommend additional training in any area related to this Decree; seeking technical assistance; or changing, modifying, or amending a provision of the Decree. Any such recommendation to change, modify, or amend a provision of the Decree must be in writing and must comply with the requirements to modify the Decree as described in Paragraphs 437–439.

402.    At the request of the Parties, the Monitor may provide technical assistance consistent with the Monitor's expertise and responsibilities under this Decree. If the Monitor declines such a request, it will explain its reasons for doing so in writing.

403.    The City's and/or MPD's acceptance of recommendations and technical assistance from the Monitor will be voluntary. The City's and/or MPD's compliance with this Decree will be assessed based on the terms of the Decree itself and not based on whether it adheres to the Monitor's recommendations and technical assistance.

404.    With the consent of the Parties, the Monitor may conduct additional reviews of the City and MPD related to the requirements of the Decree.

### 7.    Comprehensive Assessment and Hearing

405.    The Parties may at reasonable intervals request that the Monitor complete and file with the Court a written Comprehensive Assessment. The Comprehensive Assessment shall:

a.    Assess whether and to what extent the City and MPD have achieved the requirements of this Decree, including whether the City and MPD have reached

Full and Effective Compliance with the Decree or Discrete Sections of the Decree;

b.  Identify any modifications to the Decree that are necessary for continued achievement in light of changed circumstances or unanticipated impact (or lack of impact) of a requirement;

c.  Identify the areas of greatest achievement and the factors that have contributed to this success;

d.  Identify the areas of greatest concern, including recommendations and technical assistance for accelerating Full and Effective Compliance;

e.  Identify any barriers to assessing compliance, including barriers to gathering and tracking certain information and recommended means of overcoming those barriers, or, when appropriate given the time and cost to complete the assessment, recommend alternative assessments.

406.  The Monitor shall complete the Comprehensive Assessment according to the following process:

a.  The Monitor shall submit a detailed proposal to the Parties describing the issues to be assessed, the source materials to be consulted, and the methods of evaluation.

b.  Upon receiving the proposal, the parties shall have 15 days to review and comment and to propose any additional issues for the Monitor to assess.

c.  Within 15 days of receiving the Parties' feedback, the Monitor shall share a final plan for the Assessment with the Parties.

    d.   Before the Comprehensive Assessment is submitted to the Court, the Monitor shall submit a complete draft to the Parties. The Parties shall then have 15 days to provide comments and objections, as well as reactions to the Monitor's recommended modifications and any additional recommended modifications for the Monitor to consider.

    e.   Upon filing the Comprehensive Assessment with the Court, the Monitor shall post the report on the Monitor's website.

407.    If, as part of the Comprehensive Assessment, the Monitor proposes modifications to the Decree, the Parties may stipulate to them and request Court approval to put them in place. The Court may, at the Court's discretion, allow public comment regarding suggested modifications. This provision in no way diminishes the Parties' ability to modify this Decree, subject to Court approval, as set out in Paragraph 437–439. Nothing in this Decree will empower the Monitor to unilaterally modify the Decree's terms.

408.    After the Comprehensive Assessment has been filed, the Court will hold a hearing regarding the progress made by the City and MPD toward Full and Effective Compliance with the requirements of the Decree. At the hearing, the City and MPD may also seek to demonstrate that Discrete Sections of this Decree are eligible for Partial Termination pursuant to Section XVIII.E.

### *8.    Semiannual Progress Reports*

409.    The Monitor shall file with the Court and post to the Monitor's website semiannual written progress reports that shall include:

a.  The progress made by the City and MPD under the Annual Implementation Plan, as well as an overall assessment of the City and MPD's progress to date in complying with the Decree;

b.  The methodology and specific assessments for each Compliance Review conducted, redacted as necessary for privacy concerns and legal compliance. An unredacted version shall be filed under seal with the Court and provided to the Parties;

c.  A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementing the Decree;

d.  The extent to which each material requirement of the Decree has been:

(1) incorporated into implemented Policy; (2) trained at the levels set forth in this Decree for all relevant MPD officers and City employees; (3) reviewed or audited by the Monitor, including the date of the review or audit and the data and materials relied upon for the review or audit; and (4) assessed by the Monitor to be in compliance, and the date of this assessment;

e.  The Monitor's recommendations regarding necessary steps to achieve Full and Effective Compliance with the Decree;

f.  The extent to which the Monitor has provided technical assistance; and

g.  An appendix listing each material requirement of the Decree and stating whether the requirement is "Compliant"; "Partially Compliant On-Track"; "Partially Compliant Off-Track"; "At Risk"; "Non-Compliant"; "Not Yet Measured"; "Not Applicable".

410.    The Monitor shall provide the Parties with a draft of semiannual progress reports at least 30 days prior to Court filing and public release. The Parties shall have 15 days to provide comments on the draft. The Monitor shall have 15 days to consider and make any revisions based on the Parties' comments. The Monitor shall post the final reports to its website. The Monitor shall also establish an electronic mechanism for receiving public feedback on the reports.

411.    The Parties agree to the admissibility of any final reports by the Monitor in any Court hearing in the above-captioned case, including any hearing on a motion to terminate this Decree.

### 9.    *Communications with the Parties, the Court, and the Public*

412.    The Monitor shall maintain regular contact with the Parties to enable effective and timely communication regarding the implementation of and compliance with this Decree. To facilitate this communication, the Monitor shall hold regular calls and meetings with the Parties on a schedule agreed to by the Parties and the Monitor.

413.    The Monitor shall meaningfully engage with community members and MPD officers to discuss the City's and MPD's progress under the Decree, to explain the Monitor's reports and implementation process, and to receive questions and concerns. The Monitor shall designate a team member as a point of contact for these activities. The Monitor shall obtain feedback from stakeholders so that the Monitor reaches a broad swath of people. The Monitor will also use modern tools of communication, such as social media, to receive community and officer feedback.

414.    Except as authorized by the terms of this Decree, by the Court, or by agreement of the Parties, during and after the termination of this Decree, the Monitor and Monitor team

members shall not make any public statements about any act or omission of the Parties or their current or former officials, officers, agents, representatives, employees, assigns, or their successors; or disclose non-public information provided to the Monitor or Monitor team members pursuant to the Decree.

### 10.    Testimony, Records, and Conflicts of Interest

415.    The Monitor and Monitor team members may testify before the Court in the above-captioned case as to the observations, assessments, recommendations, and performance of the Monitor's duties but will not testify in any other litigation or proceeding with regard to any policy or practice; act or omission of the City, MPD, or any of their current or former officials, officers, agents, representatives, employees, assigns, or their successors, related to this Decree; or any matter or subject that the Monitor or Monitor team members received knowledge of as a result of this Decree. All notes, reports, analysis, databases, recordings, or other documents produced, received, or maintained by the Monitor or Monitor team members, as well as all information gathered in the course of producing said items is information that is possessed by the Monitor or Monitor team members as a result of the Decree. The Monitor and Monitor team members will not disclose this information to any person or entity who is not a Party to this Decree, including without limitation, any person or entity who seeks this information through the discovery process in other judicial or administrative proceedings. Monitor and Monitor team member testimony and documents will not be subject to civil process. The Monitor will timely notify the Parties if the Monitor or any Monitor team member receives a subpoena in any other litigation or proceeding for testimony or documents related to this Decree so that a Party may move to quash the subpoena. This Paragraph does not apply to any proceeding before the Court related to performance of contracts or subcontracts for monitoring this Decree. The limitations

on the Monitor and Monitor team set forth in this Paragraph survive the termination of this Decree.

416.    Unless such conflict is waived by the Parties, the Monitor and Monitor team members shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Decree including, both during and after termination of this Decree, future retention (on a paid or unpaid basis) by any current or future private litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City, MPD, or their current or former officials, officers, agents, representatives, employees, assigns, or their successors. The Monitor and Monitor team members shall not enter any contract with, nor enter a relationship with anyone who has a contract with, the City, MPD, or the United States unless the Monitor or Monitor team member first discloses the potential contract or relationship to the Parties and the Parties agree in writing to waive any conflict. The Monitor shall file a notice of any such waiver with the Court.

417.    The Monitor shall not serve as lead monitor on any other monitoring team in an active case involving the United States; however, a member of the Monitor's team may serve as a member of another monitoring team. If the United States wishes to hire a Monitor team member to assist in a separate investigation or matter that does not involve the City or MPD, or their current or former officials, officers, agents, representatives, employees, assigns, or their successors, it will notify the Monitor, the City, and MPD in advance of the hiring and discuss any concerns. Such hire may not proceed without the written consent of the City and MPD.

418.    If the Monitor resigns, the former Monitor may not enter any contract with the City, MPD, or the United States on a matter related to the Decree while the Decree remains in

effect, without the written consent of the Parties. The former Monitor shall file a notice of any such consent with the Court.

419.    Both during and after the termination of this Decree, the Monitor and Monitor team members shall not be permitted to represent or work for any person or organization in any criminal, civil, or administrative matter adverse to the City, MPD, or the United States, or any of their current or former officials, officers, agents, representatives, employees, assigns, or their successors, including any person or organization designated as a witness, consultant, victim, defendant, subject, target, or person of interest, for the duration of the monitorship.

420.    The Monitor is an agent of the Court and not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor and the Monitor team members shall not be deemed public records subject to public inspection under federal, Minnesota, or local law. Disclosure by the City or MPD to the Monitor, Monitor team members, or the United States of records, data, or information will not be deemed a waiver of any privilege or right MPD or the City may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of or access to any records, information, or data.

421.    The Monitor and Monitor team members shall not be liable for any claim, lawsuit, or demand arising out of and substantively related to their performance pursuant to this Decree brought by non-parties to this Decree.

### C.    Data Maintenance, Access, and Confidentiality

422.    The City and MPD shall collect and maintain all data and records necessary to document implementation of the Decree and assess compliance. These data and records include documentation of Stops, Searches, Arrests, uses of force, BWC footage, training records, internal and external complaints, complaint investigations, and supporting documentation, and other

documentation required by the Decree and specified in the Annual Implementation Plan. To the extent that these data and records are routinely purged according to a document retention schedule, the City and MPD shall notify the Monitor and the United States of the schedule for all relevant data and records and the Monitor and the Parties shall develop a protocol for maintaining the data and records that balances the burden of maintaining the data and records on MPD and the City with the need to maintain the data and records to adequately assess compliance.

423.    To facilitate their work pursuant to this Decree, the Monitor may conduct on-site visits and assessments with reasonable prior notice to MPD or the City and, except as may be restricted by another law enforcement agency which may be in charge of such scene, prohibited by law, or pursuant to a recognized privilege, shall have timely, direct, unimpeded access to individuals, facilities, documents, and crime or incident scenes, which will include access to trainings, meetings, patrol activities, and reviews, such as Critical Incident reviews, force reviews, documentation of Stops, Searches, Arrests, and uses of force, and internal and external complaints, and protected employee personnel records, including records of Misconduct complaints and investigations, panel reviews or other disciplinary hearings. To avoid unnecessary confusion, interference with daily operations, or duplication of effort, the Monitor shall coordinate with the MPD Implementation Unit in making any on-site visits or observations and otherwise seeking access to MPD or its individuals, facilities, and documents.

424.    Unless unreasonable, to facilitate their work pursuant to this Decree, the United States may conduct on-site visits and assessments with reasonable prior notice to CAO and, except as may be restricted by another law enforcement agency which may be in charge of such scene, prohibited by law, or pursuant to a recognized privilege, shall have timely, direct,

unimpeded access to individuals, facilities, documents, and crime or incident scenes, which will include access to trainings, meetings, patrol activities, and reviews, such as Critical Incident reviews, force reviews, documentation of Stops, Searches, Arrests, and uses of force, and internal and external complaints, and protected employee personnel records, including records of Misconduct complaints and investigations, panel reviews or other disciplinary hearings. To avoid unnecessary confusion, interference with daily operations. or duplication of effort, the United States shall coordinate with the CAO in making any on-site visits or observations and otherwise seeking access to the City or MPD or their individuals, facilities, and documents.

425.    The City and MPD shall not withhold from the Monitor or the United States information related to the work of a City attorney on the CAO Implementation team who is serving in the capacity of embedded counsel with IAD or OCPR based on a claim of privilege. Such access by the Monitor or the United States to information related to the work of embedded counsel shall never constitute a waiver of attorney-client or attorney work product privileges.

426.    The Parties recognize that, pursuant to Minnesota and/or federal law, the United States and the Monitor are not barred from access to materials protected by the Minnesota Government Data Practices Act.

427.    MPD shall notify the Monitor and the United States as soon as practicable, and in any case within 24 hours, of any critical firearm discharge, in-custody death, or arrest of any officer.

428.    Should the City or MPD decline to provide the Monitor or the United States access to requested documents or data based on privilege or other legal prohibition, the City or MPD shall notify the Monitor and the United States that they are withholding documents or data and briefly explain the basis for withholding. The City need not create a log of each document

that was withheld and may, for example, provide one overall explanation for withholding all documents of a particular type. If the Monitor or the United States disagrees, the Monitor or the United States may request that the Court, or the Court may of its own accord, order an *in camera* review of the protected material to determine disclosure.

429.    The Monitor and individuals on the Monitor team who review types of data that may include Criminal Justice Information Systems ("CJIS") information must be CJIS certified. The Parties acknowledge that the United States has legal authority to access CJIS materials. The City will not be required to redact data for the Monitor or the United States. The Monitor and the United States shall have access to all records and information relating to criminal investigations of MPD officers as permissible by law. The Monitor and the United States shall have access to all documents in criminal investigation files that have been closed by MPD after the Effective Date as permissible by law. The Monitor and the United States also shall have access to all arrest reports, warrants, and warrant applications initiated after the Effective Date, whether or not contained in open criminal investigation files, as permissible by law.

430.    The Monitor, Monitor team members, and the United States shall maintain all not public information provided by the City and MPD in a confidential manner. This Decree shall not be deemed a waiver of any privilege or right MPD or the City may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document. This provision survives the termination of this Decree.

### D.    Court Jurisdiction and Decree Modifications

431.    This Decree will become effective upon approval and entry as an order of the Court ("Effective Date").

432.    The investigation that led to this Decree was initiated pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the authority granted to the Attorney General under 34 U.S.C. § 12601 to seek declaratory or equitable relief to remedy an alleged pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law.

433.    This Court has jurisdiction of this action. 28 U.S.C. §§ 1331, 1345. The United States is authorized to initiate this action. 34 U.S.C. § 12601; 42 U.S.C. § 12188. Venue is proper because MPD is located in and the claims arose in the District of Minnesota. 28 U.S.C. § 1391.

434.    The Decree will constitute the entire integrated agreement of the Parties. No prior drafts or prior or contemporaneous communications, oral or written, will be relevant or admissible to determine the meaning of the Decree's provisions in any litigation or other proceeding.

435.    The Court will retain jurisdiction of this action for all purposes until such time as the Court issues an order terminating the Decree. At all times, the City and MPD will bear the burden of demonstrating, by a preponderance of the evidence,  Full and Effective Compliance with the requirements of this Decree.

436.    The United States may seek enforcement of the provisions of this Decree. The United States agrees to consult with the City and MPD before instituting enforcement proceedings and will make a good faith attempt to resolve any disputes before seeking enforcement. If a dispute cannot be resolved informally, the United States may apply to the Court for appropriate relief. Nothing in this Decree shall be construed to be a waiver by the City

or MPD of the right to oppose any enforcement action and the City and MPD do not waive any defenses to any enforcement action.

437.    The Parties may jointly stipulate to make changes, modifications, and amendments to the Decree, which will be subject to Court approval. The Court shall approve any changes, modifications, or amendments to which the Parties jointly stipulate unless the Court finds that the changes would substantially undermine the purpose and objectives of the Decree. The Court may, at its discretion, allow public comment on the proposed changes, modifications, and amendments.

438.    The Parties shall confer with one another and with the Monitor about potential changes, modifications, and amendments whenever a Party or the Monitor raises concerns—or where the Monitor's Compliance Reviews, or Comprehensive Assessments demonstrate—that a provision as written is not furthering the purpose of the Decree, or where a preferable alternative will achieve the same purpose.

439.    Where the Parties or the Monitor are uncertain whether a change to the Decree is advisable, the Parties, with Court approval, may agree to suspend the current requirement for a time period agreed upon at the outset of the suspension. During such suspension, the Parties, with Court approval, may agree to temporarily implement an alternative requirement. The Monitor shall assess and report to the Court whether the suspension of the requirement and any implementation of an alternative provision is as, or more, effective at achieving the purpose as was the suspended requirement, and the Parties will consider this assessment in determining whether to request that the Court approve the suggested change, modification, or amendment.

440.    Unless stated otherwise in this Decree, if any Party disagrees with any aspect of the implementation of the Decree, that Party will make a good faith attempt to resolve the

dispute informally. If the Parties are unable to resolve the dispute within 10 days of the apparent impasse or longer upon the Parties' mutual agreement, that Party may inform the other Parties and the Monitor in writing of the dispute. Within 10 days thereafter, the Parties will meet and confer on the dispute at a mutually agreed time. If necessary, any Party may petition the Court thereafter to resolve the dispute.

441.    In the event of ambiguity or inconsistency in any of the Decree's terms, the Decree shall be interpreted in a flexible, practical, and cost-effective manner to achieve its remedial purposes.

442.    Subject to the confidentiality protections for collective bargaining negotiations, the City and MPD agree to notify the Monitor and the United States when and if any exclusive representative of a collective bargaining unit takes a position during negotiations that any provision of the Decree is not valid or enforceable.

443.    This Decree is not intended to alter or affect any collective bargaining agreements or rights, Minnesota law, or local ordinance in effect as of the date the Decree is signed by the Parties. To the extent any Minnesota law, local ordinance, or collective bargaining provision conflicts with any provision of this Decree or impedes its effective implementation, the City and MPD will comply with the Decree to the extent permissible and propose modifications to this Decree in an effort to achieve the same objectives with permissible means, if possible. Nothing in this Decree, including any forms of officer engagement detailed in this Decree, creates or is intended to create new mandatory subjects of bargaining or creates an obligation to bargain about policy content with the Police Officers Federation of Minneapolis or any other exclusive representative. The City and MPD retain managerial control and discretion over the content of MPD's policies and procedures.

444.    The City and MPD will Require compliance with the Decree by their respective officials, officers, employees, agents, representatives, assigns, and successors, as applicable.

445.    The Parties do not intend for anything in this Decree to be used by third parties to create liability by or against the City or MPD, or their current or former officials, officers, agents, representatives, employees, assigns, or their successors, under any federal, state, or municipal law, including 42 U.S.C. § 1983. The City and MPD do not admit liability based on the allegations contained in the United States' Complaint. The Parties do not intend for this Decree (including the United States' Report, Complaint, the Agreement in Principle between the Parties, and any assessments, reviews, and reports the Decree requires to be produced) to confer any right on any third-person or entity seeking relief against the City, MPD, or any current or former official, officer, agent, representative, employee, assign, or successor thereof, for their conduct. The Parties do not intend for this Decree (including the assessments, reviews, and reports produced by the Monitor pursuant to the Decree) to be construed or used as an admission or evidence of liability by or against the City and/or MPD, or their current or former officials, officers, agents, representatives, employees, assigns, or their successors, under any federal, state, or municipal law, including 42 U.S.C. § 1983.  This Paragraph survives the termination of this Decree.

446.    The provisions of this Decree are not intended to create new standards of liability. Further, it is not the Parties' intent to change the constitutional or other legal standards in any criminal proceeding. This Decree does not create any rights, claims, causes of action, requests for relief, or defenses that are otherwise unenforceable or do not exist under law, other than those that arise and inure only to the benefit of the United States to enforce this Decree. This paragraph survives the termination of this Decree.

447.    This Decree is enforceable only by the Parties. No person or entity is or is intended to be a third-party beneficiary of this Decree for the purposes of any civil, criminal, or administrative action. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Decree.

### E.    Partial Termination and Final Termination

448.    Partial termination is a process designed to acknowledge the City's and MPD's successful efforts, while allowing the Parties and the Monitor to focus their efforts on requirements with which the City and/or MPD has not achieved and maintained Full and Effective Compliance. Final termination marks the end of this case and the Decree.

449.    As used herein a "Discrete Section" of this Decree is a group of paragraphs that is designated by a separate primary heading. This Decree has 17 Discrete Sections, denoted with roman numerals II to XVIII (Section I contains introductory and legal provisions and does not contain requirements for compliance).

450.    A Discrete Section of this Decree is in Full and Effective Compliance when the City and/or MPD, as applicable, has demonstrated that they have incorporated into Policy all requirements of the Discrete Section, trained relevant personnel as necessary to implement those requirements in accord with Policy, and used accountability measures, such that the requirement is carried out in practice.

451.    Full and Effective Compliance exists only when maintained according to the time periods set forth as follows:

> a.    One year following the implementation of Section XI (Body-Worn Cameras) and Section XVI (Officer and Employee Assistance and Support) of this Decree; and
>
> b.    Two years following the implementation of the remainder of the Sections of this Decree.

c.   Noncompliance with mere technicalities, or a temporary and isolated failure to comply during a period of otherwise sustained compliance, will not preclude the City and MPD from demonstrating Full and Effective Compliance. Likewise, the City and MPD will not demonstrate Full and Effective Compliance by establishing temporary compliance with a requirement during a period of otherwise prolonged or repeated noncompliance.

### 1.   *Partial Termination*

452.   Either Party may move the Court at any time to terminate a Discrete Section(s) of the Decree. A Discrete Section is subject to partial termination if the City and/or MPD, as applicable, have achieved and then maintained Full and Effective Compliance with all of the requirements of the Discrete Section for the time period set forth in Paragraph 451.

453.   If the Parties disagree about whether a Discrete Section of the Decree is subject to partial termination, the moving Party shall have the burden of showing by a preponderance of the evidence that the City and/or MPD, as applicable, have achieved and maintained Full and Effective Compliance with such Discrete Section(s).  Prior to filing a contested motion for partial termination, the moving Party shall notify the other Party and the Monitor in writing of the grounds for the motion and provide supporting documentation. Within one month, the Parties will confer as to the status of compliance and, if agreement is not reached, the Monitor may conduct reasonable assessments of the grounds for the motion, including on-site observations, document reviews, or interviews with the City and/or MPD personnel. If consultation and assessment does not resolve the dispute within two months, the moving Party may file a motion to terminate Discrete Sections. The opposing Party will have six weeks after the receipt of the motion to respond, and the moving Party shall have one month to file a reply.

454.    A Discrete Section that is terminated is no longer subject to enforcement and monitoring, and the requirements of the Discrete Section are no longer part of the Decree.

## 2.    *Final Termination*

455.    Upon the Court's determination that the City and MPD have achieved Full and Effective Compliance with this Decree and maintained such compliance for the time period set forth in Paragraph 451, the Court will terminate the Decree and dismiss this case.

456.    Should a motion to terminate the Decree be filed, the Court shall hold a hearing and the burden will be on the moving party to demonstrate by a preponderance of the evidence that the City and MPD have reached Full and Effective Compliance with the requirements of this Decree and achieved and maintained that compliance for the time periods set forth in Paragraph 451.

457.    If the Parties disagree about whether final termination is appropriate, prior to filing a contested motion for final termination, the moving party will notify the other Party and the Monitor in writing of the grounds for the motion and provide supporting documentation. Within one month, the Parties will confer as to the status of compliance. If agreement is not reached, the Monitor and the opposing Party shall have at least two months to evaluate the grounds for the motion, including on-site observations, document reviews, and interviews with City and/or MPD personnel. If consultation and assessment do not resolve the dispute, the moving Party may file a motion for final termination. If the moving Party moves for termination of the Decree, the opposing Party will have two months after the receipt of the motion to respond to the motion, and the moving Party shall have one month to file a reply. If the other Party does not object, the Court may grant the moving Party's motion. If the opposing Party objects, the

Court shall hold a hearing on the motion, and the moving Party will have the burden to demonstrate that final termination is appropriate under the Decree.

## XIX.  DEFINITIONS

458.  **Adult Learning Techniques:** refers to an overall approach to training that is designed and delivered in a manner tailored for adult professionals. Adult learning techniques will prioritize active and interactive instructional approaches that provide opportunities for individuals receiving training to learn new concepts and skills and practice applying them in productive, supportive environments. Specific techniques that may be incorporated include: small-group discussions, analysis of videos of police encounters, the discussion of oral or written scenarios, role-playing exercises, in-person scenarios, and others. Adult learning approaches should also include training instructors providing timely informal feedback to employees on the quality of their performance or participation in training programs.

459.  **Arrest:** the taking of a person into custody. An arrest involves actual restraint of the person, which may be imposed by force or may result from the submission of the person arrested. An arrest is lawful when supported by probable cause.

460.  **Chemical Agents**: Substances designed to irritate the eyes, mucous membranes, and skin (e.g., OC spray, pepper balls, Mk-9 pepper foggers, smoke, etc.).

461.  **Citation**: official documentation stating that an officer has made a person aware of a violation.

462.  **Civil Disturbance:** also known as civil disorder or civil unrest, is when a gathering or assembly becomes violent or involves a collective threat of imminent violence, including but not limited to, assaults, significant property damage, arson fires, and bodily injury

to people. Isolated acts of lawbreaking or violence do not justify treating an otherwise peaceful protest as a Civil Disturbance.

463.    **Community-Based Services:** behavioral health services and supports provided in a person's home or other community settings, rather than in facility-based settings such as a hospital, jail, or residential treatment facility.

464.    **Competency-Based Training:** competency-based training is problem-based and scenario-based training which builds proficiency in the skills, abilities, judgment, and behaviors that a person needs to perform job tasks or occupational functions successfully.  Assessments to demonstrate competency at the conclusion of competency-based training will require individuals to demonstrate the requisite knowledge and skills.

465.    **Conducted Electrical Weapon/CEW**: a weapon designed primarily to discharge electrical charges into a person that cause involuntary muscle contractions and override the person's voluntary motor responses.

466.    **Criminal Misconduct**: any criminal activity by an MPD officer, including but not limited to actions that violate criminal laws and also qualify as Misconduct.

467.    **Crisis Hotlines:** 24/7 hotline support for people experiencing a behavioral health crisis. This term includes 988 and all other crisis hotlines operated in Minneapolis.

468.    **Crisis Intervention Team ("CIT") Coordinator**: an individual who is either a sworn officer at the rank of Sergeant or above or is a Mental Health Professional with demonstrated experience effectively and appropriately interacting with people who have behavioral health needs.  This individual must also have received enhanced, specialized competency-based training in instructing officers how to respond to individuals with behavioral health needs.

469. **Crisis Respite**: a setting that is operational 24/7 and provides community-based psychiatric and counseling services to people with behavioral health needs in a home-like environment.

470. **Crisis Stabilization**: a setting that is operational 24/7 and provides time-limited treatment to persons who are experiencing acute psychiatric distress.

471. **Crisis Triage Program Support**: an individual, which may be an employee of the Office of Community Safety or one of its departments, whose assignment includes support of MECC's Crisis Triage Specialists.

472. **Crisis Triage Specialist**:  MECC staff who has received enhanced specialized training in responding to individuals with behavioral health needs.

473. **Crowd Control Weapons:** any weapon (or tool used as a weapon) used to move, manage, or disperse a crowd or to address a Civil Disturbance. These include chemical aerosols, chemical munitions or projectiles (CS or OC), smoke munitions or projectiles, Impact Projectiles, impact weapons (batons, riot sticks, bicycles, or other items used as impact weapons), and light sound distraction devices.

474. **Discharge CEWs/Discharging a CEW**: using a CEW in drive-stun mode, or firing CEW probes or darts, whether or not the CEW or CEW probes/darts make contact.

475. **Enhanced CIT Specialist**: an MPD officer who has received enhanced, specialized training in responding to individuals with behavioral health needs.

476. **Field Interview**: a voluntary interaction during which officers seek to gather information about suspected criminal activity.

477. **First Amendment Event**: any gathering at which individuals are engaging in activity protected by the First Amendment of the United States Constitution. These include, but are not limited to, marches, protests, and other assemblies, whether scheduled or spontaneous.

478. **First Amendment-Protected Activity or Protected Activity:** All forms of speech and expressive conduct protected under the First Amendment of the United States Constitution, including but not limited to speech and conduct used to convey ideas and/or information, express grievances, or otherwise communicate with others and includes both verbal and non-verbal expression.

479. **Impact Projectiles:** Projectiles fired from a less-lethal launcher designed to deliver a non-penetrating, non-lethal, impact. Impact Projectiles are also known as impact munitions, kinetic impact projectiles, sponge rounds, foam-tip projectiles, bean bag projectiles, baton rounds, blunt-impact projectiles (BIP) and, colloquially, as rubber bullets. Impact Projectiles may include direct-fired rounds, which are fired directly at the target, or indirect-fired rounds, which are discharged toward the ground in front of a target.

480. **Impact Weapon**: batons or other objects used to strike people.

481. **Improvised Impact Weapon**: a device or object that is not a department-approved weapon but is nonetheless used as an Impact Weapon (e.g., flashlight, radio, or stick).

482. **Intermediate Weapon:** weapons that are not intended to cause death or serious physical injury and are not empty hand techniques. These include CEWs, chemical aerosols, chemical munitions, impact projectiles, and batons.

483. **Joint Response**: a response of a Mobile Crisis Response and one or more MPD officers.

484.    **Journalist:** A person who an officer knows or reasonably should know is, at the time of the encounter, engaged in news gathering for the purpose of disseminating news or information to the public. "Journalist" may include, but is not limited to, an employee of a newsgathering organization, independent contractor, freelancer, or a self-employed person. The following non-exclusive factors shall be considered indicia that a person is a Journalist, and all factors may be considered in light of the circumstances encountered by the officer:

a.    The person is not engaging in protest activities, not intermixing with people who are engaging in protest activities, and/or is standing apart from protesters;

b.    Visual identification as a member of the press, such as wearing a professional or authorized press badge, pass, or other official press credentials, or distinctive clothing that identifies the wearer as a member of the press;

c.    The person displays or presents professional gear such as professional photographic, videographic, or sound recording equipment;

d.    The person is engaging in journalistic activities such as photographing, recording, livestreaming, broadcasting, notetaking, or interviewing; and/or

e.    The person verbally identifies themselves as a member of the press.

485.    **MECC:** Minneapolis Emergency Communications Center.

486.    **MECC Call-Taker**: an MECC employee who receives, answers, and initially classifies 911 calls.

487.    **MECC Dispatcher**: an MECC employee who dispatches a response.

488.    **Mental Health Practitioner**: a person who meets the requirements set forth in Minn. Stat. § 245I.04, subd. 4.

489.    **Mental Health Professional**: a person who meets the requirements set forth in Minn. Stat. § 245I.04, subd. 2.

490.    **Misconduct:** a violation of MPD Policies or Procedures, including but not limited to, as specified in those Policies and Procedures: violations of federal, state, or local criminal or applicable civil laws, criminal or civil constitutional violations, violations of administrative rules, or violations of regulations.

491.    **Mobile Crisis Response**: a team of at least two individuals, who are not MPD officers, who respond to incidents involving and emergency calls for assistance for people exhibiting behavioral health issues. The City's Behavioral Crisis Response (BCR) team, for example, is a Mobile Crisis Response.

492.    **Neck Restraint or Choke Hold**: means a method by which a person applies sufficient pressure to a person to make breathing difficult or impossible and includes but is not limited to any pressure to the neck, throat, or windpipe that may prevent or hinder breathing, or reduce intake of air. A Neck Restraint or Choke Hold also means applying pressure to a person's neck on either side of the windpipe, but not to the windpipe itself, to stop the flow of blood to the brain via the carotid arteries.

493.    **Peer Support Specialist**: a person who has lived experience of mental illness and who is certified through the State of Minnesota to provide direct mental health services.

494.    **Policy/Protocol/Procedure**: regulations or directives of MPD or the City, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of MPD and/or City personnel or other agents, and/or providing direction on how to fulfill those duties, functions, and obligations.

495. **Prohibit**: to promulgate a Policy and/or Procedure, train on that Policy and/or Procedure, and use accountability measures, such that the prohibition is carried out in practice.

496. **Public Safety Statement**: information about a police shooting or firearm discharge that contains time-sensitive fundamentals about the incident that the first responding Supervisor elicits from the involved officer(s) for the purposes of providing officer and public safety, and to assist in apprehending outstanding suspects.

497. **Quality-of-Life Offenses:** consuming alcoholic beverages in public, begging/panhandling, possession of marijuana paraphernalia, loitering (excluding loitering with intent to sell or distribute narcotics or with intent to solicit for the purposes of prostitution), and any other offenses categorized as "Quality-of-Life" offenses by MPD Policy.

498. **Reportable Force:** any Use of Force that falls within Level 1, Level 2, or Level 3 Reportable Force, as defined in this Decree.

499. **Require:** to promulgate a Policy and/or Procedure, train on that Policy and/or Procedure, and use accountability measures, such that the requirement is carried out in practice.

500. **Retaliation:** taking adverse action in response to First Amendment-Protected Activity, when the officer would not have taken such action in the absence of (but for) the First Amendment-Protected Activity. "Adverse Action" includes any action that would chill a person of ordinary firmness from continuing the First Amendment-Protected Activity, including but not limited to uses of force, arrests, and threats of force and arrest.

501. **Search:** an inspection of a person's house, body, clothing, vehicle, or property or other intrusion on a privacy interest by an officer for the purpose of discovering evidence of a crime or a person who is accused of a crime.

502.    **Secondary Employment**: off-duty security or law-enforcement work outside the scope of MPD duties that results in or is anticipated to result in compensation.

503.    **Stop**: a brief, involuntary detention of a person for investigative or enforcement purposes. **A Stop** occurs when a person is not taken into custody or arrested, but reasonably believes that they are not free to leave based on the circumstances, including officers' conduct, regardless of the officers' intent. A **Vehicle Stop** is a Stop of a person or persons in a vehicle. A **Traffic Stop** is a Vehicle Stop for the purpose of enforcing the traffic code. A **Pedestrian Stop** is a stop of a person who is not in a vehicle.

504.    **Supervisor**: a sworn MPD employee at the rank of Sergeant or above (or anyone acting in those capacities) with oversight responsibility for MPD personnel.

505.    **Weapons Pat-Down (or Pat-Down)**: a brief, non-invasive inspection of the outer layers of a person's clothing for weapons. Any inspection beyond the outer layers of a person's clothing or to look for contraband other than a weapon is a Search.

506.    **Youth:** a person who is younger than 18 years old.

It is so ordered, this _____ day of _____, 2025.

_____

United States District Court Judge

IN WITNESS WHEREOF, the Parties hereto have caused this Decree to be signed in their respective names by their respective duly authorized officers.

For Plaintiff UNITED STATES OF AMERICA:


KRISTEN CLARKE                                                January 6, 2025
Assistant Attorney General                                   Date
Civil Rights Division


REGAN RUSH
Chief, Special Litigation Section
Civil Rights Division


CYNTHIA COE
Deputy Chief, Special Litigation Section
Civil Rights Division


KATIE CHAMBLEE-RYAN
PATRICK KENT
DANA PAIKOWSKY
LILY SAWYER-KAPLAN
AMY SENIER
Trial Attorneys, Special Litigation Section
Civil Rights Division
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 514-2000

164

ANA VOSS
Chief, Civil Division
United States Attorney's Office
District of Minnesota
*Attorney for the United States Acting Under Authority*
*Conferred by 28 U.S.C. § 515*

BY: BAHRAM SAMIE (#0392645)
Deputy Chief, Civil Division
United States Attorney's Office
District of Minnesota


KRISTEN E. RAU (#0397907)
Assistant United States Attorney
United States Attorney's Office
District of Minnesota
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600

For Defendant CITY OF MINNEAPOLIS:


_____

JACOB FREY
Mayor, City of Minneapolis

_January 6, 2025_
Date


_____

KRISTYN ANDERSON (#0267752)
Minneapolis City Attorney
ADAM E. SZYMANSKI (#0397704)
Assistant Minneapolis City Attorney
Minneapolis City Attorney's Office
350 S. 5th Street, Room 210
Minneapolis, MN 55415
(612) 673-3000

_January 6, 2025_
Date